# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| WILLIAM PARRISH, Individually and On Behalf of Others Similarly Situated, | **Case No.: 5:16-cv-00417-DAE**<br>Collective Action |
| v. | Judge David A. Ezra |
| PREMIER DIRECTIONAL DRILLING, L.P. | Magistrate John W. Primomo |

## PARRISH'S MOTION FOR SUMMARY JUDGMENT AS TO EMPLOYEE STATUS, LIABILITY / BACKWAGES, AND PREMIER'S GOOD FAITH DEFENSE

Respectfully submitted,

**BRUCKNER BURCH PLLC**
  Richard J. (Rex) Burch
  Texas Bar No. 24001807
  Matthew S. Parmet
  Texas Bar No. 24069719
8 Greenway Plaza, Suite 1500
Houston, Texas 77046
Telephone:    (713) 877-8788
Telecopier:    (713) 877-8065
rburch@brucknerburch.com
mparmet@brucknerburch.com

**JOSEPHSON DUNLAP LAW FIRM**
  Michael A. Josephson
  Texas Bar No. 24014780
  Andrew W. Dunlap
  Texas Bar No. 24078444
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Telephone:    (713) 352-1100
Telecopier:    (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

**Attorneys in Charge for Plaintiffs**

TABLE OF CONTENTS

A.      SUMMARY ....................................................................................................1

B.      ARGUMENT & AUTHORITIES ON EMPLOYEE STATUS ........................................2

     1.      Summary judgment standard. ....................................................................2

     2.      Parrish and the other DDs are entitled to overtime as employees of Premier. .................3

         2.1.      The FLSA defines "employment" broadly to cover more workers and further its remedial purpose. ...............................................................3

     3.      The economic realities test confirms Plaintiffs are Premier's employees. ............................4

     4.      First Factor: Premier exercised control over Plaintiffs. .............................................4

         4.1.      Premier had total contractual control. ...............................................5

         4.2.      Premier supervised the work of IC DDs. ...........................................7

         4.3.      Premier required its IC DDs to adhere to its training requirements. ...........................7

     5.      Second Factor: Premier's investments significantly exceeded the DD's relative investments, if any. ............................................8

     6.      Third Factor: Premier controlled the DDs opportunity for profit and loss. ..................10

     7.      Fourth Factor: No special skill and initiative is required to be a Premier DD. ..................12

     8.      Fifth Factor: Plaintiffs' permanence is consistent with the operational characteristics intrinsic to Premier's directional drilling business. ....................................13

C.      ARGUMENT AND AUTHORITIES ON PLAINTIFFS' CALCULATION OF BACK WAGES.......... 14

     1.      Misclassified employees are entitled to back wages. ....................................14

     2.      Estimated hours are an accepted method to determine back wages. ................16

     3.      Plaintiffs use halftime for overtime to calculate the back wages. ........................16

D.      ARGUMENT & AUTHORITIES ON PREMIER'S GOOD FAITH AFFIRMATIVE DEFENSE .... 16

     1.      Summary judgment standard when the non-movant bears the burden of proof. ............16

     2.      The good faith defense is subject to summary disposition. ................................17

     3.      Premier's good faith affirmative defense fails as a matter of law. ........................17

         3.1.      To avoid liquidated damages, Premier must show both subjective good faith and an objectively reasonable basis for the way it paid Plaintiffs. ....................17

     4.      Premier cannot claim apathetic ignorance of the FLSA as a defense. ..................18

     5.      The evidence shows Premier cannot meet its burden on good faith defense. ..................19

E.      CONCLUSION ....................................................................................20

# Table of Exhibits

| Ex. | Document |
|-----|----------|
| 1 | Deposition excerpts |
| 2 | Consultant Agreement (Directional Personnel) |
| 3 | DD Consultant Requirements (Directional Personnel) |
| 4 | Non-Disclosure and Confidentiality Agreement |
| 5 | Pay Rate Schedule 1 |
| 6 | Pay Rate Schedule 2 |
| 7 | Travel Pay Schedule |
| 8 | Pay Date Schedule |
| 9 | 2014 Pay Calendar |
| 10 | Alfaro Separation Form |
| 11 | Robbins Separation Form |
| 12 | Premier Financial Audits |
| 13 | MWD Tool Invoices |
| 14 | Dell Invoice |
| 15 | WinServe Invoices |
| 16 | Billing invoices to Premier customers |
| 17 | Email regarding well plans |
| 18 | Email regarding training 1 |
| 19 | Email regarding training 2 |
| 20 | Email regarding training 3 |
| 21 | Email regarding training 4 |
| 22 | Email regarding training 5 |
| 23 | Email regarding training 6 |
| 24 | Email regarding training 7 |
| 25 | Emails regarding policies and procedures |
| 26 | Email regarding travel pay |
| 27 | Email requiring use of JSA forms |
| 28 | Emails regarding Level 2 contract hands |
| 29 | Email regarding directions |

| Ex. | Document |
|-----|----------|
| 30 | Parrish's Pay Stubs |
| 31 | Alfaro's Pay Stubs |
| 32 | Beckett's Pay Stubs |
| 33 | Ellestad's Pay Stubs |
| 34 | Robbins' Pay Stubs |
| 35 | Parrish's First Invoice |
| 36 | Alfaro's First Invoice |
| 37 | Robbins' First Invoice |
| 38 | Master Services Agreements |
| 39 | Premier's Amended Objections and Answers to Pls' Interrogatories |
| 40 | Allis-Chalmers Complaint |
| 41 | Premier's Signed Stipulation as to Relative Investments, May 11, 2017 |
| 42 | Plaintiffs' Damages Summary |
| 43 | Decl. of Andrew W. Dunlap, Jul. 21, 2017 |

## Cases

*Albanil v. Coast 2 Coast, Inc.*, No. CIVAH-08-486, 2010 WL 1404120 (S.D. Tex. Mar. 31, 2010)..........15

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)............................................... 15, 16

*Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436 (10th Cir. 1998)..........................................12

*Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464 (5th Cir. 1979).....................................18, 19

*Bernard v. IBP, Inc. of Nebraska*, 154 F.3d 259 (5th Cir.1998)................................................18

*Bolick v. Mgmt. by Skylane, LLC*, No. H-07-2261, 2008 WL 4589961 (S.D. Tex. Oct. 14, 2008)..... 18, 19

*Breaux and Daigle, Inc. v. United States*, 900 F.2d 49 (5th Cir. 1990) ..............................................4

*Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042 (5th Cir. 1987) ....................................5, 10, 11, 14

*Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988) ..................................................... 8, 14

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945)................................................................17

*Broussard v. Parish of Orleans*, 318 F.3d 644 (5th Cir. 2003)....................................................3

*Brown v. Family Dollar Stores of IN, LP*, 534 F.3d 593, 595 (7th Cir. 2008).............................16

*Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 333 (5th Cir. 1993) ...........................................10

