**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| WILLIAM PARRISH, individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civ. Act. No. 5:16-cv-00417-DAE |
| PREMIER DIRECTIONAL DRILLING, L.P., ) ) | |
| Defendant. ) ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF</u>
## <u>DEFENDANT PREMIER DIRECTIONAL DRILLING L.P.'S</u>
## <u>MOTION FOR SUMMARY JUDGMENT AS TO ALL PLAINTIFFS</u>

Premier was introduced to this lawsuit when Plaintiffs' counsel (Michael Josephson) told Premier Directional Drilling LP's ("Premier") limited partner, Todd Brooks, that he had sued Premier and if Premier did not settle, Josephson would use the litigation to drive Premier into bankruptcy. (SUF ¶¶43-44.) Josephson also bragged that his firm had earned $27,000,000 in just the last year from suing oilfield companies, and he never even had to set foot in a courtroom. (*Id.*) Although the Court allowed notice of this lawsuit to circulate to 93 directional drillers, 89 have chosen not to join. The reason is clear – they all understand that they were independent contractors. Even Parrish, who represents the four opt-ins, testified that he views himself as an independent contractor and <u>not</u> an employee. Parrish and the others knew they were independent contractors from the start, and should have never commenced this litigation.

Premier contracted with Plaintiffs to operate independently on remote drilling rigs, where they had to rely on their skills and experience in directional drilling to advise Premier's customer (the drilling operator) on how to reach underground natural resources as quickly, efficiently, and safely as possible. Plaintiffs owned their own consulting companies (such as Parrish Consulting, LLC and JD Ellestad, Inc.). They are all highly skilled in directional drilling - which requires an aptitude in trigonometry, physics, and geology - having gained that skill over years of experience in the oilfield. As highly sought-after experts, Plaintiffs charged up to $1,400 per day for their services, earning as much as $300,000 per year. Plaintiffs were also free to accept or reject jobs as they saw fit, or to take as much time between jobs as they liked. To support their businesses, Plaintiffs invested tens of thousands of dollars in office space, trucks, tools, electronic devices, and other supplies. Plaintiffs then wrote off these business expenses – in many cases over $100,000 annually - allowing the Plaintiffs to pay taxes on only a fraction of their earnings.

U.S. District Court Judge John D. Rainey found (and the Fifth Circuit affirmed) that a similar independent contractor relationship existed between workers and another oilfield services company in *Thomas Perez v. Gate Guard Services LP*.[1] Not only were the gate attendants

---

[1] No. V-10-91, 2013 WL 593418, *1 (S.D. Tex. Feb. 13, 2013.)

independent contractors rather than employees, but the U.S. Department of Labor was ordered to pay the defendant's attorneys' fees for having argued otherwise. This action is equally as frivolous. Plaintiffs are not the kind of economically-dependent, low-wage workers that Congress intended to protect with the overtime requirements of the FLSA. For these reasons, Premier respectfully requests that summary judgment be granted on all of Plaintiffs' claims.

## STATEMENT OF UNDISPUTED FACTS

### I. PREMIER'S BUSINESS

Premier is a directional drilling staffing company that supplies Directional Drillers ("DD") and Measurement While Drilling Engineers ("MWD") to drilling operators. (SUF ¶ 1, 4.) Directional drilling is the process of drilling from a point on the surface to a target that might be miles from the drilling rig. (SUF ¶¶ 10-11.) Because the operator cannot just drill in a straight line from the surface to the target, hitting the target involves curving the well path from its vertical start, around potential underground obstacles, to and through the pay zone (which might be just a few feet in width). (*Id.*) Although a "well plan" is drafted to describe the curve that will most efficiently reach the target, from the moment drilling begins, real-world variables such as geological fractures, previously-drilled wellbores, and variations in downhole forces act to push the drill off path in ways that cannot be anticipated. (SUF ¶ 14, 169.)

The DD's role is to apply his skill and experience to advise the drilling operator on how to reach the target as efficiently as possible given those actual downhole forces and conditions. (SUF ¶ 170.) To do this, the DD must use information received from the MWD, as well as his knowledge of trigonometry, physics, and geology, to determine exactly where underground the drilling tool is located and which direction it is facing. (SUF ¶ 19, 23.) Using this information, along with the well plan, his years of experience, and his intimate knowledge of the drilling rig and the capabilities of the equipment, the DD develops a plan for adjusting various drilling parameters to ensure that the drill continues on the most efficient path to the target. (SUF ¶¶ 19, 21-22, 24.) The success of a directional drilling project is measured by how quickly and accurately the operator is able to hit the target, which depends in large part on the advice

provided by the DD. (SUF ¶ 13.) A mistake by the DD can be costly and dangerous. (SUF ¶ 15.) For example, Parrish once allowed the well path to cross outside the scope of the lease, creating potential costly liability for Premier's client. (SUF ¶ 15.)

During the course of a directional drilling project, the DD submits daily reports as to the results to Premier and Premier's customer representatives. (SUF ¶¶ 191, 197.) Once a project ends, there is no guarantee that another project will be forthcoming. (SUF ¶ 80.) As a result, DD work is on-again/off-again, often with unpredictable and long gaps between projects. (SUF ¶¶ 64, 76, 87-91.)[2] After one project ends, the DD may be out of work, move on to another project (with Premier or elsewhere), take time off, or work on a side business. (SUF ¶ 115-125.)

Given the unpredictable fluctuation in the oil and gas industry, Premier, like many of its competitors, must use a flexible staffing model.[3] (SUF ¶ 5, 38-39.) To avoid both overstaffing and layoffs, Premier employs a small staff of DDs. (SUF ¶ 5.) Premier then satisfies additional client needs by supplementing its DD workforce on an as-needed basis with independent contractors who otherwise run their own directional drilling businesses. (SUF ¶¶ 6-7.) When Premier's clients request directional drilling services, Premier sends an employee DD if there is one with the skills, experience, and availability for the job. (SUF ¶¶ 74-75.) If no qualified DD employee is available, Premier contacts contractor DDs to staff the project. (*Id.*)

As a staffing company, Premier's profits and losses depend in large measure on the compensation it must pay to the workers who staff its customers' projects. (SUF ¶ 94.) To staff a project with independent contractor DDs is an expensive proposition, as such DDs are highly-

---

[2] Alfaro worked only three jobs and had 26 days off between the first and second project and one week off between the second and third project. (SUF ¶ 88.) Beckett worked six jobs and had time off between each and every job, ranging from one week to 31 days. (SUF ¶ 89.) Ellestad worked 19 jobs and had time off between all but six of those jobs ranging between two and 27 days. (SUF ¶ 90.) Parrish worked 40 jobs in the three year limitations period and had time off between at least 27 of those projects ranging between five to 21 days. (SUF ¶ 91.) Robbins worked on just one project for four days. (SUF ¶ 68.)