*Chapman v. A.S.U.I. Healthcare of Texas, Inc.*, C.A. No. H-11-3025, 2012 WL 3614187 (S.D. Tex. Aug. 21, 2012)..........................................................................................................5, 8, 10, 11

*Clark v. Centene Co. of Texas, L.P.*, 104 F.Supp.3d 813 (W.D. Tex. 2015)..................................15

*Donovan v. Am. Airlines, Inc.*, 686 F.2d 267 (5th Cir. 1982) ......................................................4

*Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261 (5th Cir. 1987) ...................................................11

*Hayes v. Primavera Primary Home Care, Inc.*, No. SA-16-CV-575-XR, 2017 WL 564115 (W.D. Tex. Feb. 10, 2017) ...........................................................................................................................3

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299 (5th Cir. 1998) .....................12

*Hopkins v. Cornerstone Am.*, 512 F.Supp.2d 672 (N.D. Tex. 2007)...........................................12

*Hopkins v. Cornerstone Am.*, 545 F.3d 338 (5th Cir. 2008) .............................................3, 4, 5, 8

*Karna v. BP Corp. N. Am., Inc.*, C.A. No. H-12-0101, 2013 WL 1155485 (S.D. Tex. Mar. 19, 2013) ......................................................................................................................................passim

*Karr v. City of Beaumont*, 950 F. Supp. 1317 (E.D. Tex. 1997) ...........................................18, 19

*LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260 (5th Cir. 1986)........................................18, 19

*Lee v. Coahoma Cnty., Miss.*, 937 F.2d 220 (5th Cir. 1991) .....................................................18

*Martin v. Priba Corp.*, No. 3:91-CV-2786-G, 1992 WL 486911 (N.D. Tex. Nov. 6, 1992).......................5

*Mireles v. Frio Foods*, 899 F.2d 1407 (5th Cir. 1990) ..............................................................18

*Mitchell v. John R. Cowley & Bro, Inc.*, 292 F.2d 105 (5th Cir. 1961)...........................................14

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992)............................................................4

*Nieddu v. Lifetime Fitness, Inc.*, 38 F.Supp.3d 849 (S.D. Tex. 2014) ..............................................15

*Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942) ..........................................................17

*Reich v. Southern New England Telecomms Corp.*, 121 F.3d 58 (2d Cir. 1997) ................................16

*Reich v. Tiller Helicopter Servs., Inc.*, 8 F.3d 1018 (5th Cir. 1993) ...............................................17

*Reich v. Tiller Helicopter Svcs., Inc.*, 8 F.3d 1018 (5th Cir. 1993) ................................................17

*Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662 (5th Cir. 1983) ..............................................4

*Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496 (5th Cir. 1999) ...................................................17

*Sales v. Bailey*, No. 2:12-CV-00056-SA-SAA, 2014 WL 3897726 (N.D. Miss. Aug. 8, 2014) ................15

*Singer v. City of Waco, Tex.*, 324 F.3d 813 (5th Cir. 2003) ...........................................................18

*Solis v. Hooglands Nursery, L.L.C.*, 372 Fed.Appx. 528 (5th Cir. 2010) ........................................17

*Transamerica Ins. Co. v. Avenell*, 66 F.3d 715 (5th Cir. 1995) ......................................................17

*United States v. Rosenwasser*, 323 U.S. 360 (1945) ......................................................................4

*Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419 (1945) .........................................15

*Walton v. United Consumers Club, Inc.*, 786 F.2d 303 (7th Cir. 1986) ....................................18, 19

*Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527 (3d Cir. 2012) ........................................................4

*Zavala v. Wal-Mart Stores, Inc.*, 393 F.Supp.2d 295 (D.N.J. 2005) ..............................................4

**Statutes**

29 U.S.C. § 203 ........................................................................................................................3

29 U.S.C. § 207 ...................................................................................................................3, 15

29 U.S.C. § 216 .................................................................................................................14, 17

29 U.S.C. § 260 .................................................................................................................17, 18

**Rules**

FED. R. CIV. P. 56 ....................................................................................................................3

**Regulations**

29 C.F.R. § 778.109 ................................................................................................................15

29 C.F.R. § 778.112 ................................................................................................................15

29 C.F.R. § 790.22 ..................................................................................................................17

**Other Authorities**

Richard J. Burch, *A Practitioner's Guide to Joint Employer Liability under the FLSA*, 2 HOUS. BUS. & TAX. L.J. 393 (2002) ..................................................................................................................4

## A.     SUMMARY

Premier Directional Drilling, L.P. ("Premier")—a directional drilling company—misclassified

its directional drillers ("DDs") (i.e., Plaintiffs) as independent contractors ("ICs") and paid them a flat

day rate without any overtime compensation. Premier's misclassification of its **most "integral"**

**employees** and its failure to pay them overtime violates the Fair Labor Standards Act ("FLSA").

Plaintiffs move for summary judgment because Premier's own corporate representatives and

managers confirm Premier and Plaintiffs have an employer-employee relationship:

| | |
|---|---|
| **Integral part of employer's business** | Q.  I would imagine that directional drillers are -- are key to a directional drilling business, right?<br>**A.  They're a integral part of a -- a bigger picture, other services, other people.[1]** |
| **Managerial skills affect profit and loss** | Q.    Okay.   And Premier determines what level the independent contractors are, correct?<br>**A.  Yes.**<br>Q.   Okay.  And Premier decides what their corresponding pay rate per level is going to be, correct?<br>**A.  Yes.[2]** |
| | Q.  If a consultant DD makes a mistake on a job, are they charged back for that?<br>**A.  Not that I am aware of.[3]** |
| | Q.  And so William Parrish would have been free to send somebody else to do a job that you offered?<br>**A.  I'm sure he would have been free to do it, but we probably wouldn't have allowed that to happen because we don't know the person he's sending.[4]** |
| **Relative investments** | Q.  Right.  You're paying the directional hands, right?  You're paying the MWDs, right?<br>**A.  We're paying for the people on location.**<br>Q.  Right.<br>**A.  We're paying for the equipment on location.[5]** |

---

[1] Ex. 1-B, Kennedy, at 266:22-267:1.
[2] Ex. 1-E, Oliver, at 65:12-19.
[3] Ex. 1-C, Menard, at 267:24-269:1.
[4] Ex. 1-C, Menard, at 276:19-23.
[5] Ex. 1-B, Kennedy, at 252:20-25.

| Skill and initiative | Q.  Is the work any different that's being performed by an employee DD versus a consultant DD? <br> **A.  On the job site, no.**[6] |
|---|---|
| **Permanency of worker relationship** | Q.  Okay.  You've had independent contractors that worked for Premier for years; isn't that correct? <br> **A.  Yes.**[7] |
| **Control by employer** | Q.  As an independent contractor directional driller at Premier, Premier expected that those individuals followed Premier's policies and procedures, correct? <br> **A.  Yes.**[8] |

Plaintiffs also move for summary judgment on the backwages owed them under the FLSA, because: (1) it is undisputed that Plaintiffs worked 12 hours a day; and (2) Plaintiffs accept as correct the records Premier produced showing Plaintiffs' pay received and days worked. Plaintiffs calculated damages using Premier's own records and assumptions. Plaintiffs' calculations show that Plaintiffs are entitled to $181,711.00 in back wages. Finally, Premier has no evidence to support its good faith defense—and in fact, evidence shows that Premier did not know FLSA independent contractor standards, was unfamiliar with the FLSA generally, did not do any investigation into independent contractor status or the FLSA, and did not rely on the advice of counsel pre-2015. Plaintiffs therefore move for summary judgment awarding liquidated damages in an amount equal to their backwages.