[3] Premier's use of independent contractor DDs is similar to Allis-Chalmers, Strata, Panther Directional, Triton, Gyrodata, and Halliburton Sperry Sun. (SUF ¶¶ 38-39.)

sought after and able to command a premium for their special skill. (SUF ¶¶ 100, 126-139.) Independent contractor DDs have spent years developing their skills and expertise in various geologies and with various drilling rigs, making them more valuable than a DD without a specialized expertise. (SUF ¶¶ 142-143, 147-167.) Many independent contractor DDs have developed personal goodwill with specific operators, resulting in Premier having to secure the services of a particular DD to satisfy its customers' preferences. (SUF ¶ 141.) Because they are free to work for any directional drilling company they choose, independent contractor DDs are able to command a premium from Premier in exchange for them foregoing the opportunity to work elsewhere. (SUF ¶¶ 291.) Independent contractors can also charge more because they provide their own tools and equipment. (SUF ¶¶ 218, 221-224, 232-265.)

Since Premier pays a premium for independent contractor DDs, it expects them to have everything (skills, tools, equipment, supplies, etc.) necessary to successfully complete a project for one of Premier's customers without any supervision or oversight from Premier. (SUF ¶ 114.) Premier does not train or instruct independent contractor DDs on how to do their jobs.[4] (SUF ¶ 176, 181, 185, 188.) No Premier supervisor was on site to monitor Plaintiffs' day-to-day work. (SUF ¶ 202.)[5] No Plaintiff ever received a performance evaluation from or was disciplined by Premier. (SUF ¶ 209.) Premier's only instruction to Plaintiffs was with respect to how they reported their *results* to Premier and/or its clients, via software known as "WinServe." (SUF ¶¶ 193-195.) Notably, no aspect of WinServe told Plaintiffs how to do directional drilling; it simply documents the path of the drill and provides a format for reporting drilling results. (SUF ¶¶ 190-191.) As explained by Premier's Vice President, Premier has no say in how a DD goes about his job – "Every directional driller does something different." (SUF ¶ 193.)

---

[4]     The only "training" Plaintiffs received was <u>safety</u> training that had nothing to do with how to do directional drilling. (SUF ¶¶ 185-187.)

[5]     On rare occasions, a DD Coordinator might come to a rig to interact with the customer. (SUF ¶ 204.) The DD Coordinator is not a "supervisor"; he merely ensures jobs are properly staffed and tools are properly delivered to each job site. (SUF ¶ 206.)

## II. PLAINTIFFS' DIRECTIONAL DRILLING CONSULTING BUSINESSES

Plaintiffs had each developed their own unique expertise and skills through years of training and experience before they first contracted with Premier. (SUF ¶ 147-167.) Parrish had 18 years of experience in the oilfield and a full year's experience as a DD before contracting with Premier. (SUF ¶ 147.) Ellestad worked as a directional driller for eight years before contracting with Premier. (SUF ¶ 151.) Robbins had 16 years of experience working in the oilfield, seven years as a drilling operator and was an employee directional driller for six months prior to contracting with Premier. (SUF ¶¶ 157-158.) Alfaro had 22 years' experience in the oilfield and seven years' experience as a DD before contracting with Premier. (SUF ¶ 161.) Beckett had 13 years' experience in the oilfield and eight years' experience as a DD before contracting with Premier. (SUF ¶ 165.)

Plaintiffs each decided to go into business for themselves by opening their own DD consulting firms - Parrish formed Parrish Consulting, LLC; Ellestad formed JD Ellestad, Inc.; and Alfaro formed V. Hughes Services, LLC. (SUF ¶¶ 46, 51, 55.)[6] They received Forms 1099 for their work and declared to the IRS that they were self-employed. (SUF ¶¶ 62, 277, 289.) All Plaintiffs agreed that they were independent contractors. (SUF ¶¶ 266-280.) They considered the benefits and risks of going into business for themselves rather than being an employee, and chose to open their own businesses. (SUF ¶ 268-273.) Indeed, despite filing this lawsuit, **Parrish still agrees he was an independent contractor**, and not an employee:

> Q: All right. And now you're here suing Premier saying you're an employee, right?
> **A: I'm not an employee.**
> **Q: Okay. You're an independent contractor for Premier?**
> **A: Yes.**

(SUF ¶ 266) (emphasis added). Having set up their own consulting firms, Plaintiffs then ensured that their businesses had whatever resources they each decided they needed to do directional drilling work – they purchased and/or assigned to their businesses trucks, computers, printers, calipers, tape measures, office supplies, safety gear, clothing, cell phones, internet, and health

---

[6]  Beckett also operated a "Directional Drilling Consulting" business. (SUF ¶ 60.)

insurance. (SUF ¶¶ 218, 221-265.) Parrish, Alfaro and Ellestad provided their own computers and directional drilling software. (SUF ¶ 211.)[7] Parrish, Alfaro, and Ellestad also decided to set up, and file taxes on behalf of, their legal entities. (SUF ¶¶ 46-49, 51, 54-55, 59, 221.) Alfaro even set up a separate office outside his home for V. Hughes Services, LLC. (SUF ¶ 244.)