Because there is no material dispute of fact, Plaintiffs are entitled to summary judgment with respect to: (1) their status as employees; (2) the number of hours Plaintiffs worked; (3) Plaintiffs' rates of pay; (4) Plaintiffs' backwages; and (5) Premier's good faith defense (and their liquidated damages).

**B.**  ARGUMENT & AUTHORITIES ON EMPLOYEE STATUS

**1.**  **Summary judgment standard.**

Courts should grant summary judgment if no genuine issue of material fact exists and the

---

[6] Ex. 1-C, Menard, at 212:7-10.
[7] Ex. 1-A, Geoffroy, at 94:19-22.
[8] Ex. 1-E, Oliver, at 69:14-19.

moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Broussard v. Parish of Orleans*, 318 F.3d 644, 650 (5th Cir. 2003). Summary judgment must be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with sworn statements, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

> **2.      Parrish and the other DDs are entitled to overtime as employees of Premier.**

The FLSA requires covered employers to pay employees (including those misclassified as "independent contractors") at 1.5 times their regular rate for all hours worked in excess of 40 hours during a workweek. 29 U.S.C. § 207(a)(1); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008), *cert. denied*, 556 U.S. 1129 (2009) (rejecting employer's argument that plaintiffs were independent contractors because they had "contractually agreed to be, and actually believed themselves to be independent contractors," because subjective beliefs cannot change employee status under the FLSA); *Karna v. BP Corp. N. Am., Inc.*, C.A. No. H-12-0101, 2013 WL 1155485, at *7 (S.D. Tex. Mar. 19, 2013) (finding employees classified as independent contractors were employees under the FLSA and granting partial summary judgment on employment status).

> **2.1.      The FLSA defines "employment" broadly to cover more workers and further its remedial purpose.**

"The definition of employee under the FLSA is particularly broad." *Hopkins*, 545 F.3d at 343. The FLSA broadly defines "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). This "mean[s] that an alleged employee spent time performing a principal activity for the benefit of the alleged employer." *Hayes v. Primavera Primary Home Care, Inc.*, No. SA-16-CV-575-XR, 2017 WL 564115, at *2 (W.D. Tex. Feb. 10, 2017) (Rodriguez, J.). Congress intended this definition to cover far more than just "common law" workers. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324-25 (1992).

Indeed, "The term 'employee' is … used [in the FLSA] in in the **broadest sense ever … included in any act**." *E.g.*, *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 665 (5th Cir. 1983) (citing

*Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 271 (5th Cir. 1982)) (emphasis added) (some ellipses in original) (internal quotation marks omitted); *see also, e.g., Nationwide Mut. Ins. Co.*, 503 U.S. at 326 ("[The FLSA] stretches the meaning of 'employee' to cover some parties who might not qualify under a strict application of traditional agency law principles.").

"These broad definitions have been considered consistent with the remedial purposes of the FLSA. They were aimed, in part, at eliminating the practices of companies who sought to reduce their labor costs (and to avoid their obligations under federal labor laws) by using illegitimate contractors." *Zavala v. Wal-Mart Stores, Inc.*, 393 F.Supp.2d 295, 327 (D.N.J. 2005), *aff'd sub nom. Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527 (3d Cir. 2012) (citing *United States v. Rosenwasser*, 323 U.S. 360, 363 & n. 3 (1945); Richard J. Burch, *A Practitioner's Guide to Joint Employer Liability under the FLSA*, 2 HOUS. BUS. & TAX. L.J. 393, 406 (2002)). What's more, to achieve the FLSA's purposes, any doubts regarding a worker's employment status must be resolved in favor of employment. *See Breaux and Daigle, Inc. v. United States*, 900 F.2d 49, 52 (5th Cir. 1990).

### 3.   The economic realities test confirms Plaintiffs are Premier's employees.

To determine whether an individual is an employee under the FLSA, the Fifth Circuit considers whether "as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins*, 545 F.3d at 343. To aid in this determination, courts consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the workers and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Id.* No single factor is determinative. *Id.*

### 4.   First Factor: Premier exercised control over Plaintiffs.

Degree of control refers to whether the plaintiff possesses "real independence" in the

economic relationship. *See Hopkins*, 545 F.3d at 343. The Fifth Circuit makes clear, "[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Id.* (citing *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1049 (5th Cir. 1987)) (brackets in original). But a defendant cannot counterfeit control; "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Id.* And the fact that a worker has discretion in how he performs his responsibilities does not make him an independent contractor. *Id.*; *Karna*, 2013 WL 1155485, at *9. An employee is not transformed into a separate economic entity simply because he is not micro-managed in the performance of his everyday tasks. *Karna*, 2013 WL 1155485, at *9.

Where an employer controls the "meaningful economic aspects" of the business, the control factor weighs heavily in favor of employee status. *Hopkins*, 545 F.3d at 343-44 (finding control factor weighed in favor of employee status where sales leaders did not control personnel issues, advertising, the products they sold, and the number of leads they received); *Karna*, 2013 WL 1155485, at *8-9 (finding control factor weighed in favor of employee status where employees were expected to work the number of hours needed by the employer and the employer alleged it told the workers only the tasks that needed to be completed without detailed instructions); *Chapman v. A.S.U.I. Healthcare of Texas, Inc.*, C.A. No. H-11-3025, 2012 WL 3614187, at *4 (S.D. Tex. Aug. 21, 2012) (finding control factor weighed in favor of employee status where employer controlled the meaningful aspects of the business, such as selecting clients, hiring staff, and assigning workers to shifts); *Martin v. Priba Corp.*, No. 3:91-CV-2786-G, 1992 WL 486911, at *4 (N.D. Tex. Nov. 6, 1992) (refusing to find independent contractor status where, as here, workers' economic status was intrinsically linked to conditions over which the employer had absolute control, including timing of shifts and advertising).