Plaintiffs made every decision related to their businesses. They chose whether to focus on getting projects from Premier or looking elsewhere for work. (SUF ¶¶ 115, 291.) They decided which projects to accept and which to decline; indeed, Parrish admits he turned down projects with no negative repercussions.[8] Plaintiffs decided whether and how to negotiate compensation for their services, including whether to offer discounts; indeed, Parrish admits he negotiated for more money several times. (SUF ¶¶ 95, 97-99.) As a result of this individual negotiation, independent contractor DDs charged anywhere between $425 and $1,500 per day. (SUF ¶ 100.)[9]

Plaintiffs also controlled their businesses' profit by controlling their expenses. For example, Plaintiffs paid for their own travel to and from the rigs, and their own food and entertainment while on the rig. (SUF ¶¶ 218, 228, 250, 258-259.) As another example, even though the operating company (not Premier) provided lodging on the rig site, some independent contractors paid for their own living expenses. (SUF ¶¶ 219-220.) Beckett admitted he sometimes paid for a hotel instead of staying in the living quarters at the rig. (SUF ¶ 220.)

---

[7] To ensure consistent reporting, Premier provided each of its projects with a laptop computer and access to WinServe, although independent contractors were free to use, and did use, their own computers and copies of WinServe if they preferred. (SUF ¶¶ 211-215.)

[8] (SUF ¶¶ 79-83) (Q. "Was there ever any issue with you saying, I'm not available to accept jobs at those times?" A. "No.").)

[9] Parrish was paid between $972 and $1,200 for the various projects he worked for Premier between 2013 and 2015. (SUF ¶ 102.) Alfaro was paid between $425 and $1,050 per day; Beckett was paid between $1,300 and $1,400 per day; Ellestad was paid between $1,170 and $1,300 per day; and Robbins was paid $1,075 per day on the projects they performed for Premier. (SUF ¶¶ 103-106.) Other independent contractor directional drillers were similarly paid varying rates between $500 and $1,500 per day. (SUF ¶¶ 107-113.) Independent Contractor Mark Richard's pay ranged from $650 to $1,400 per day; Timothy Rasberry's pay ranged from $500 to $1,350 per day; Neil Heath's pay ranged from $500 to $1,500 per day; and Daryl Ooten's pay ranged from $500 to $1,450 per day. (*Id.*)

Having declared themselves self-employed to the IRS, Plaintiffs deducted the costs and expenses that they incurred in running their own businesses on their tax returns as business expenses. (SUF ¶¶ 239-265, 277.) For example, Parrish wrote off over $118,000 in business expenses in 2013, and nearly $115,000 in 2014, plus another $33,000 in just three months in 2015. (SUF ¶¶ 231, 239-242.) JD Ellestad, Inc. generated about $190,000 in revenues in 2014, but reported a <u>loss</u> of $18,650 because Ellestad's business had also invested in a goat farm that apparently resulted in significant losses. (SUF ¶ 130.) Alfaro's company, V. Hughes Services, wrote off $43,000 in business expenses over just a few months in 2015. (SUF ¶ 243.) Beckett wrote off almost $100,000 in business expenses over two years. (SUF ¶ 252.)

Plaintiffs admit they were contracted by Premier on a short-term, project-by-project basis and that they were not guaranteed work from Premier after completion of a project. (SUF ¶¶ 64, 76, 80, 87-91.) Apart from Parrish, who provided services to Premier off-and-on between 2012 and March 2015, Plaintiffs worked projects through Premier for less than a year. (SUF ¶¶ 65-73.)

In sum, as independent contractor DDs, Plaintiffs had a fundamentally different relationship with Premier than Premier had with its employee DDs.

| Employees | Plaintiffs – Independent Contractors |
|---|---|
| Report to Operations Manager | Not supervised by any Premier employee |
| May be promoted, demoted, or transferred | Not eligible for promotion, demotion, or transfer |
| Must work jobs as instructed by Premier | Free to accept or reject jobs |
| Must work when and where instructed by Premier | Free to set own availability and schedule |
| Paid a guaranteed salary plus set daily bonus | Paid only for work done; free to negotiate pay |
| Eligible for insurance and other benefits | Must provide their own insurance |
| Taxes withheld and income reported on Form W-2 | No taxes withheld and payments reported on Form 1099 |
| Eligible for reimbursement of expenses | No reimbursements; responsible for own costs |
| Prohibited from working for other companies while employed by Premier | Free to work in other businesses, including Premier's competitors |
| Eligible for training on how to be a directional driller | Must have the skill, experience, and expertise to operate independently and without oversight |

(SUF ¶¶ 281-295.) For all of these reasons, Premier is entitled to summary judgment.

In his Complaint, Plaintiff William Parrish asserted that he, and others similarly situated, were improperly classified as independent contractors and, as such, were not properly compensated for hours they worked over 40 per work week. [Doc. No. 1]. On November 7, 2016, the Court granted conditional certification of a class of directional drillers who performed work for Premier between May 5, 2013 and the present. [Doc. No. 30]. Despite notice circulating to 93 former independent contractor directional drillers, only four (4) individuals – Alfaro, Beckett, Ellestad, and Robbins – are pursuing claims.[10] In keeping with their promise to drive Premier into bankruptcy because it refuses to settle, Plaintiffs have made this litigation very costly for Premier. At every turn, Plaintiffs have run up Premier's legal fees by filing numerous baseless discovery motions before this court. Yet, despite the extensive discovery, the record is devoid of any evidence supporting Plaintiffs' claim that they were Premier's employees.

**ARGUMENT AND CITATION OF AUTHORITY**

**I.  PLAINTIFFS ARE NOT SUBJECT TO THE FLSA BECAUSE THEY WERE INDEPENDENT CONTRACTORS**

There is no FLSA coverage where an independent contractor relationship exists, which is a question of law.[11] The Fifth Circuit utilizes a five factor test to determine whether an individual is an employee or an independent contractor: (1) the permanency of the relationship; (2) the degree of control exercised by the alleged employer; (3) the skill and initiative required to perform the job; (4) the extent of the investments in the specific project(s) at issue; and (5) the degree to which the worker controls his or her own opportunity for profit or risk of loss.[12] The court may also consider other factors, such as whether the worker held himself out as an

---

[10]  Former opt-in plaintiffs Dennis Jones, Christopher Leonard, Michael Stump, Johnny Davis, Jr., Jason Shepherd, Gyula Toppanto, and Michael Gardner have all voluntarily withdrawn without any payment or promise from Premier. [Doc. Nos. 52, 54, 101, 131].