### 4.1.    Premier had total contractual control.

Premier maintained control over everything Plaintiffs did, including on location, through its

Master Services Agreements ("MSAs") with Premier's clients and through the Consultant Agreement that Premier required Plaintiffs to sign. *See*, *e.g.*, Exs. 2, 38. Premier even warrantied that the work it performed would meet the quality and performance standards set forth by the client and that it (and not any individual DDs or other subcontractor) would strictly comply with all performance obligations and deadlines. Ex. 38.

Premier required its IC DDs to utilize approved staffing companies, complete "onboarding" paperwork, and sign a non-disclosure agreement before it would assign the DDs to any job. Exs. 3, 4; Ex. 1-A, Geoffroy, at 39:7-41:16, 50:7-12, 59:20-23, 62:4-63:4; Ex. 1-B, Kennedy at 108:8-23. The onboarding process also included a background check and a drug testing prerequisite. Ex. 1-A, Geoffroy, at 42:7-13, 61:17-20.

Premier's Consultant Agreements dictated the manner in which they performed their work and waived certain legal rights. Ex. 2. For instance, the Consultant Agreements obligated the DDs to follow the policies and procedures of the oilfield services companies to which Premier assigned them and to perform their work in a "good and workmanlike manner." Ex. 2, C.A., at ¶¶ 1, 2. In this regard, Premier regularly dictated what it expected from its DDs. *Id.* Premier also maintained the right to observe and inspect the work performed by its DDs to ensure the work was being performed in accordance with Premier's policies, procedures, and other requirements. *Id.*

Premier also expressly limited DDs' ability to work for other companies (1) indirectly, through MSAs with its clients, and (2) directly, through its Consulting Agreement, which included non-solicitation clauses and other clauses contractually binding the Consultants to finish jobs Premier assigned them to. Ex. 2, C.A., at ¶ 6. The Consultant Agreements contained non-compete clauses requiring the Consultants to provide Premier with 30 days' notice prior to quitting. *Id.* And the Consultant Agreements expressly prohibited DD from having any other person perform work. *Id.* at ¶ 10. In fact, Premier's Consultant Agreement expressly required the DDs to surrender any ability to

market themselves and to instead rely on Premier as their exclusive "Marketing Agent." *Id.* at ¶ 6.

### 4.2. Premier supervised the work of IC DDs.

Premier assigned IC DDs to its job sites for its clients. Premier placed each IC DD under the supervision of a Premier DD Coordinator. Ex. 1-B, Kennedy, at 137:8-138:14, 142:9-13, 175:6-19, 211:19-25; Ex. 1-E, Oliver, at 46:19-47:13, 101:4-102:19. DD Coordinators supervised the IC DDs by doing the following:

- Interviewing potential IC DDs. Ex. 1-C, Menard, at 63:18-23.
- Hiring IC DDs. Ex. 1-B, Kennedy, at 284:6-9; Ex. 1-E, Oliver, at 52:9-53:16, 54:21-58:9.
- Promoting IC DDs to a higher level. Ex. 1-E, Oliver, at 31:3-32:6, 58:17-59:12, 118:17-120:12.
- Terminating IC DDs relationship with Premier. Ex. 1-B, Kennedy, at 169:24:170:17; Ex. 1-E, Oliver, at 48:22-49:23, 50:18-51:01.
- Swapping employee DDs to IC DDs. Ex. 10, 11; Ex. 1-A, Geoffroy, at 45:22-46:02.
- Approving time off requests for IC DDs. Ex. 1-B, Kennedy, at 242:11-19; Ex. 1-E, Oliver, at 85:25-86:25.
- Providing IC DDs with job-specific information. Ex. 1-A, Geoffroy, at 36:20-37:16; Ex. 1-C, Menard, at 152:12-25, 153:12-14, 183:6-184:13, 256:8-22; Ex. 1-E, Oliver, at 77:19-78:1; Exs. 17, 25, 29.
- Ensuring IC DDs followed the job packet—containing, among other things, the well plan—provided by Premier. Ex. 1-E, Oliver, at 40:5-17. DDs were also required to follow the program ("prog") from the Premier's client. *Id.* at 40:18-47-1.
- Ensuring IC DDs followed Premier's policies and procedures. Ex. 1-A, Geoffroy, at 53:21-54:22, 55:20-56:1, 82:19-22, 90:5-8, 90:14-24; Ex. 1-B, Kennedy, at 213:2-214:7; Ex. 1-C, Menard, at 81:22-82:15, 147:17-22, 148:5-7, 211:20-212:10; Ex. 1-E, Oliver, at 69:14-19, 71:10-15, 75:2-12, 77:1-4, 84:20-24, 90:7-25; Exs. 22, 25, 27.

Moreover, Premier's DD Coordinators provide the same supervision to employee and IC DDs alike. Ex. 1-E, Oliver, at 106:14-21; Ex. 1-E, Oliver, at 33:21-34:11, 210:21-211:02.

### 4.3. Premier required its IC DDs to adhere to its training requirements.

Even though Plaintiffs worked for Premier as IC DDs, they were not exempt from Premier's rigorous training requirements. Ex. 1-C, Menard, at 321:1-11. Plaintiffs were required to complete mandatory training modules to receive various safety related issues from Premier regularly—that is, at least once each month. Ex. 18 ("These topics are part of Premier complying with standards by OSHA

and our industry to annually educate or to monthly train **our employees** on the hazards of our field." (emphasis added)). Chief among Premier's concerns was how training of all DDs would reflect on it **as a company**. Ex. 19 ("This number moving forward can adversely affect us **as a company** and the only way to improve this number is to log hours in without a recordable. These monthly safety certification tests can be used as an indication of commitment towards a safety program in the workplace." (emphasis added)). Exs. 17, 20, 21, 23, 26.

> **5.    Second Factor: Premier's investments significantly exceeded the DD's relative investments, if any.**

To determine the degree of economic independence, the Court must measure the investment of the individual worker compared to the investment of the purported employer. *See Hopkins*, 545 F.3d at 344. Where a purported employer has provided a significant amount of risk capital and the worker has provided only a minimal investment, an employer-employee relationship is more likely to be found. *See, e.g., id.* In circumstances where the alleged employer refers "temporary" personnel to third-parties in need of workers, the relative investment factor weighs in favor of employee status where the worker's investment is "negligible" compared to a company that referred the workers. *See, e.g., Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-60 (2d Cir. 1988) (finding this factor weighed in favor of employee status where, as here, the corporation maintained staff to make job assignments, contracted with clients, and maintained payroll); *Chapman*, 2012 WL 3614187, at *4 (finding this factor weighs in favor of employee status where company controlled the workers' opportunity for work, assigned them to jobsites, told them their schedules, and called them to cover job assignments, if necessary).

Here, there is no question that Premier's investment in its directional drilling services far surpasses the limited investment, if any, made by its DDs. And Premier so admitted in multiple Court filings with the Court and a signed stipulation. Ex. 41.