[11]  *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 264 (5th Cir. 1987); *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 n.24 (5th Cir. 1985).

[12]  *See Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332-33 (5th Cir. 1993).

independent contractor, industry standards, and whether the individual is the kind of low-wage worker the FLSA was designed to protect.[13] Not all factors must weigh in favor of independent contractor classification for the Court to find that the worker was properly classified as an independent contractor as a matter of law.[14]

### A.     Plaintiffs' Work Was Short-Term and on a Project-to-Project Basis

Where, as here, a relationship can be characterized as temporary, project-by-project, or on-again/off-again, it will weigh in favor of independent contractor status.[15] The Fifth Circuit has found workers to be independent contractors because they worked on a project-to-project basis for a limited time and could also work for other companies.[16] For instance, the Fifth Circuit in *Carrell* considered the project-based work and whether the worker provided services to other companies between projects.[17] The *Carrell* court held that the welders were independent contractors, not employees, stating, "[t]he Welders' relationship with [the alleged employer] was on a project-by-project basis, the Welders worked from job to job and from company to company; many of the Welders spent little time working for [the alleged employer]".[18]

Similarly, in *Thibault*, a plaintiff who "did not work exclusively for defendants," "traveled from job-to-job and from state-to-state looking for work," and provided services for less than a year was an independent contractor.[19] In both *Gate Guard* and *Mack*, the workers were independent contractors where they "were hired on a job-by-job basis and were fully aware

---

[13]     *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983); *Henderson v. Hernandez*, No. 5:05-cv-037-C, 2005 WL 473678, at *1 (N.D. Tex. 3/1/05); *Gate Guard Services, L.P. v. Solis*, No. V-10-91, 2013 WL 593418, at *11-13 (S.D. Tex. 2/13/13).

[14]     *Carrell*, 998 F.2d at 334; *see also Thibault v. Bellsouth Telecomms. Inc.*, 612 F.3d 843, 846 (5th Cir. 2010).

[15]     *See Thibaut*, 612 F.3d at 846; *see also Carrell*, 998 F.2d at 332; *Mack v. Talasek*, No. V-09-53, 2012 WL 1067398, at *4-6 (S.D. Tex. Mar. 28, 2012).

[16]     *Id.*

[17]     998 F.2d at 334.

[18]     *Id.*

[19]     612 F.3d at 846.

that their positions were temporary", worked "off and on", were free to work for other companies, and could accept or reject projects as they chose.[20] Notably, work can be project-based and indicative of independent contractor status even if two projects occur back-to-back.[21]

Here, like the workers in *Carrell*, *Thibault*, *Mack* and *Gate Guard*, Plaintiffs: (1) worked on a project-by-project basis (SUF ¶¶ 64, 76, 80, 87-91); (2) often had several weeks to one month off between each project (SUF ¶¶ 82-91); (3) were free to accept or decline projects (SUF ¶¶ 76-83); (4) were not guaranteed future work (SUF ¶ 80); (5) could find their own replacement (SUF ¶ 85); and (6) controlled their own schedule by choosing which jobs they would accept (SUF ¶¶ 78, 86).[22] Plaintiffs could also do other work between Premier projects, including work for Premier's competitors. (SUF ¶¶ 115-125, 291.)

Further, with the exception of Parrish, the Plaintiffs provided services to Premier over the course of less than one year. (SUF ¶¶ 65-73.) Robbins contracted with Premier for **only four days**; Alfaro contracted with Premier at various times over the course of just **two months**; Beckett provided services to Premier over the course of only **seven months**; and Ellestad provided services at various times over the course of **ten months**.[23] (*Id.*) As several courts in the Fifth Circuit have found, similar facts weigh heavily in favor of independent contractor status.[24]

### B. Plaintiffs Were Highly Skilled and Demonstrated Significant Initiative

---

[20]     *Mack*, 2012 WL 1067398 at *4-6, *Gate Guard*, 2013 WL 593418 at *10-11.

[21]     *Id.*

[22]     *See Talbert v. American Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (plaintiff was independent contractor where she "ultimately controlled the number of hours she worked.").

[23]     Parrish performed services for Premier at different times over less than three years from April 2012 to March 2015. (SUF ¶¶ 65-66.)

[24]     *See Mack*, 2012 WL 1067398 at *5 (finding no permanent relationship where workers worked an average of nine to 20 months for defendant); *Carrell*, 998 F.2d at 332 (no permanent relationship where the workers performed services for three to sixteen weeks, on average); *Lindsley v. Bellsouth Telecomms., Inc.*, 401 Fed. Appx. 944, 945 (5th Cir. 2010) (finding a worker who provided services for three months as an independent contractor); *Gate Guard*, 2013 WL 593418 at *10 (finding workers who worked an average of four months were independent contractors even though some worked several years).

The skill indicative of an independent contractor relationship includes "some unique skill set…or some ability to exercise significant initiative within the business."[25] Mere "routine work which requires industry and efficiency is not indicative of independence and nonemployee status."[26] Plaintiffs did not do mere "routine work." Each job presents unique challenges that the Plaintiffs were required to plan for, react to, and overcome. (SUF ¶¶ 19, 21-22, 24, 169-170.)

In this sense, Plaintiffs were "hired guns" – experts in directional drilling who could come in to a project, take stock of the geology, rig, equipment, mud, and other factors, and then give advice to an operator on how best to use the operator's own equipment to achieve the end result of an efficient and smooth wellbore that hits the pay zone. (SUF ¶¶ 19-24, 142-167, 169-170, 172, 175, 177.) The independent contractor DDs' specialized skill set is akin to a river or harbor pilot – an individual who comes onto someone else's ship and gives navigational advice to safely and efficiently direct the ship from Point A to Point B. Like a DD, "the individual pilot gives navigation advice independently according to his own professional judgment."[27]

Similarly, the Fifth Circuit has found "specialized skills" indicative of an independent contractor relationship in the case of welders on an oil and gas pipeline, where the stakes are higher and the margin for error smaller than other types of welding work.[28] Likewise, it takes "specialized skills" to drill miles-long oil wells, where millions of dollars are on the line and the pay zone may be only a few feet in width, than other types of directional drilling work, such as guiding a utility conduit under a residential driveway. (SUF ¶ 11.)