Premier Directional Drilling is certainly a "directional drilling" company whose revenue

depends largely on its DDs' work for its clients. As Premier CEO Michael Kennedy confirms, the DDs are an "integral part" of Premier's business. Ex. 1-B, Kennedy, at 83:24-84:2, 86:25-87:4, 89:7-90:9, 203:12-204:3, 266:22-267:1, 271:25-272:7; *see* Ex. 1-C, Menard, at 119:23-120:8, 279:19-280:5; Ex. 1-E, Oliver, at 35:9-18, 46:19-25.

In order to operate, Premier invested considerable money in operational costs for:

- office space (around $19,000.00 per month)
- liability and property insurance (around $500,000.00 per year)
- employee benefits (at least $750,000.00 per year)
- computers (around $1,000.00 to $1,500.00 each for "less than a hundred")
- accounting and payroll services along with workers' compensation insurance, provided by a related company (around $1.5 million per month).

Ex. 1-F, Schmidt, at 64:24-65:2, 92:25-93:9, 137:13-138:25. That is exclusive of other costs to keep Premier running, such as telephone lines, computer servers, and office supplies and equipment.

Plus, Premier provided expensive oilfield machinery and other field equipment necessary for DDs to do their jobs.

- 16 EVO tools (approximately $800,000 each—with a principal and interest payment of $130,000 per month)
- 7 electromagnetic survey ("EM") tools
- WinServe subscriptions for DD reporting software (around $4,000 to $5,000 per year per computer)
- computers (around $1,000.00 to $1,500.00 each for around 25 rig-assigned laptops)
- Rental of mud motors (between $90 and $150 per operating hour)

Ex. 39, at Rogs 18, 21, Ex. 1-F, Schmidt, at 65:6-66:3, 67:15-22, 82:22-83:5, 95:10-13, 161:13-22. All of this operating equipment, and more, was provided by Premier and its clients. Ex. 1-B, Kennedy, at 240:12-17; Ex. 1-E, Oliver, at 102:20-104:22. And that still doesn't account for the cost of measurement while drilling personnel ("MWDs"), whose work is essential to the DD's job, and whose pay was provided solely by Premier. Ex. 1-B, Kennedy, at 138:17-141:6, 157:14-25, 176:12-177:16, 177:24-178:19, 252:10-25; Ex. 1-C, Menard, at 155:4-13, 160:7-9, 164:11-22; Ex. 1-E, Oliver, at 43:20-45:11, 45:24-46:1, 98:13-20. Premier also supplied the software and computers for employee and IC

DDs, if needed. Ex. 1-B, Kennedy, at 146:7-19; Ex. 1-C, Menard, at 141:18-143:12, 145:16-25, 245:15-247:10, 249:12-250:1. None of these costs were passed back to the DDs—including pay of the MWD hand. Ex. 1-B, Kennedy, at 138:17-141:6, 151:22-152:1.

In contrast to the substantial investment made by Premier, the DD's investments were limited to basic items any oilfield employee would supply for themselves, such as tally books, a caliper, a scientific calculator, a tape measure, and personal protective equipment, such as a hard hat, steel-toed boots, safety goggles, gloves, and fire-retardant clothing. Ex. 1-E, Oliver, at 38:9-40:4, 81:20-83:16; Ex. 1-B, Kennedy, at 145:16-145:20, 215:5-216:17; Ex. 1-C, Menard, at 293:20-294:22.

The relative investment isn't even close. Premier was spending tens of thousands of dollars per job and hundreds of thousands of dollars per month on oilfield equipment alone—and millions when accounting for operating costs. Ex. 12. In contrast, DDs spent hundreds of dollars per year (to be generous). The investment factor weighs **heavily** in favor of determining the DDs are employees.[9]

6.    **Third Factor: Premier controlled the DDs opportunity for profit and loss.**

Where the determinants of profit and loss are established by the purported employer, an employment relationship is more likely to be found. *See, e.g., Mr. W. Fireworks, Inc.*, 814 F.2d at 1050-51; *Karna*, 2013 WL 1155485, at *10-11; *Chapman*, 2012 WL 3614187, at * 5. The Fifth Circuit has found that employee status is supported when a company controls the hours an individual works and their rate of pay. *See Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 333 (5th Cir. 1993) (noting that when an employer has control over hours worked and rates of pay that employee status is supported, but finding independent contractor status strictly because workers' year-end profits depended on their ability to consistently find other welding work and minimize welding costs); *see also Karna*, 2013 WL

---

[9] Surely, Premier's financial documents would show additional investment by Premier, but it has refused to follow the Court's Order and produce those records.

1155485, at *10-11 (noting that a worker's opportunities for profit and loss were indicative of independent contractor status only where they could control how much they earned from working for the defendant); *Chapman*, 2012 WL 3614187, at *5 (finding this factor weighed in favor of employee status where company determined workers' hours and rates of pay and where workers' only costs were their uniforms).

Importantly, "minor additional income made from work which is not connected with the actual business under examination is not relevant to a court's determination of employee status." *Mr. W. Fireworks, Inc.*, 814 F.2d at 1049; *see also Karna*, 2013 WL 1155485, at *10. And a worker's income from entirely unrelated activities is not evidence that the worker controlled his opportunities for profit and loss with regard to his work. *See Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 267-68 (5th Cir. 1987) ("Economic dependence is not conditioned on reliance on an alleged employer for one's primary source of income … the proper test … examines whether the workers are dependent on a particular business or organization for their continued employment in that line of business.").

Here, Premier unilaterally decided to pay IC DDs a day rate regardless of hours worked, instead of a salary or otherwise. Ex. 1-B, Kennedy, at 214:08-215:25, 282:23-283:2; Ex. 1-E, Oliver, at 115:7-25. Just like its employee DDs, Premier required IC DDs to work at least 12 hours a day. Ex. 1-C, Menard, at 296:19-297:12. Premier also set employee and DD pay rates according to the same scale, based solely on their field experience. Exs. 5, 6, 7, 9, 28; Ex. 1-A, Geoffroy, at 52:5-17; Ex. 1-B, Kennedy, at 60:7-61:10, 78:12-80:15; Ex. 1-C, Menard, at 306:24-307:6; Ex. 1-E, Oliver, at 33:10-34:16, 59:20-62:15, 63:14-63:19, 65:12-19, 119:04-120:12; Ex. 1-D, Selby, at 51:8-17, 52:11-54:11. Premier even dictated the date that payment would be issued. Ex. 1-E, Oliver, at 63:3-10; Ex. 8. And Premier billed its clients the same whether employees or IC DDs were staffed to the job. Ex. 16.

There is no evidence of any one of Plaintiffs ever negotiating his rate of pay or turning down a job. Ex. 1-C, Menard, at 227:3-8; Ex. 1-E, Oliver, at 66:4-67:16. Ex. 39, at Rog 9.