Plaintiffs must have wide-ranging skills and expertise to be able to walk on to a drilling

---

[25]    *Wherley v. Schellsmidt*, No. 3:12-cv-0242-D, 2013 WL 5744335, at *5 (N.D. Tex. Oct. 23, 2013) (citing *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 345 (5th Cir. 2008)).

[26]    *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976).

[27]    *Coleman v. N.O. & Baton Rouge S.S. Pilots' Ass'n*, 437 F.3d 471, 479, 481 (5th Cir. 2006) ("We can find no argument or authority for deeming pilots anything other than independent contractors."); *see also Blancq v. Hapag-Lloyd A.G.*, 986 F. Supp. 376, 382 (E.D. La. 1997) (river pilot was "self-employed and acted as an independent contractor").

[28]    *Carrell*, 998 F.2d at 333 ("Pipe welding, unlike other types of welding, requires specialized skills.").

rig and efficiently guide the wellbore to the target. For example, Plaintiffs needed to be able to "analyz[e] well plans and gamma markers to maximize time spent in the production zone." (SUF ¶¶ 164, 167.) This, in turn, required a "[s]ound mathematical background in directional drilling operations". (SUF ¶ 167.) Plaintiff must also have the skills needed for the formation that is being drilled, whether Permian basin, Granite Washer, Eagleford, Barnett Shale, Haynesville Shale or Austin chalk. (SUF ¶¶ 143, 149, 153, 159, 163, 166.) Plaintiffs gained these skills through *specialized* on-the-job training and experience. (SUF ¶ 147.)

Plaintiffs had to show high levels of initiative in ensuring the drill stayed as close to the well path as possible, anticipating and obviating any issues to minimize down time, and correcting issues on their own or in conjunction with others.[29] (SUF ¶¶ 17-24, 169-170, 179.) Plaintiffs' initiative in proactively monitoring drilling and anticipating problems is of vital importance because errors could cost the operator hundreds of thousands of dollars. (SUF ¶ 146.)

Further, Plaintiffs also showed skill and initiative in operating their own businesses.[30] They negotiated their pay (SUF ¶¶ 78, 95-98); chose which work to accept or reject (SUF ¶¶ 79-83); determined how much focus to place on obtaining work from Premier versus performing other work (SUF ¶ 116); maintained positive relationships with the operators (Premier's clients) to increase the likelihood of obtaining future work either from Premier or from the operator directly (SUF ¶ 141); and controlled their costs and expenses (SUF ¶¶ 218-265). Thus, this factor weighs strongly in favor of independent contractor status.[31]

---

[29]    *See Carrell*, 998 F.2d at 333-34 (finding worker was a "highly skilled" independent contractor even where his "initiative was limited to decisions regarding his welding equipment and the details of his welding work").

[30]    *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983) (control of the components of running a business shows initiative indicative of independent contractor status); *see also Donovan v. Dial America Marketing, Inc.*, 757 F.2d 1376, 1387 (3d Cir. 1985).

[31]    *Chao v. Mid-Atl. Install. Servs., Inc.*, 16 Fed, Appx. 104, 107 (4th Cir. 2001) (affirming independent contractor status where "[a]n Installer's net profit or loss depends … on the business acumen with which the Installer makes his required capital investments in tools, equipment, and a truck; and on the Installer's decision whether to hire his own employees or to work alone.")

**C.      Premier Did Not Control the Details of Plaintiffs' Work or Their Schedules**

Ceding control over work details to highly-skilled experts indicates independent contractor status.[32] Like the workers in *Gate Guard*, *Thibault*, *Talbert*, and *Mack*, Plaintiffs were not told how to do their jobs or supervised on a day-to-day basis. (SUF ¶ 202.) To the contrary, they were paid up to $300,000 per year precisely because they did <u>not</u> need supervision.[33]

Plaintiffs received no training, performance reviews, or discipline from a Premier supervisor.[34] (SUF ¶¶ 147-167, 176, 209.) While Plaintiffs had the option of contacting a DD Coordinator as a resource, they were not required to do so. (SUF ¶¶ 203, 206.) It was up to the DDs to advise operators by going through a complicated thought process in real-time and based on actual conditions in the field:

> [I]f a drill was "3 degrees [off plan] and you're 20 feet out, you've [the DD] got to make the decision on 'Do I slide now'; 'Is the formation going to turn me'; you know, 'Based on my last yield, if I do slide, how much am I going to slide'; 'What directional am I going to hold it to get it back to the level.'

(SUF ¶¶ 182-183.) This expert analysis done by DDs is highly probative of independent contractor status.[35]

Plaintiffs also had complete control over their schedule because they could accept or reject work as they saw fit. (SUF ¶¶ 79-84, 86, 207, 287.) This fact was significantly probative of

---

[32]      *See Thibault* 612 F.3d at 846-47 (cable splicer was an independent contractor where alleged employer never specified how to do the splicing); *Carrell*, 998 F.2d at 334 (welder was an independent contractor where he controlled the manner and details of work); *Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 566 (7th Cir. 2009) (worker was an independent contractor where he controlled the details of his work).

[33]      In any event, Plaintiffs admit that no Premier supervisor was ever on-site. (SUF ¶ 202.) Parrish admits at more than 75% of the jobs he worked he never even saw a safety officer or DD coordinator at a rig. (SUF ¶ 204.) Such rare and limited interactions do not evidence control. *See Gate Guard* 2013 WL 593418 at *3-6; *see also Thibault*, 612 F.3d at 847 (finding workers were independent contractors where their supervisor only came to the worksite occasionally and did not instruct workers on how to do their job).

[34]      *See Gate Guard*, 2013 WL 593418 at *5.