Like true employees, Premier did not share costs or losses with its IC DDs. Ex. 1-B, Kennedy, at 141:18-142:8, 143:9-13, 167:21-168:23, 240:19-241:4; Ex. 1-C, Menard, at 267:24-269:3. Moreover, IC DDs did not have to return any pay if a job was completed in less time than expected. Ex. 1-B, Kennedy, at 142:21-143:7.  IC DDs relied on Premier as an employer, as there was no requirement for IC DDs to market or bring in business. Ex. 1-B, Kennedy, at 237:24-238:3. Of course, they couldn't bring in any business, since Premier's Consultant Agreement made them surrender any ability to market themselves and appoint Premier as their exclusive "Marketing Agent." Ex. 2, C.A., at ¶ 6. IC DDs also could not subcontract out their work at Premier. Ex. 1-B, Kennedy, at 184:15-25; 187:9-15; Ex. 1-C, Menard, at 276:19-23; 281:14-16; Ex. 1-E, Oliver, at 37:17-23.

7.      **Fourth Factor: No special skill and initiative is required to be a Premier DD.**

Courts must look at "whether the worker exhibits the type of skill and initiative typically indicative of independent contractor status." *Hopkins*, 545 F.3d at 345. Unique skills or an ability to exercise significant initiative within the business are indicative of independent contractor status. *Id.* Even if a worker uses special skills, this in itself is not indicative of independent contractor status, especially if the worker does not use those skills in any independent way. *Karna*, 2013 WL 1155485, at *11 (citing *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1443 (10th Cir. 1998)). But "routine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 305 (5th Cir. 1998). "The skill and initiative that evidence independence cannot include routine duties or responsibilities normally expected of an employee in the same position." *Hopkins v. Cornerstone Am.*, 512 F.Supp.2d 672, 691 (N.D. Tex. 2007). "Rather, skill and initiative should demonstrate independent entrepreneurism." *Id.*

And when a company maintains both independent contractors and employees in the same position, that alone is evidence that the position does not require the specialized skill or initiative of an independent contractor. *See Karna*, 2013 WL 1155485, at *12.

This was the case at Premier. Premier freely admits there are no differences between an employee and independent contractor directional driller, other than pay. Ex. 1-A, Geoffroy, at 035:20-036:06; Ex. 1-E, Oliver, at 107:01-19, 108:21-109:05. In fact, there were no differences between an employee and independent contractor directional driller based on the location, customer, or tools used. Ex. 1-A, Geoffroy, at 30:09-23; Ex. 1-C, Menard, at 37:22-25, 39:12-19. Employee and IC DDs performed the same duties. Ex. 1-A, Geoffroy, at 35:20-36:6, 84:13-84:18; Ex. 1-C, Menard, at 81:22-82:15, 211:20-212:10, 242:24-243:2; Ex. 1-E, Oliver, at 34:17-35:8, 108:21-109:5. Whether an employee or IC DD, the workers were interchangeable. Ex. 1-A, Geoffroy, at 31:1-11; Ex. 1-C, Menard, at 47:16-49:10, 50:2-5, 172:8-19, 299:6-23; Ex. 1-E, Oliver, at 116:1-117:18; Ex. 1-B, Kennedy, at 237:09-17. And ICs were considered under the same hierarchy as employee DDs. Ex. 1-C, Menard, at 38:15-21, 131:11-135:04; Ex. 1-E, Oliver, at 32:17-33:09. Premier's corporate and customer documents did not differentiate between ICs and employee DDs. Ex. 1-A, Geoffroy, at 83:16-19, 87:18-88:10.

Because the DD job was equally occupied by employee and ICs, Premier could not identify any unique skill or initiative that distinguished the Plaintiff ICs from other employees. Ex. 1-E, Oliver, at 68:15-69:07, 88:21-90:04; Ex. 1-A, Geoffroy, at 42:17-43:03, 44:15-23, 93:1-24. Nor did Premier identify any specialized education or training required for the employee or IC DD job. Ex. 1-C, Menard, at 180:7-182:18; Ex. 1-B, Kennedy, at 249:21-24, 250:14-24.

8. **Fifth Factor: Plaintiffs' permanence is consistent with the operational characteristics intrinsic to Premier's directional drilling business.**

With respect to permanence of the working relationship, Courts must make allowances for a business' operational characteristics that are unique or intrinsic to the particular business or industry and to the workers the business employs. *Mr. W Fireworks, Inc.*, 814 F.2d at 1054; *Mitchell v. John R. Cowley & Bro, Inc.*, 292 F.2d 105, 108 (5th Cir. 1961). In situations where the workers at issue are transient by nature, the proper test for determining permanency of the relationship is not whether the

alleged employees returned from job-to-job, but whether the alleged employees worked for the entire

operative period of a particular job. *See Mr. W Fireworks, Inc.*, 814 F.2d at 1054. Workers in transient

workforces have been deemed employees where the lack of permanence is due to the "nature of the

business," rather than "to the workers' own business initiative." *Id.* at 1047, 1053-1054 ("[C]ourts must

make allowances for those operational characteristics that are unique or intrinsic to the particular

business or industry."); *Superior Care, Inc.*, 840 F.2d at 1060-61. Moreover, employees may work for

more than one employer without losing their benefits under the FLSA. *Superior Care, Inc.*, 840 F.2d at

1060. And the fact that the worker does not rely on the employer for his primary source of income

require a finding of independent contractor status. *Id.*

It is undisputed Premier engaged its Plaintiffs in long-term employment. Ex. 1-A, Geoffroy,

at 94:13-95:15; Ex. 1-B, Kennedy, at 210:17-21. Their employment periods are:

| Plaintiff | Employee Start | Employee End | IC Start | IC End | Tot. Mos. w/ Premier |
|---|---|---|---|---|---|
| Parrish | | | August 2012 | March 2015 | 31[10] |
| Alfaro | April 2012 | August 2015 | September 2015 | October 2015 | 42[11] |
| Robbins | October 2014 | March 2015 | March 2015 | March 2015 | 4[12] |
| Ellestad | | | April 2014 | March 2015 | 11[13] |
| Beckett | | | September 2014 | April 2015 | 7[14] |

C. **ARGUMENT AND AUTHORITIES ON PLAINTIFFS' CALCULATION OF BACK WAGES**

1. **Misclassified employees are entitled to back wages.**

An employer who violates the FLSA is liable to its employees for their unpaid overtime wages.

29 U.S.C. § 216(b). "If the employee is paid a flat sum for a day's work or for doing a particular job,

without regard to the number of hours worked in the day or at the job, and if he receives no other

---

[10] Exs. 30, 35.
[11] Ex. 10, 31, 36.
[12] Ex. 11, 34, 37.
[13] Ex. 33.
[14] Ex. 32.

form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek." 29 C.F.R. § 778.112. The "regular rate" is the hourly rate actually paid the employee for the normal, non-overtime workweek for which they are employed. *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945). The "regular rate" is a rate per hour even though the FLSA does not **require** employers to compensate overtime-pay-eligible employees on an hourly basis. 29 C.F.R. § 778.109. The FLSA requires inclusion in the "regular rate" of "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e).