[35]      *See Talbert*, 405 F. App'x at 856 (independent contractor expected to handle work without supervision); *Gate Guard*, 2013 WL 593418 at *5 (lack of day-to-day supervision showed independent contractor status); *Mack*, 2012 WL 1067398 at *2 (same).

independent contractor status in *Gate Guard*, even when the work was offered on a "take-it or leave-it basis".[36] Also, as in *Gate Guard*, Plaintiffs could engage in personal activities of their choosing when they had time.[37] (SUF ¶¶ 115-125, 291.) Indeed, several contractor DDs had side businesses to which they could tend when not on-duty on a rig, such as Ellestad's goat farm, Raspberry's hydro-graphics company, and Richard's gutter business. (SUF ¶¶ 117-125.) That Plaintiffs could choose how to apportion their time between their directional drilling business and other ventures is highly probative of an independent contractor relationship.[38]

That Plaintiffs may have received *safety* training is of no import because they received no training on how to do directional drilling. (SUF ¶¶ 185-188.) In *Gate Guard*, the workers received safety training but were still independent contractors because they received "no training or instruction on how to do their work."[39] In any event, safety measures do **not** evidence the type of control indicative of employment.[40] Likewise, the fact that Plaintiffs submitted daily drilling reports does not evidence "control" because daily reporting allowed Premier to ensure its

---

[36]    2013 WL 593418 at *7; *see also Mack*, 2012 WL 1067398 at *2 (finding the control factor weighted in favor of independent contractor status where the workers could decline a request to work at another location without repercussion)

[37]    2013 WL 593418 at *3-6; *see also Mack*, 2012 WL 1067398 at *1-2 (finding independent contractor status where the workers (1) could control the length of their shifts; (2) were not obligated to accept projects from the defendant; and (3) were not restricted from providing gate guard services to other companies during the time they worked for defendant).

[38]    *Talbert v. American Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (plaintiff was independent contractor where she could control how much she worked for the alleged employer).

[39]    2013 WL 593418 at *3-6.

[40]    *See, e.g.*, *Gate Guard*, 2013 WL 593418 at *6; *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004) (control exercised to "ensur[e] compliance with safety and security regulations" is "qualitatively different" from the type of control in employment); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 691-92 (D. Md. 2010) (quality control and safety measures did not show employment); *Taylor v. Waddell & Reed, Inc.*, No. 09-cv-2909-AJB, 2012 WL 3584942, at *5 n.9 (S.D. Cal. Aug. 20, 2012) ("compliance with legal requirements is not indicative of control for purposes of establishing the employer-employee relationship"); *Zampos v. W&E Comm'ns, Inc.*, 970 F. Supp. 2d 794, 804 (N.D. Ill. 2013) ("quality control and compliance-monitoring that stem from the nature of the business…are qualitatively different from control that stems from the nature of the relationship between the employees and the putative employer").

customers were receiving quality service from Plaintiffs. (SUF ¶ 196.) Like safety, quality control measures are not indicative of employment.[41]

Given the complete lack of supervision, and that the only requirements imposed upon Plaintiffs were safety training and quality control reporting, Premier clearly did not exert the type control indicative of an employment relationship.

### D. Plaintiffs Made Substantial Investments in Their Businesses

Substantial investment in one's own business shows economic independence, and therefore independent contractor status.[42] Here, Plaintiffs invested tens of thousands of dollars annually in their directional drilling consulting businesses, as evidenced by the tens of thousands of dollars in business expenses they wrote off on their taxes. (SUF ¶ 130, 231, 243, 252, 263-265.)[43] In total, Parrish (through Parrish Consulting, LLC) reported **more than $266,000 in expenses** while he worked through Premier – including $118,000 in 2013; $115,000 in 2014; and $33,000 for just three months of work in 2015. (SUF ¶ 231.) Ellestad, despite earning $190,000 from Premier in 2014, reported a *loss* to the IRS of $18,650, evidencing more than **$200,000 in expenses**. (SUF ¶ 130.) Again, Ellestad reported a *loss* of more than $50,000 in 2015, despite earning $37,000 from Premier, evidencing **$87,000 in expenses**. (SUF ¶ 131.) Alfaro (through V. Hughes Services) reported $43,329 in expenses in just a few months in 2015. (SUF ¶ 243.) And Beckett reported $95,120 in expenses in his directional drilling business, including **$64,765** in expenses in 2014 and **$30,355** in expenses in 2015. (SUF ¶ 252.) In short, Plaintiffs each built businesses that generated hundreds of thousands of dollars annually in revenue, and that held

---

[41] *See, e.g.*, *Jacobson,* 740 F. Supp. 2d at 690-91 (quality control is not the type of control indicative of an employment relationship); *Lawrence*, 2011 WL 666304 at *8 (same).

[42] *See Carrell*, 998 F.2d at 333.

[43] Business expenses reported on Plaintiffs' tax returns include: office space for Alfaro's directional drilling business (SUF ¶ 57, 244); calipers, tape measurers, calculators (SUF ¶¶ 223, 234, 245); vehicles (including insurance, oil, gas, maintenance and repairs (SUF ¶¶ 218, 232, 236, 250, 254-255); personal protective equipment (SUF ¶¶ 224, 246, 261); office supplies, office equipment, food, entertainment, cell phones, internet access, health insurance, and rental equipment (SUF ¶¶ 224, 227, 229, 237, 240, 246, 250, 256-257, 261).

tens of thousands of dollars in assets and consumables.

Premier's investment in its business has nothing to do with whether the Plaintiffs had gained economic independence through establishing such viable going concerns. To the extent Premier's investment relative to Plaintiffs' investments is considered, however, it is not the focus of the Court's inquiry.[44] For example, in *Gate Guard*, the Southern District of Texas **did not even refer to** Gate Guard's overall investment in its operations.[45]  Rather, the persuasive fact was that some (not all) of the gate attendants invested between $800 to $72,000 in their vehicles, tools, and equipment.[46] The court found that the substantial investment by the gate attendants caused this factor to weigh in favor of independent contractor status.[47] Here, even viewing Plaintiffs' investments in the context of Premier's investment in a given project, the result is more indicative of economic independence than in *Gate Guard*.  In that case, Gate Guard invested up to $20,000 in each project;[48] by contrast, Premier's investment is at most an $1,100 laptop, and access to WinServe ($4,500 plus $900 annually).[49] (SUF ¶¶ 212-213, 215.)