"If the employer has kept accurate records, a plaintiff can easily meet this burden by securing the production of those records."*Albanil v. Coast 2 Coast, Inc.*, No. CIVAH-08-486, 2010 WL 1404120, at *9 (S.D. Tex. Mar. 31, 2010), *aff'd in part, rev'd in part on diff. grounds*, 444 F.App'x 788 (5th Cir. 2011); *Rosales,* 149 F.App'x at 246 ("If the employer's records are 'proper and accurate,' the employee may rely on these records[.]" (quoting *Anderson,* 328 U.S. at 686-87 (1946)); *Clark v. Centene Co. of Texas, L.P.,* 104 F.Supp.3d 813, 827 (W.D. Tex. 2015) ("Ordinarily, the employee can meet [his] burden by requesting his time records from his employer[.]"); *Nieddu v. Lifetime Fitness, Inc.*, 38 F.Supp.3d 849, 856 (S.D. Tex. 2014) ("When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of these records."); *Sales v. Bailey*, No. 2:12-CV-00056-SA-SAA, 2014 WL 3897726, at *11 (N.D. Miss. Aug. 8, 2014) ("[The employee's] burden is easily satisfied where an employer is in possession of pertinent employment records.").

Plaintiffs have secured Premier's own records. While Premier recorded the compensation paid to each Plaintiff and the number of days worked in each pay period, Premier did not record the number of hours they worked. Premier confirmed that the payroll and timesheets provided a record of the days Plaintiffs worked and their pay. *See* Ex. E, ProPetro's Ans. to RFAs 6-10.

2.      **Estimated hours are an accepted method to determine back wages.**

Where, as here, the employer fails to keep the hourly records required by the FLSA, the solution is not to deny recovery to plaintiff who have proven that they worked unpaid overtime. Instead, authority mandates the calculation of alternative, "approximate" damages by "just and reasonable inference" based upon the existing records and other evidence. *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946); *Brown v. Family Dollar Stores of IN, LP*, 534 F.3d 593, 595 (7th Cir. 2008); *Reich v. Southern New England Telecomms Corp.*, 121 F.3d 58, 67 (2d Cir. 1997).

3.      **Plaintiffs use halftime for overtime to calculate the back wages.**

Premier's employees testified that DDs like Plaintiffs typically worked 12 hours each day. Ex. 1-C, Menard, at 296:19-297:12. Using Premier's own 12-hour-day assumption, Plaintiffs calculated the total remuneration in each week and divided that by the number of hours worked in the week to find the regular rate of pay. Plaintiffs applied half time for overtime calculation described in FLSA regulations to determine a backpay total of $181,711.00. Ex. 41. Because there is no material dispute with respect to these facts, Plaintiffs move for summary judgment with respect to: (1) the number of hours they worked in each workweek; (2) their rate of pay for each workweek; and (3) the amount of backwages owed by Premier. These amounts are accurately reflected and summarized on Exhibit 41.

D.      **ARGUMENT & AUTHORITIES ON PREMIER'S GOOD FAITH AFFIRMATIVE DEFENSE**

1.      **Summary judgment standard when the non-movant bears the burden of proof.**

In summary judgment practice, for any matter on which the non-movant would bear the burden of proof, the movant may merely point out the absence of evidence and thereby shift the burden of proof to the non-movant to come forward with competent summary judgment evidence creating a material question of fact. *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995). To avoid summary judgment, the non-movant must respond by setting forth specific facts indicating a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

## 2. The good faith defense is subject to summary disposition.

The good faith defense can be resolved in a plaintiff's favor on summary judgment. *See Solis v. Hooglands Nursery, L.L.C.,* 372 Fed.Appx. 528, 530 (5th Cir. 2010) (affirming summary judgment for employees on good faith defense) *Bolick v. Mgmt. by Skylane, LLC,* No. H-07-2261, 2008 WL 4589961, at *2 (S.D. Tex. Oct. 14, 2008) (granting summary judgment on same grounds).

## 3. Premier's good faith affirmative defense fails as a matter of law.

The FLSA's liquidated damage provision provides compensation for the employer's failure to pay workers on time. *See* 29 C.F.R. § 790.22(a) n.137 (citing *Brooklyn Savs. Bank v. O'Neil,* 324 U.S. 697 (1945); *Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572 (1942)). The FLSA presumes that employees are entitled to an additional amount equal to their actual damages as liquidated damages. *See* 29 U.S.C. § 216(b); *Reich v. Tiller Helicopter Servs., Inc.,* 8 F.3d 1018, 1031 (5th Cir. 1993). These damages are compensatory, not punitive. *Brooklyn Savs. Bank v. O'Neil,* 324 U.S. 697, 707 (1945) ("'[The FLSA's] liquidated damages provision is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages.").

### 3.1. To avoid liquidated damages, Premier must show both subjective good faith and an objectively reasonable basis for the way it paid Plaintiffs.

A court can reduce or deny liquidated damages only if the employer shows it acted in good faith and had reasonable grounds not to pay its employees. 29 U.S.C. § 260; *Reich v. Tiller Helicopter Svcs., Inc.,* 8 F.3d 1018, 1031 (5th Cir. 1993). But if the employer fails to meet its burden to show **both** subjective good-faith and objectively reasonable behavior, "the duty of the court to award liquidated damages in an amount equal to the unpaid [overtime] [is] ministerial, not discretionary." *Mireles v. Frio Foods,* 899 F.2d 1407, 1414 (5th Cir. 1990). Further, even if the employer meets its burden, the court still retains discretion to award liquidated damages. 29 U.S.C. § 260; *Lee v. Coahoma Cnty., Miss.,* 937 F.2d 220, 227 (5th Cir. 1991). The employer "faces a 'substantial burden' of establishing good faith

and a reasonable belief that its actions did not violate the FLSA." *Singer v. City of Waco, Tex.*, 324 F.3d 813, 823 (5th Cir. 2003) (citing *Bernard v. IBP, Inc. of Nebraska*, 154 F.3d 259, 267 (5th Cir.1998)). The district court's decision on liquidated damages is reviewed under an abuse of discretion standard. *Id.*

To be eligible for a reduction in liquidated damages, the employer must show it purposefully "engaged in the acts proven to be violations, but did so under a mistaken, although reasonable belief, that its acts were in conformity with the law." *Bernard*, 154 F.3d at 267. An employer cannot meet this burden by "professing ignorance" of the FLSA's requirements. *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1262 (5th Cir. 1986). Rather, an employer has a "duty to investigate potential liability under the FLSA." *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468-69 (5th Cir. 1979); *Karr v. City of Beaumont*, 950 F. Supp. 1317, 1325-26 (E.D. Tex. 1997). Thus, "'a good heart but an empty head does not produce a defense'" to liquidated damages. *Bolick v. Mgmt. by Skylane, LLC*, No. H-07-2261, 2008 WL 4589961, at *2 (S.D. Tex. Oct. 14, 2008) (quoting *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 312 (7th Cir. 1986)).