### E.    Plaintiffs' Controlled Their Own Opportunities for Profit or Loss

Independent contractors control their own opportunity for profit or loss, which can turn on their ability to (1) negotiate compensation for their services, (2) control costs and deduct

---

[44]    *See Carrell*, 998 F.2d at 333 (finding plaintiffs' investment of $19,000 in their work caused this factor to weigh in favor of independent contractor status despite the alleged employer's "obviously significant" overall investment); *Thibault*, 612 F.3d at 847 (stating that "[t]he court in *Carrell* 'recognized' the overall investment by the alleged employer, but it did not focus on it….").

[45]    2013 WL 593418 at *7.

[46]    *Id.*; *see also Carrell*, 998 F.2d at 333 (showing similar investments and finding workers were independent contractors based on such investments); *Thibault*, 612 F.3d at 847-48 (same).

[47]    *Id.*

[48]    2013 WL 593418 at *7.

[49]    *See also Carrell*, 998 F.2d at 333 (welder classified as independent contractor even where alleged employer provided some equipment and tools to the workers and also provided "helpers" to the workers, in light of contractor's investment in supplying his own truck, welding machine and maintenance, lodging,  meals, and assistants).

business expenses, and (3) earn additional income.[50]

First, like the workers in *Gate Guard*, Plaintiffs could demand more money or offer a discount, with rates ranging from $425 to $1,500 per day.[51] (SUF ¶¶ 78, 95-106.) Each contractor's revenue turns on his skill, experience, and negotiations. (SUF ¶ 101.)

Second, the focus is on Plaintiffs' tax returns and reported expenses.[52] In *Carrell*, the Fifth Circuit found that the plaintiffs' tax returns showed they had the ability to control their profit margins.[53] Similarly, in *Thibault* the plaintiffs controlled their costs and expenses.[54] Like the plaintiffs in *Carrell* and *Thibault*, **Plaintiffs *alone* controlled their costs.** Plaintiffs determined what vehicle(s) they used (SUF ¶¶ 218, 232, 236, 250, 254-255, 263-264); what tools they used (SUF ¶¶ 223, 234, 245); what personal protective equipment they purchased (SUF ¶¶ 224, 246, 261); what office supplies they purchased (SUF ¶¶ 224, 246, 261); their food and entertainment costs (SUF ¶¶ 228, 235, 260); what insurance they obtained and at what cost (SUF ¶¶ 218, 227, 240, 250, 254-255); and what cell phone costs and internet costs they incurred (SUF ¶¶ 229, 240, 261). As a result, Plaintiffs sometimes made a profit, and sometimes suffered a loss, as reported on their tax returns. (SUF ¶¶ 130-131, 239-243, 252.)[55] Employees, of course, cannot write off business expenses or realize a net <u>loss</u> on their income.

---

[50]    *See Carrell*, 998 F.2d at 333-34; *Gate Guard*, 2013 WL 593418 at *8-9; *Carrell*, 998 F.2d at 333; *Thibault*, 612 F.3d at 848; *Mack*, 2012 WL 1067398 at *3-4.

[51]    *See* 2013 WL 593418 at *8.   Richard's pay ranged from $650 to $1,400 per day; Rasberry's pay ranged from $500 to $1,350 per day; Heath's pay ranged from $500 to $1,500 per day; and Ooten's pay ranged from $500 to $1,450 per day. (SUF ¶¶ 107-113.)

[52]    *Carrell*, 998 F.2d at 333-34.

[53]    *Id.*

[54]    612 F.3d at 848.

[55]    In total, Parrish Consulting (Parrish) reported a profit, but claimed more than $290,000 in expenses in his work for Premier; JD Ellestad (Ellestad), reported a ***loss*** to the IRS in 2014 and 2015 of $18,650 and $50,000+, respectively, despite earning $190,000 and $37,000 from Premier each year; V. Hughes Services (Alfaro) reported a profit, despite claiming $43,329 in expenses in 2015; and Beckett reported a profit, despite reporting nearly $100,000 in expenses for his work in 2014 and 2015. (SUF ¶ 130-131, 231, 243, 252.)

Third, Plaintiffs could, and did, earn income apart from the work they performed for Premier. Ellestad operated a goat farm that generated some cash flow from the sale of goats, but realized a net annual loss. (SUF ¶¶ 52, 120.) Alfaro and Beckett provided directional driller services to other directional drilling companies. (SUF ¶¶ 117-119.) Indeed, Beckett earned $306,218 for his "Directional Drilling Consultant" services in 2014, including $104,897 from Premier *and $201,321 from other directional drilling work*. (SUF ¶ 117.) Beckett also earned **$29,392** from other directional drilling work in 2015. (SUF ¶ 118.)

That the Plaintiffs had sufficient control over their schedules to focus on other business ventures is highly probative of independent contractor status.[56] Here, Plaintiffs had anywhere from weeks to one month off between jobs. (SUF ¶¶ 87-91.) Additionally, Plaintiffs could invest in developing their own goodwill with Premier and/or its clients. (SUF ¶ 141.) Thus, each Plaintiffs' opportunity for profit or loss depended on his own ability and willingness to accept or locate additional work either inside or outside of the oil field industry. Because Plaintiffs could negotiate their pay, control their expenses, and engage in additional work, they had the kind of control over their opportunity for profit that is the hallmark of an independent contractor.

### F.  Other Factors Also Weigh in Favor of Independent Contractor Status

#### 1.  *Express Written Agreements*

Plaintiffs understood and agreed to their independent contractor status. In fact, Alfaro, Robbins, and Ellestad all signed agreements expressly stating that "Contractor is an independent contractor.  Nothing in this Agreement shall create or be deemed to create the relationship of employer/employee[.]" (SUF ¶ 275.) This agreement, combined with Plaintiffs' tax returns in which they swore under oath to the IRS that they were independent contractors, is highly probative of independent contractor status.[57]

---

[56]  *Mack*, 2012 WL 1067398 at *4; *see also Gate Guard*, 2013 WL 593418 at *8 (gate attendants could take other jobs, with oil and gas companies or otherwise, "during the extended periods of time [one or more months] they have off between jobs they work for" defendant).