### 4. Premier cannot claim apathetic ignorance of the FLSA as a defense.

"The good faith defense requires plain and substantial evidence of at least an honest intention to ascertain the requirements of the Act and comply with those requirements." Schneider & Stine, WAGE AND HOUR LAW: COMPLIANCE & PRAC. II, § 21:03. To be eligible for a reduction in liquidated damages, the employer must show it purposefully "engaged in the acts proven to be violations, but did so under a mistaken, although reasonable belief, that its acts were in conformity with the law." *Bernard*, 154 F.3d at 267. An employer cannot meet this burden by "professing ignorance" of FLSA requirements. *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1262 (5th Cir. 1986); *see also Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468-69 (5th Cir. 1979) ("[B]usinessmen cannot claim good faith when they blindly operate a business without making any investigation as to … the labor laws. Apathetic ignorance is never the basis of a reasonable belief."). Rather, an employer has a "duty to

investigate potential liability under the FLSA." *Barcellona*, 597 F.2d at 468-69; *Karr v. City of Beaumont*, 950 F.Supp. 1317, 1325-26 (E.D. Tex. 1997). Thus, "'a good heart but an empty head does not produce a defense'" to liquidated damages. *Bolick v. Mgmt. by Skylane, LLC*, No. H-07-2261, 2008 WL 4589961, at *2 (S.D. Tex. Oct. 14, 2008) (quoting *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 312 (7th Cir. 1986)).

### 5. The evidence shows Premier cannot meet its burden on good faith defense.

Premier and its employees didn't know the FLSA's requirements or standards for the exemptions when classification decisions were made and did nothing to affirmatively investigate its FLSA compliance. Ex. 1-B, Kennedy, at 256:7-16; Ex. 1-D, Selby, at 59:1-65:1, 67:15-73:25, 90:24-91:15, 97:1-8, 97:21-98:8. Further, they underwent no FLSA training. Ex. 1-B, Kennedy, at 165:6-166:13; Ex. 1-D, Selby, at 48:7-49:8; Ex. 1-G, Schmidt, at 27:25-39:1, 53:2-64:10.

Premier's only basis for claiming good faith is attorney advice and industry standard. Ex. 1-A, Geoffroy, at 25:15-22; Ex. 1-B, Kennedy, at 119:23-120:3, 162:11-162:22. But it did not seek attorney advice before 2015, long after the day rate independent contractor pay practice was created. Ex. 1-A, Geoffroy, at 26:16-20. Once they did consult attorneys, the attorneys actually advised Premier to reclassify its MWD ICs, which Premier then did. Ex. 1-B, Kennedy, at 152:7-19, 153:6-154:9, 155:4-156:19, 162:11-22; Ex. 1-A, Geoffroy, at 65:14-66:9, 71:4-72:6.

The industry standard Premier relies upon is from Kennedy's past employment with Allis-Chalmers—a company that was sued for misclassification of its oilfield independent contractors **while Kennedy worked there**. Ex. 1-B, Kennedy, at 246:22-247:2, 260:5-260:18, 263:23-264:7. Allis-Chalmers eventually resolved that litigation and reclassified those workers to employees. *See* Ex. 40. In any event, industry standard isn't a defense. An employer's "reliance on industry standards is not sufficient to prove good faith." *Morley v. Nine Energy Service, LLC*, Civ. A. No. H-15-1809, ECF No. 40, at *5 (S.D. Tex. Oct. 31, 2016) (granting oilfield employees' motion for summary judgment on

employer's good faith defense where employer claimed its pay practice was proper based on industry standard and failed to adequately investigate its liability under the FLSA). This is not surprising since merely conforming with an industry-wide practice is not good faith. *Reich v. Southern New England Telecom. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 910 (3d Cir. 1991) (conformance with "well-established and widely accepted industry practice is not ground for dining a reasonable goof faith violation of the Act."); *Johnson v. Big Lots Store, Inc.*, 604 F.Supp.2d 903, 926 (E.D. La. 2009) (rejecting industry practice as proof of good faith).

The truth is that Premier allowed its employees to decide whether they wanted to be paid as an employee or contractor. This entirely defeats Premier's good faith defense. Ex. 1-B, Kennedy, at 108:8-23, 173:16-174:6, 254:24-255:8, 258:24-259:19, 276:22-277:15; Ex. 1-C, Menard, at 231:9-24; Ex. 1-A, Geoffroy, at 18:9-14, 18:23-21:4; Ex. 1-E, Oliver, at 27:12-28:4, 74:3-74:18, 107:1-19. *See Mathis v. Housing Authority of Umatilla Cnty.,* 242 F.Supp.2d. 777, 785-86 (D. Ore. 2002) ("[S]ubjective intent cannot override the economic realities…. Accordingly, the issue of Mathis' desire to be an independent contractor does not alter the economic reality that she was an employee of the Housing Authority." (internal quotation omitted)); *Taylor v. Shippers Transport Express, Inc.,* No. CV 13-2092 BRO (PLAx), 2014 WL 77499046, at *2 (W.D. Cal. Aug. 5, 2014) (explaining worker's desire to be classified as an independent contractor does not assist to the determination as to whether the worker was properly classified). Premier has no evidence that it acted in good faith in failing to pay Plaintiffs overtime required overtime under the FLSA.

## E.   CONCLUSION

There exists no genuine issue of material fact as to the employee status of Plaintiffs and their hours worked, rates of pay, and backwages. Likewise, Premier has no evidence to sustain its good faith defense. The Court should grant Plaintiff's motion for summary judgment.

Respectfully submitted,

*/s/ Andrew W. Dunlap*

By: _____

Michael A. Josephson
Texas Bar No. 24014780
Andrew W. Dunlap
Texas Bar No. 24078444
**JOSEPHSON DUNLAP LAW FIRM**
11 Greenway Plaza, Ste. 3050
Houston, Texas 77046
Telephone:     (713) 352-1100
Telecopier:    (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com


Richard J. (Rex) Burch
Texas Bar No. 24001807
Matthew S. Parmet
Texas Bar No. 24069719
**BRUCKNER BURCH PLLC**
8 Greenway Plaza, Suite 1500
Houston, Texas 77046
Telephone:     (713) 877-8788
Telecopier:    (713) 877-8065
rburch@brucknerburch.com
mparmet@brucknerburch.com

**Attorneys for Plaintiff**

### CERTIFICATE OF SERVICE

On July 21, 2017, I served a copy of this document on all registered parties and/or their counsel of record, via the Court's CM/ECF system.

*/s/ Andrew W. Dunlap*

_____

Andrew W. Dunlap