[57]  *See Thibault*, 612 F.3d at 845-46 (independent contractor agreement is relevant); *Gate Guard*, 2013 WL 593418 at *11 (contract was relevant where it "mirror[ed] economic reality");

### 2.	*Industry Standard and Custom*

The court may also consider that it is customary in the industry for certain kinds of workers to be independent contractors.[58] "[T]he Fifth Circuit has stated that 'courts must make allowances for those operational characteristics that are unique or intrinsic to the particular business or industry, and to the workers they employ.'"[59] Accordingly, in *Gate Guard* the court held that the fact that gate attendants were commonly engaged as independent contractors under similar circumstances weighed in favor of independent contractor classification.[60]

Here, the unpredictable fluctuations in the oil industry, combined with the high level of skill required to perform the kind of directional drilling that Premier's customers engage in, makes it necessary for oilfield services companies like Premier to have the flexibility to engage independent contractors to satisfy project-specific needs.[61]   Contrary to Plaintiffs' apparent belief, there is nothing inherently wrong or suspicious with either Plaintiffs' desire to control their own destinies by going into business for themselves, or with Premier's engaging independent contractors.   As one court found, maintaining a core group of employees "and engaging others as independent contractors as needed when and where customer demand increases" is "an eminently reasonable business practice."[62] Accordingly, industry standard and custom further supports a finding that Plaintiffs are independent contractors.

---

*see also Carrell*, 998 F.2d at 334 (plaintiffs were aware of independent contractor status).

[58]	*See Gate Guard*, 2013 WL 593418 at *11-12.

[59]	2013 WL 593418 at *12.

[60]	*Id.* (citing *Mack*, 2012 WL 1067398 at *7 (recognizing industry standard); *Mid–Continent Cas. Co. v. Davis,* No. 3:08–CV–1478–P, 2011 WL 13727, *4 (N.D. Tex. Jan.3, 2011) (recognizing that industry standard was to treat workers as independent contractors); *Trustees of the Mich. Reg. Council of Carpenters Emp. Benefits Fund v. Fox Bros. Co.,* No. 05-CV-70262-DT, 2005 WL 3579173, *6 (E.D. Mich. Dec. 27, 2005) (fact that method of payment was according to industry standard supported a finding that plaintiffs were independent contractors).

[61]	At least six of Premier's competitors (Allis-Chalmers, Strata, Panther Directional, Triton, Gyrodata, and Halliburton Sperry Sun) also use independent contractor DDs.  (SUF ¶¶ 39.)

[62]	*Smith v. Keypoint Gov't Solutions, Inc.*, No. 15-cv-865-REB-KLM, 2016 WL 7324606, *2 (D. Colo. Dec. 16, 2016).

### 3. Plaintiffs' Classification as Independent Contractors Does Not Frustrate the Underlying Purpose of the FLSA

Plaintiffs are <u>not</u> the kind of low-wage workers the FLSA was designed to protect.[63] On an annualized basis, their revenues are staggering: (1) Parrish was paid **$230,033** in 2013, **$279,777** in 2014, and **$174,032** in 2015; (2) Alfaro was paid **$102,000** in 2015; (3) Beckett was paid **$314,691** in 2014 and **$337,809** in 2015; (4) Ellestad was paid **$253,333** in 2014 and **$292,164** in 2015; and (5) Robbins was paid **$111,800** in 2015. (SUF ¶¶ 129, 132, 134, 137, 139.) This level of compensation benefits Plaintiffs' roles as CEOs of their own businesses. If such highly compensated workers must also be paid overtime, it will surely cripple businesses such as Premier and have a profound effect on the domestic oil drilling industry.

### CONCLUSION

Plaintiffs did what millions of workers across the country are only able to dream of doing – cast off the yoke of employment by using the skills and expertise they have developed over years of hard work to go into business for themselves. Indeed, small businesses in any number of industries (such as HR consulting, IT consulting, accounting) are routinely established in exactly this way, by former employees who wish to control their own professional destinies. To deny summary judgment – that is, to allow Plaintiffs to continue seeking overtime on top of the hundreds of thousands of dollars they have already made – would be a miscarriage of justice. It would also allow Plaintiffs to have their cake and eat it, too, by allowing them to have written off tens (and in some cases, hundreds) of thousands of dollars in business expenses by swearing under oath to the IRS that they were in fact in business for themselves. Premier respectfully requests that the Court grant its Motion for Summary Judgment in its entirety, dismiss Premier from this action, and award Premier its reasonable attorneys' fees and costs.

This 21st day of July, 2017.

By:     *s/ Annette A. Idalski*
       Annette A. Idalski
       Texas Bar No. 00793235

---

[63] *Usery*, 527 F.2d at 1311 (citation omitted).

Peter N. Hall, *pro hac vice*
CHAMBERLAIN, HRDLICKA, WHITE
WILLIAMS & AUGHTRY
191 Peachtree Street, N.E., 46th floor
Atlanta, GA 30303-1747
Tel: (404) 658-5386
annette.idalski@chamberlainlaw.com
peter.hall@chamberlainlaw.com

*Counsel for Defendant Premier*
*Directional Drilling, L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I have electronically filed the foregoing with the Clerk of Court via the CM/ECF system which will send notification to all parties and/or counsel of record, including:

Michael A. Josephson
Andrew W. Dunlap
Lindsay R. Itkin
Jessica M. Bresler
Josephson Dunlap Law Firm
11 Greenway Plaza, Suite 3050
Houston, TX 77046
mjosephson@mybackwages.com
adunlap@mybackwages.com
litkin@mybackwages.com
jbresler@mybackwages.com

Richard J. Burch
Matthew Scott Parmet
Bruckner Burch PLLC
8 Greenway Plaza, Suite 1500
Houston, TX 77046
rburch@brucknerburch.com
mparmet@brucknerburch.com

Respectfully submitted this 21st day of July, 2017.

**CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY**

*s/ Annette A. Idalski*
Annette A. Idalski

2613074.3
150101.000004