**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| WILLIAM PARRISH, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. Act. No. 5:16-cv-00417-DAE |
| PREMIER DIRECTIONAL DRILLING, L.P., | ) ) | |
| Defendant. | ) ) | |

**CORRECTED COPY OF**
**PREMIER DIRECTIONAL DRILLING L.P.'S**
**MOTION FOR SUMMARY JUDGMENT AS TO ALL PLAINTIFFS AND**
**MEMORANDUM OF LAW IN SUPPORT**

Premier was introduced to this lawsuit when Plaintiffs' counsel (Michael Josephson) told Premier Directional Drilling LP's ("Premier") limited partner, Todd Brooks, that he had sued Premier and if Premier did not settle, Josephson would use the litigation to drive Premier into bankruptcy.[1] Josephson also bragged that his firm had earned $27,000,000 from suing oilfield companies, and he never even had to set foot in a courtroom. Although the Court allowed notice to circulate to 93 directional drillers, 89 have chosen not to join this lawsuit. The reason is clear – they all understand that they were independent contractors. Even Parrish, who represents the four opt-ins, testified that was an independent contractor and <u>not</u> an employee.  Parrish and the others knew they were independent contractors from the start, and should have never commenced this litigation.

Premier contracted with Plaintiffs to operate independently on remote drilling rigs, where they had to rely on their skills and experience in directional drilling to advise Premier's customer (the drilling operator) on how to reach underground natural resources as quickly, efficiently, and safely as possible. Plaintiffs owned their own consulting companies (such as Parrish Consulting, LLC and JD Ellestad, Inc.). They are all highly skilled in directional drilling - which requires an aptitude in trigonometry, physics, and geology - having gained that skill over years of experience in the oilfield. As highly sought-after experts, Plaintiffs charged up to $1,400 per day for their services, earning as much as $300,000 per year. Plaintiffs were also free to accept or reject jobs as they saw fit, or to take as much time between jobs as they liked. To support their businesses, Plaintiffs invested tens of thousands of dollars in office space, trucks, tools, electronic devices, and other supplies. Plaintiffs then wrote off these business expenses – in many cases over $100,000 annually - allowing the Plaintiffs to pay taxes on only a fraction of their earnings.

U.S. District Court Judge John D. Rainey found (and the Fifth Circuit affirmed) that a similar independent contractor relationship existed between workers and another oilfield services company in *Thomas Perez v. Gate Guard Services LP*.[2] Not only were the gate attendants independent

---

[1] Kennedy Dep. 47:6-13; Schmidt Dec. ¶ 14.

[2] No. V-10-91, 2013 WL 593418, *1 (S.D. Tex. Feb. 13, 2013.)

contractors rather than employees, but the U.S. Department of Labor was ordered to pay the defendant's attorneys' fees for having argued otherwise. This action is equally as frivolous. Plaintiffs are not the kind of economically-dependent, low-wage workers that Congress intended to protect with the overtime requirements of the FLSA.  For these reasons, Premier respectfully requests that summary judgment be granted on all of Plaintiffs' claims.

## STATEMENT OF UNDISPUTED FACTS

### I.     PREMIER'S BUSINESS

Premier is a directional drilling staffing company that supplies Directional Drillers ("DD") and Measurement While Drilling Engineers ("MWD") to drilling operators.[3] Directional drilling is the process of drilling from a point on the surface to a target that might be miles from the drilling rig.[4] Because the operator cannot just drill in a straight line from the surface to the target, hitting the target involves curving the well path from its vertical start, around potential underground obstacles, to and through the pay zone (which might be just a few feet in width). (*Id.*) Although a "well plan" is drafted to describe the curve that will most efficiently reach the target, from the moment drilling begins, real-world variables such as geological fractures, previously-drilled wellbores, and variations in downhole forces act to push the drill off path in ways that cannot be anticipated.[5]

The DD's role is to apply his skill and experience to advise the drilling operator on how to efficiently reach the target given actual downhole forces and conditions.[6] To do this, the DD must use information received from the MWD, as well as trigonometry, physics, and geology, to determine where the drilling tool is located and which direction it is facing.[7] Using this information, along with the well plan, his years of experience, and his intimate knowledge of the drilling rig and

---

[3] Schmidt Dec. ¶3.

[4] Geoffroy Dec. ¶¶ 5-6; Parrish Dep. 93:16-95:5.

[5] Parrish Dep. 86:12-87:24; Geoffroy Dec. ¶¶ 9, 12; Alfaro Dep. 232:5-12.

[6] Alfaro Dep. 230:10-231:3; Menard Dec. ¶ 14; Mims Dec. ¶ 16.

[7] Parrish Dep. 95:11-97:5, 110:7-111:8; Robbins Dep. 93:16-94:13, 110:17-25; Alfaro Dep. 132:25-133:13, 232:25-23314; Ellestad Dep. 97:6-14; Geoffroy Dec. ¶ 18.

the capabilities of the equipment, the DD develops a plan for adjusting various drilling parameters to ensure that the drill continues on the most efficient path to the target.[8] The success of a project is measured by how quickly and accurately the operator is able to hit the target, which depends on the advice provided by the DD.[9] A mistake by the DD can be costly.[10]

During the course of a directional drilling project, the DD submits daily reports to Premier and Premier's customer representatives.[11] Once a project ends, there is no guarantee that another project will be forthcoming.[12] As a result, DD work is on-again/off-again, often with unpredictable and long gaps between projects.[13] After one project ends, the DD may be out of work, move on to another project (with Premier or elsewhere), take time off, or work on a side business.[14]

Given the unpredictable fluctuation in the oil and gas industry, Premier, like many of its competitors, must use a flexible staffing model.[15] To avoid both overstaffing and layoffs, Premier employs a small staff of DDs. (*Id.*) Premier then satisfies additional client needs by supplementing its DD workforce on an as-needed basis with independent contractors who otherwise run their own

---

[8] *Id.*; *see also* Parrish Dep. 114:10-17; Ellestad Dep. 94:21-95:14, 98:9-22; Beckett Dep. 54:8-55:3; Robbins Dep. 109:1-21, 111:12-112:23, 127:5-24; Geoffroy Dec. ¶ 11; Menard Dec. ¶ 13.

[9] Geoffroy Dec. ¶ 8.

[10] Geoffroy Dec. ¶ 9; Oliver Dep. 89:15-23.

[11] Schmidt Dec. ¶ 8; Geoffroy Dep. 81:12-83:8; Beckett Dep. 117:7-10.

[12] Ellestad Dep. 168:11-14; Robbins Dep. 79:23-80:16, 81:19-25, 120:7-10.

[13] Parrish Dep. 62:5-15, 128:16-129:1, Ex. 9; Ellestad Dep. 25:4-13, Ex. 6; Schmidt Dep. II at 74:20-22; Oliver Dep. 50:6-17; Geoffroy Dep. 96:16-19; Mims Dec. ¶ 8. Alfaro had 26 days off between the first and second project and one week off between the second and third project. (Alfaro Dep. 205:15-18, Ex. 10.) Beckett had time off between each job - from 7 to 31 days. (Beckett Dep. 117:3-10, Ex. 13.) Ellestad had time off between most jobs, from 2 to 27 days. (Ellestad Dep. 172:23-173:6, Ex. 12.) Parrish had time off between most jobs, ranging between five to 21 days. (Parrish Dep. 204:16-24, Ex. 17.) Robbins worked on just one project for four days. (Robbins Dep. 17:16-18:24.)

[14] Parrish Dep. 38:7-40:14, 129:2-21, Ex. 5; Menard Dep. 259:15-25; Alfaro Dep. 197:17-22; Beckett Dep. 78:22-79:18, 130:13-22, Exs. 3-5; Ellestad Dep. 56:16-57:7, 71:25-72:6, Ex. 3; Robbins Dep. 127:25-128:21; Mims Dec. ¶ 4.

[15] Schmidt Decl. ¶ 4; Schmidt Dep. II at 35:8-18; Geoffroy Dep. 21:16-24:8; Oliver Dep. 23:5-9.) Premier's use of independent contractor DDs is similar to Allis-Chalmers, Strata, Panther Directional, Triton, Gyrodata, and Halliburton Sperry Sun. (Geoffroy Dep. 21:16-24:8.

directional drilling businesses.[16] When Premier's clients request directional drilling services, Premier sends an employee DD if there is one with available; if not, it must find a contractor DD.[17]

As a staffing company, Premier's profits and losses depend in large measure on the compensation it must pay to the workers who staff its customers' projects.[18] To staff a project with independent contractor DDs is expensive, as such DDs are highly-sought after and able to command a premium for their special skill.[19] Independent contractor DDs have spent years developing their skills in various geologies and with various drilling rigs, making them more valuable than a DD without a specialized expertise.[20] Many independent contractor DDs have developed personal goodwill with operators, resulting in Premier having to pay to satisfy its customers' preferences.[21] Because they are free to work anywhere they choose, independent contractor DDs can charge a premium from Premier in exchange for them foregoing the opportunity to work elsewhere.[22] Independent contractors can also charge more because they provide their own tools and equipment.[23]

Since Premier pays a premium for independent contractor DDs, it expects them to have everything (skills, tools, supplies, etc.) necessary to complete a project for one of Premier's customers without any supervision or oversight from Premier.[24] Premier does not train or instruct

---

[16] Menard Dep. 50:6-18; Schmidt Dep. I at 41:8-42:17; Schmidt Dep. II at 35:8-18; Menard Dec. ¶ 2.

[17] Geoffroy Dep. 30:15-31:7.

[18] Schmidt Dec. ¶ 6

[19] Parrish Dep. 31:11-33:13, 40:2-14, Exs. 1-5, 8; Ellestad Dep. 58:8-16, 67:12-69:4, Exs. 3-5, 13; Robbins Dep. Ex. 6; Alfaro Dep. 93:8-15, 219:13-15, Exs. 2, 11; Beckett Dep. Ex. 3, 14.

[20] Parrish Dep. 47:23-52:1, 54:14-56:22, 60:13-61:25, 155:8-24, Ex. 6; Ellestad Dep. 13:4-17, 23:17-20, 102:16-103:6, Ex. 8; Alfaro Dep. 109:2-112:13, 222:6-24, Ex. 3; Robbins Dep. 27:12-30:18, 37:19-42:9, 80:20-24, 90:1-10, Ex. 2; Beckett Dep. 19:1-20:17, 24:2-6, 29:3-33:1, Ex. 1; *see also* Schmidt Dep. II at 69:9-13; Geoffroy Dec. ¶ 3; Menard Dec. ¶¶ 14-15; Mims Dec. ¶¶ 16, 18.

[21] Parrish Dep. 188:3-189:24; Robbins Dep. 135:16-136:3; Menard Dep. 281:17-282:1.

[22] Schmidt Dec. ¶ 12; Menard Dep. 259:15-25; Alfaro Dep. 197:17-22; Ellestad Dep. 71:25-72:6; Beckett Dep. 130:13-22; Selby Dep. 21:24-22:1.

[23] Parrish Dep. 11:1-14:3, 17:7-30: 9, 76:21-83:25, 118:17-119:16, Exs. 1-3, 5; Ellestad Dep. 47:20-51:2, 120:11-122:9, Ex. 5; Beckett Dep. 69:10-74: 15, 92:18-95:14, Exs. 4, 5; Alfaro Dep. 67:8-74:15, 82:12-84:11, 99:3-104:13, 135:24-141:7, Exs. 2, 5; Robbins Dep. 95:20-96:16, 99:3-10; Menard Dep. 245:3-14; Schmidt Dep. II at 93:17-22; Mims Dec. ¶ 29.

[24] Schmidt Dec. ¶ 15.

independent contractor DDs on how to do their jobs.[25] No Premier supervisor was on site to monitor Plaintiffs' day-to-day work.[26] No Plaintiff ever received a performance review or was disciplined by Premier.[27] Premier's only instruction to Plaintiffs was with respect to how they reported their *results* to Premier and/or its clients, via software known as "WinServe."[28] Notably, merely provides a format for reporting drilling results.[29] As explained by Premier's Vice President, Premier has no say in how a DD goes about his job – "Every directional driller does something different."[30]

## II.     PLAINTIFFS' DIRECTIONAL DRILLING CONSULTING BUSINESSES

Plaintiffs had each developed their own unique expertise and skills through years of training and experience before they first contracted with Premier.[31] Parrish had 18 years of experience in the oilfield and a full year's experience as a DD.[32] Ellestad worked as a directional driller for eight years.[33] Robbins had 16 years of experience working in the oilfield, seven years as a drilling operator, and was an employee directional driller for six months prior to contracting with Premier.[34]

---

[25] Oliver Dep. 50:2-5; Ellestad Dep. 154:16-20; Robbins Dep. 159:4-161:8; Schmidt Dep. II at 130:12-132:16-22, Ex. 13; Alfaro Dep. 194:15-19; Geoffroy Dec. ¶ 13.)  The only "training" Plaintiffs received was safety training that had nothing to do with how to do directional drilling. (Parrish Dep. 172:11-173:7, 182:9-18, Ex. 15; Robbins Dep. 159:4-161:8; Geoffroy Dec. ¶ 17.)

[26] Parrish Dep. 131:15-133:1; Ellestad Dep. 123:23-124:2, 169:3-6; Robbins Dep. 123:6-20; Beckett Dep. 127:10-21. On rare occasions, a DD Coordinator might come to a rig to interact with the customer. (Parrish Dep. 131:15-133:8.) The DD Coordinator is not a "supervisor"; he merely ensures jobs are properly staffed and tools are properly delivered to each job site. (Menard Dep. 33:6-23; Kennedy Dep. 87:19-88:15.)

[27] Parrish Dep. 232:3-11; Ellestad Dep. 168:15-169:6; Robbins Dep. 131:18-24; Menard Dep. 169:23-25; Beckett Dep. 132:16-22.

[28] Parrish Dep. 244:17-245:17, Ex. 22; Geoffroy Dep. 54:13-16; Schmidt Dep. I at 59:4-60:18; Oliver Dep. 83:23-84:8; Schmidt Dec. ¶ 7.

[29] Parrish Dep. 126:17-128:1; Schmidt Dec. ¶ 8.

[30] Geoffroy Dep. 54:13-55:3.

[31] Parrish Dep. 47:23-25, 51:20-55:10, 60:13-61:25, Ex. 6; Ellestad Dep. 13:4-17, 23:17-20, 102:16-103:6, Ex. 8; Robbins Dep. 27:12-30:18, 37:19-42:9, 80:20-24, 90:1-10, Ex. 2; Alfaro Dep. 109:2-112:13, 222:10-14, Ex. 3; Beckett Dep. 19:1-20:17, 24:2-6, 29:3-33:1, Ex. 1.

[32] Parrish Dep. 47:23-25, 51:20-52:1, 54:14-55:10, Ex. 6.

[33] Ellestad Dep. 13:4-17, Ex. 8.

[34] Robbins Dep. 27:12-30:18, 37:19-38:21, 42:6-9, 90:1-10.

Alfaro had 22 years' experience in the oilfield and seven years' experience as a DD.[35] Beckett had 13 years' experience in the oilfield and eight years' experience as a DD.[36]

Plaintiffs each decided to go into business for themselves by opening their own DD consulting firms - Parrish formed Parrish Consulting, LLC; Ellestad formed JD Ellestad, Inc.; and Alfaro formed V. Hughes Services, LLC.[37] They received Forms 1099 for their work and declared to the IRS that they were self-employed.[38] Plaintiffs agreed that they were independent contractors.[39] They considered the benefits and risks of going into business for themselves rather than being an employee, and chose to open their own businesses.[40] Indeed, despite filing this lawsuit, **Parrish still agrees he was an independent contractor**, and not an employee:

> Q:  All right. And now you're here suing Premier saying you're an employee, right?
> **A:  I'm not an employee.**
> **Q:  Okay. You're an independent contractor for Premier?**
> **A:  Yes.[41]**

Having set up their own consulting firms, Plaintiffs then ensured that their businesses had whatever resources they each decided they needed to do directional drilling work – they purchased and/or assigned to their businesses trucks, computers, printers, calipers, tape measures, office supplies, safety gear, clothing, cell phones, internet, and health insurance.[42] Parrish, Alfaro and Ellestad provided their own computers and WinServe.[43] Parrish, Alfaro, and Ellestad set up their own legal

---

[35] Alfaro Dep. 109:2-112:13.

[36] Beckett Dep. 19:1-20:17, 24:2-6, 29:3-31:17.

[37] Parrish Dep. 11:24-12:23; Ellestad Dep. 35:8-37:6, Ex. No. 14; Alfaro Dep. 24:5-26:7. Beckett also operated a "Directional Drilling Consulting" business. (Beckett Dep. Exs. 4-5.)

[38] Beckett Dep. Ex. 4-5; Parrish Dep. Exs. 1, 3, 5; Ellestad Dep. Exs. 3, 4; Alfaro Dep. Ex. 2.

[39] Parrish Dep. 15:1-18:22, 37:7-12, 70:3-71:19, 74:10-19, Exs. 1, 3, 5, 7, 14; Alfaro Dep. 103:16-104:9, 192:13-193:11, Exs. 2, 7; Beckett Dep. 40:5-22, 68:13-19, Ex. 4; Ellestad Dep. 30:5-31:15, 39:22-41:17, 62:8-10, 104:21-105:16, Exs. 1, 2, 3, 4, 8; Robbins Dep. 71:10-73:24, Exs. 4, 5.

[40] Parrish Dep. 15:1-10; Ellestad Dep. 30:5-31:15; Beckett Dep. 40:5-22.

[41] Parrish Dep. 37:7-12) (emphasis added).

[42] Parrish Dep. Exs. 1, 3-5; Alfaro Dep. Exs. 2, 5;  Beckett Dep. Exs. 4, 5; Ellestad Dep. Ex. 3-5; Robbins Dep. 69:17-71:4, 95:20-96:16, 99:3-10, 129:9-12; Oliver Dep. 38:9-16; Schmidt Dep. I 165:9-15; Mims Dec. ¶ 29.

entities.[44] Alfaro even set up a separate office outside his home for V. Hughes Services, LLC.[45]

Plaintiffs made every decision related to their businesses. They chose whether to focus on getting projects from Premier or looking elsewhere for work.[46] They decided which projects to accept and which to decline; indeed, Parrish admits he turned down projects when he wanted.[47] Plaintiffs decided whether to negotiate for their services, including whether to offer discounts or ask for more money, as Parrish did from time to time.[48] As a result of this individual negotiation, independent contractor DDs charged anywhere between $425 and $1,500 per day.[49]

Plaintiffs also controlled their businesses' profit by controlling their expenses. For example, Plaintiffs paid for their own travel, and their own food and entertainment while on a job.[50] As another example, Some independent contractors (like Beckett) paid for their own living expenses.[51]

Having declared themselves to be self-employed, Plaintiffs deducted business expenses on

---

[43] Parrish Dep. 82:11-83:25; Ellestad Dep. 51:10-54:17, 126:19-127:8; Alfaro Dep. 88:5-11, 138:13-22. To ensure consistent reporting, Premier provided access to WinServe, although contractors could and did use their own computers WinServe if they preferred. (*Id.*; Menard Dep. 141:4-12; Oliver Dep. 112:13-113:1; Schmidt Dep. I at 65:6-8; Schmidt Decl. at ¶¶ 10, 11, Ex. 1.)

[44] Parrish Dep. 11:24-16:21, 29:20-21, Ex. 35; Ellestad Dep. 35:8-37:6, 41:18-23, Ex. 3, 14; Alfaro Dep. 91:10-13, 253:7-14.

[45] Alfaro Dep. 67:8-71:10.

[46] Parrish Dep. 129:2-21; Alfaro Dep. 197:17-22; Beckett Dep. 130:13-22; Ellestad Dep. 71:25-72:6; Mims Dec. ¶ 4; Schmidt Dec. ¶ 12

[47] Parrish Dep. 134:10-135:5, 216:4-23, 248:11-21, 253:13-254:1; Alfaro Dep. 151:19-154:4; Beckett Dep. 43:3-9; Ellestad Dep. 80:20-81:11, 135:14-16; Geoffroy Dep. 93:18-20; Oliver Dep. 66:4-7; Menard Dep. 264:4-22; Menard Dec. ¶ 3; Mims Dec. ¶ 3.

[48] Schmidt Dep. I at 125:10-23, 126:16-21, 129:7-15, 130:17-22, 131:25-132:19, 156:13-17; Schmidt Dep. II at 76:7-10, 84:15-18, 85:22-25, 121:2-122:3; Alfaro Dep. 220:15-23; Parrish Dep. 140:19-141:4, 142:13-144:11; Ellestad Dep. 136:3-11; Robbins Dep. 134:16-25.

[49] Alfaro Dep. 154:20-23; Heath Dec. ¶27. Parrish charged between $972 and $1,200 per day. (Parrish Dep. 138:3-5, 139:7-11, 140:3-12.) Alfaro charged between $425 and $1,050 per day; Beckett, between $1,300 and $1,400 per day; Ellestad, between $1,170 and $1,300 per day; and Robbins, $1,075 per day. (Alfaro Dep. 152:7-11, 154:20-24; Beckett Dep. 115:24-116:2; Ellestad Dep. 178:5-13, Ex. 13; Robbins Dep. Ex. 6.) Heath's pay ranged from $500 to $1,500 per day. (*Id.*)

[50] Parrish Dep. 232:24-234:7; Alfaro Dep. 137:24-138:2; Beckett Dep. 72:22-73:8, Ex. 4, 5; Ellestad Dep. 176:23-177:10.

[51] Beckett Dep. 95:18-99:16; Schmidt Dep. II at 98:10-24; Menard Dep. 213:9-23.

their tax returns.[52] Parrish wrote off over $118,000 in 2013, and nearly $115,000 in 2014, plus another $33,000 in just three months in 2015.[53] JD Ellestad, Inc. generated about $190,000 in revenues in 2014, but reported a <u>loss</u> of $18,650 because Ellestad's business had also invested in a goat farm.[54] Alfaro's company, V. Hughes Services, wrote off $43,000 in business expenses over just a few months in 2015.[55] Beckett wrote off almost $100,000 in business expenses over two years.[56]

Plaintiffs were contracted by Premier on a short-term, project-by-project basis and were not guaranteed work from Premier.[57] Most Plaintiffs worked projects through Premier for less than a year.[58] In sum, as independent contractor DDs, Plaintiffs had a fundamentally different relationship with Premier than Premier had with its employee DDs.

| Employees | Plaintiffs – Independent Contractors[59] |
|---|---|
| Report to Operations Manager | Not supervised by any Premier employee |
| May be promoted, demoted, or transferred | Not eligible for promotion, demotion, or transfer |
| Must work jobs as instructed by Premier | Free to accept or reject jobs |
| Premier assigns jobs | Free to set own availability and schedule |
| Paid a guaranteed salary plus set daily bonus | Paid only for work done; free to negotiate pay |
| Eligible for insurance and other benefits | Must provide their own insurance |
| Taxes withheld; Form W-2 | No taxes withheld; Form 1099 |
| Eligible for reimbursement of expenses | No reimbursements; responsible for own costs |
| Prohibited from working for other companies while employed by Premier | Free to work in other businesses, including Premier's competitors |
| Eligible for training on how to be a directional driller | Must have the skill, experience, and expertise to operate independently and without oversight |

[52] Parrish Dep. Exs. 1, 3, 5; Ellestad Dep. Exs. 3, 4; Alfaro Dep. Ex. 2; Beckett Dep. Ex. 4.

[53] Parrish Dep. 40:15-41:6, Exs. 3-5.

[54] Ellestad Dep. 48:17-23, Ex. 3.

[55] Alfaro Dep. 104:5-13, Ex. 2 p.5.

[56] Beckett Dep. 74:9-82:1, Exs. 4, 5.

[57] Parrish Dep. 62:5-15, 128:16-129:1, Exs. 9, 17; Alfaro Dep. Ex. 10; Beckett Dep. Ex. 13; Ellestad Dep. 25:4-13, 82:11-83:18, 168:11-14, Exs. 6, 12; Robbins Dep. 120:7-10.

[58] Parrish Dep. 11:4-5, 21:22-24; Alfaro Dep. 102:2-6; Beckett Dep. 114:1-5; Ellestad Dep. 86:25-87:3; Robbins Dep. 17:16-18:24.

[59] Parrish Dep. 129:2-21; Alfaro Dep. 197:17-22, 220:20-221:3; Beckett Dep. 130:13-22; Ellestad Dep. 71:25-72:6; Geoffroy Dep. 34:21-36:2, 80:11-23, 99:11-12; Menard Dep. 56:24-57:4, 259:15-25; Oliver Dep. 86:16-25; Schmidt Dep. II at 22:24-23:4, 50:5-52:8, 74:15-22, 90:12-13, 94:2-10, 124:5-125:11, 138:17-20, 140:25-141:14; Schmidt Decl. ¶12; Menard Dec. ¶¶ 24-25.

**PROCEDURAL HISTORY**

In his Complaint, Plaintiff William Parrish asserted that he, and others similarly situated, were improperly classified as independent contractors and, as such, were not paid overtime. On November 7, 2016, the Court granted conditional certification of a class of directional drillers who performed work for Premier between May 5, 2013 and the present. Despite notice circulating to 93 former independent contractor directional drillers, only four individuals are pursuing claims.[60] In keeping with their promise to drive Premier into bankruptcy because it refuses to settle, Plaintiffs have made this litigation very costly. At every turn, Plaintiffs have run up Premier's legal fees by filing numerous baseless discovery motions before this court.  Yet, despite the extensive discovery, the record is devoid of any evidence supporting Plaintiffs' claim that they were Premier's employees.

**ARGUMENT AND CITATION OF AUTHORITY**

**I.    PLAINTIFFS ARE INDEPENDENT CONTRACTORS NOT SUBJECT TO FLSA**

There is no FLSA coverage where an independent contractor relationship exists, which is a question of law.[61] The Fifth Circuit utilizes a five factor test to determine whether an individual is an employee or an independent contractor: (1) the permanency of the relationship; (2) the degree of control exercised by the alleged employer; (3) the skill and initiative required to perform the job; (4) the extent of the investments in the specific project(s) at issue; and (5) the degree to which the worker controls his or her own opportunity for profit or risk of loss.[62] The court may also consider other factors, such as whether the worker held himself out as an independent contractor, industry standards, and whether the individual is the kind of low-wage worker the FLSA was designed to protect.[63] Not all factors must weigh in favor of independent contractor classification for the Court to

---

[60] Former opt-in plaintiffs Dennis Jones, Christopher Leonard, Michael Stump, Johnny Davis, Jr., Jason Shepherd, Gyula Toppanto, and Michael Gardner have all voluntarily withdrawn without any payment or promise from Premier. [Doc. Nos. 52, 54, 101, 131].

[61] *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 264 (5th Cir. 1987); *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 n.24 (5th Cir. 1985).

[62] *See Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332-33 (5th Cir. 1993).

[63] *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983); *Henderson v. Hernandez*, No. 5:05-cv-037-C, 2005 WL 473678, at *1 (N.D. Tex. 3/1/05); *Gate Guard Services,*

find that the worker was properly classified as an independent contractor as a matter of law.[64]

### A.   Plaintiffs' Work Was Short-Term and on a Project-to-Project Basis

Where a relationship is on-again/off-again, it will weigh in favor of independent contractor status. The Fifth Circuit has found workers to be independent contractors because they worked on a project-to-project basis for a limited time and could also work for other companies.[65] For instance, the Fifth Circuit in *Carrell* held that the welders were independent contractors, not employees, stating, "[t]he Welders' relationship with [the alleged employer] was on a project-by-project basis, the Welders worked from job to job and from company to company; many of the Welders spent little time working for [the alleged employer]".[66]

Similarly, in *Thibault*, a plaintiff who "did not work exclusively for defendants," "traveled from job-to-job and from state-to-state looking for work," was an independent contractor.[67] In both *Gate Guard* and *Mack*, the workers were independent contractors where they "were hired on a job-by-job basis", worked "off and on", were free to work for other companies, and could accept or reject projects as they chose.[68] Notably, work can be project-based and indicative of independent contractor status even if two projects occur back-to-back.[69]

Here, like the workers in *Carrell*, *Thibault*, *Mack* and *Gate Guard*, Plaintiffs: (1) worked on a project-by-project basis;[70] (2) often had weeks off between projects;[71] (3) were free to accept or

---

*L.P. v. Solis*, No. V-10-91, 2013 WL 593418, at *11-13 (S.D. Tex. 2/13/13).

[64] *Carrell*, 998 F.2d at 334; *see also Thibault v. Bell S. Tele. Inc.*, 612 F.3d 843, 846 (5th Cir. 2010).

[65] *See Thibault*, 612 F.3d at 846; *see also Carrell*, 998 F.2d at 332; *Mack v. Talasek*, No. V-09-53, 2012 WL 1067398, at *4-6 (S.D. Tex. Mar. 28, 2012).

[66] 998 F.2d at 334.

[67] 612 F.3d at 846.

[68] *Mack*, 2012 WL 1067398 at *4-6, *Gate Guard*, 2013 WL 593418 at *10-11.

[69] *Id.*

[70] Parrish Dep. 129:2-21; Alfaro Dep. 197:17-22, 220:20-221:3; Beckett Dep. 130:13-22; Ellestad Dep. 71:25-72:6; Geoffroy Dep. 34:21-36:2, 80:11-23, 99:11-12.

[71] Parrish Dep. 62:5-15, 128:16-129:1, Ex. 9; Ellestad Dep. 25:4-13, 76:11-77:21, 82:11-19, 83:5-18, Ex. 6.

decline projects;[72] (4) were not guaranteed future work;[73] (5) could find their own replacement;[74] and (6) controlled their own schedule by choosing which jobs they would accept.[75] Plaintiffs could also do other work between Premier projects, including work for Premier's competitors.[76]

      Further, with the exception of Parrish, the Plaintiffs provided services to Premier over the course of less than one year.[77] Robbins contracted with Premier for **only four days**; Alfaro contracted with Premier at various times over the course of just **two months**; Beckett provided services to Premier over the course of only **seven months**; and Ellestad provided services at various times over the course of **ten months**.[78] (*Id.*) As several courts in the Fifth Circuit have found, similar facts weigh heavily in favor of independent contractor status.[79]

### B.    <u>Plaintiffs Were Highly Skilled and Demonstrated Significant Initiative</u>

      The skill indicative of an independent contractor relationship includes "some unique skill set…or some ability to exercise significant initiative within the business."[80] Mere "routine work

---

[72] Parrish Dep. 134:10-135:5, 216:4-23, 248:11-21, 253:13-254:1; Alfaro Dep. 151:19-154:4; Beckett Dep. 43:3-9; Ellestad Dep. 80:20-81:11, 135:14-16; Geoffroy Dep. 93:18-20; Kennedy Dep. 75:16-76:11; Oliver Dep. 66:4-7; Menard Dep. 264:4-22; Menard Dec. ¶ 3; Mims Dec. ¶ 3.

[73] Parrish Dep. 62:5-15, 128:16-129:1, Exs. 9, 17; Alfaro Dep. Ex. 10; Beckett Dep. Ex. 13; Ellestad Dep. 25:4-13, 82:11-83:18, 168:11-14, Exs. 6, 12; Robbins Dep. 120:7-10.

[74] Parrish Dep. 207:18-209:7; Menard Dep. 171:11-172:5.

[75] Parrish Dep. 254:13-256:2, Ex. 33; Beckett Dep. 145:22-146:7; Alfaro Dep. 220:20-23; Geoffroy Dep. 35:20-36:2; Schmidt Dep. II at 76:7-10; Oliver Dep. 86:16-25, 112:4-12, 117:18-14. *See Talbert v. American Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (plaintiff was independent contractor where she "ultimately controlled the number of hours she worked.").

[76] Parrish Dep. 129:2-21; Menard Dep. 259:15-25; Alfaro Dep. 92:11-93:2, 197:17-22; Beckett Dep. 130:13-22; Ellestad Dep. 56:16-57:7, 71:25-72:6, Ex. 3; Robbins Dep. 127:25-128:21.

[77] Parrish Dep. 11:4-5, 21:22-24; Alfaro Dep. 102:2-6; Beckett Dep. 114:1-5; Ellestad Dep. 86:25-87:3; Robbins Dep. 17:16-18:24.

[78] Parrish performed services for Premier at different times over less than three years from April 2012 to March 2015. (Parrish Dep. 11:4-5, 21:22-24, 41:14-16.)

[79] *See Mack*, 2012 WL 1067398 at *5 (average of nine to 20 months); *Carrell*, 998 F.2d at 332 (three to sixteen weeks); *Lindsley v. Bellsouth Telecomms., Inc.*, 401 F. App'x 944, 945 (5th Cir. 2010) (three months); *Gate Guard*, 2013 WL 593418 at *10 (average of four months).

[80] *Wherley v. Schellsmidt*, No. 3:12-cv-0242-D, 2013 WL 5744335, at *5 (N.D. Tex. 10/23/13).

which requires industry and efficiency is not indicative of independence and nonemployee status."[81] Plaintiffs did not do mere "routine work." Each job presents unique challenges that the Plaintiffs were required to plan for, react to, and overcome.[82]

In this sense, Plaintiffs were "hired guns" – experts in directional drilling who could come in to a project and give advice to an operator on how best to use the operator's own equipment to achieve the end result of smooth wellbore that hits the pay zone.[83] The independent contractor DDs' specialized skill set is akin to a harbor pilot – an individual who comes onto someone else's ship and gives advice to efficiently direct the ship from Point A to Point B.[84]

Similarly, *Carrell* found "specialized skills" indicative of an independent contractor in the case of welders on a pipeline, where the stakes are higher and the margin for error smaller than other types of welding work.[85] Likewise, it takes "specialized skills" to drill miles-long oil wells, where millions of dollars are on the line and the pay zone may be only a few feet in width, than other types of directional drilling work, such as guiding a utility conduit under a residential driveway.[86]

Plaintiffs must have wide-ranging skills and expertise to be able to walk on to a drilling rig and efficiently guide the wellbore to the target. For example, Plaintiffs needed to be able to "analyz[e] well plans and gamma markers to maximize time spent in the production zone."[87] This, in turn, required a "[s]ound mathematical background in directional drilling operations." (*Id.*) Plaintiff

---

[81] *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976).

[82] Parrish Dep. 110:7-114:17; Alfaro Dep. 132:25-133:13, 230:10-233:14; Ellestad Dep. 94:21-98:22; Beckett Dep. 54:8-55:3; Robbins Dep. 109:1-112:23, 127:5-24; Geoffroy Dep. 88:16-89:4; Geoffroy Dec. ¶¶ 11-13; Menard Dec. ¶¶ 12-14; Mims Dec. ¶ 16.

[83] *Id.*; *see also* Ellestad Dep. 171:11-16, Ex. 11; Robbins Dep. 126:13-127:24, Ex. 10; Menard Dep. 84:22-85:24, 193:1-20; Alfaro Dep. 116:18-117:1; Mims Dec. ¶ 19.

[84] *Coleman v. N.O. & Baton Rouge S.S. Pilots' Ass'n*, 437 F.3d 471, 479, 481 (5th Cir. 2006); *see also Blancq v. Hapag-Lloyd A.G.*, 986 F. Supp. 376, 382 (E.D. La. 1997) (river pilot was "self-employed and acted as an independent contractor").

[85] 998 F.2d at 333 ("Pipe welding, unlike other types of welding, requires specialized skills.").

[86] Geoffroy Dec. ¶ 6; Menard Dec. ¶ 5.

[87] Alfaro Dep. Ex. 3; Beckett Dep. Ex. 1.

must also have the skills needed for the formation that is being drilled.[88] Plaintiffs gained these skills through *specialized* on-the-job training and experience.[89]

Plaintiffs had to show initiative in ensuring the drill stayed close to the well path, anticipating issues to minimize down time, and correcting issues on their own or in conjunction with others.[90] Plaintiffs' initiative in proactively monitoring drilling and anticipating problems is of vital importance because errors could cost the operator hundreds of thousands of dollars.[91]

Further, Plaintiffs also showed skill and initiative in running their own businesses.[92]   They negotiated their pay;[93] chose which work to accept or reject;[94] decided where to focus their revenue-generation efforts;[95] developed goodwill with to increase the likelihood of obtaining future work either from Premier or from the operator directly;[96] and controlled their costs and expenses.[97] Thus,

---

[88] Parrish Dep. 56:5-22, 60:13-17, 61:17-25, 155:8-24; Alfaro Dep. 222:6-24; Beckett Dep. 31:18-33:1, Ex. 1; Ellestad Dep. 23:17-20, 165:16-166:8, Ex. 8; Robbins Dep. 80:20-24, Ex. 2; Schmidt Dep. II at 61:18-22, 69:9-13; Menard Dec. ¶¶ 14-15; Mims Dec. ¶¶ 16, 18.

[89] *Id.*; Parrish Dep. 47:23-25, 51:20-52:1, 54:14-55:10, Ex. 6.

[90] Parrish Dep. 94:1-97:5, 103:16-104:14, 110:7-114:17, 178:17-179:7; Alfaro Dep. 132:25-133:13, 230:10-233:14; Beckett Dep. 54:8-55:3, 58:1-23; Ellestad Dep. 90:16-91:18, 94:21-98:22, 144:24-145:2; Robbins Dep. 34:4-36:2, 93:16-94:13, 109:1-112:23, 132:23-133:17; Geoffroy Dep. 88:16-89:4; Schmidt Dep. II at 101:17-19, 103:4-15; Geoffroy Dec. ¶¶ 10-12, 14; Menard Dec. ¶¶ 9, 13-14; Mims Dec. ¶¶ 14-16. *See Carrell*, 998 F.2d at 333-34 (worker was "highly skilled" where "initiative was limited to decisions regarding his welding equipment and the details of his welding work").

[91] Schmidt Dec. ¶ 15.

[92] *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983) (running a business shows initiative); *see also Donovan v. Dial America Marketing, Inc.*, 757 F.2d 1376, 1387 (3d Cir. 1985).

[93] Schmidt Dep. I at 125:10-23, 126:16-21, 129:7-15, 130:17-22, 131:25-132:19, 156:13-17; Schmidt Dep. II at 76:7-10, 84:15-18, 85:22-25, 121:2-122:3; Parrish Dep. 140:19-141:4, 142:13-144:11; Ellestad Dep. 135:17-136:11; Robbins Dep. 134:16-25;  Menard Dep. 217:25-219:4, 222:12-17; Geoffroy Dep. 35:30-36:2; Oliver Dep. 112:4-12, 117:18-14; Mims Dep. ¶ 5.

[94] Parrish Dep. 134:10-135:5, 216:4-23, 248:11-21, 253:13-254:1; Alfaro Dep. 151:19-154:4; Beckett Dep. 43:3-9; Ellestad Dep. 80:20-81:11, 135:14-16; Geoffroy Dep. 93:18-20; Kennedy Dep. 75:16-76:11; Oliver Dep. 66:4-7; Menard Dep. 264:4-22; Menard Dec. ¶ 3; Mims Dec. ¶ 3.

[95] Robbins Dep. 127:25-128:21; Ellestad Dep. 71:25-72:6.

[96] Parrish Dep. 188:3-189:24; Robbins Dep. 135:16-136:3; Menard Dep. 281:17-282:1.

[97] Parrish Dep. 18:17-22, 36:21-37:12, 40:22-41:6, Exs. 1, 3, 5; Ellestad Dep. 62:8-10, Exs. 3, 4; Alfaro Dep. 103:16-19, 104:5-9, Ex. 2; Beckett Dep. 68:13-19, Ex. 4.

this factor weights in favor of independent contractor status.[98]

###    C.    Premier Did Not Control the Details of Plaintiffs' Work or Their Schedules

Ceding control over work details to highly-skilled experts indicates independent contractor status.[99] Like the workers in *Gate Guard*, *Thibault*, *Talbert*, and *Mack*, Plaintiffs were not told how to do their jobs or supervised on a day-to-day basis.[100] To the contrary, they were paid up to $300,000 per year precisely because they did <u>not</u> need supervision.[101]

Plaintiffs received no training, performance reviews, or discipline from a Premier supervisor.[102] While Plaintiffs had the option of contacting a DD Coordinator as a resource, they were not required to do so.[103] It was up to the DDs to advise operators by going through a complicated thought process in real-time and based on actual conditions in the field:

> [I]f a drill was "3 degrees [off plan] and you're 20 feet out, you've [the DD] got to make the decision on 'Do I slide now'; 'Is the formation going to turn me'; you know, 'Based on my last yield, if I do slide, how much am I going to slide'; 'What directional am I going to hold it to get it back to the level.'

(Oliver Dep. at 93:3-18.) This analysis done by DDs is probative of independent contractor status.[104]

---

[98] *Chao v. Mid-Atl. Install. Servs., Inc.*, 16 Fed, Appx. 104, 107 (4th Cir. 2001) (independent contractor's "net profit or loss depends … on the business acumen with which the [he] makes his required capital investments").

[99] *See Thibault* 612 F.3d at 846-47 (cable splicer was independent contractor where no instruction on details of work); *Carrell*, 998 F.2d at 334 (welder was an independent contractor where he controlled the details of work); *Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 566 (7th Cir. 2009) (independent contractor controlled the details of work).

[100] Parrish Dep. 131:15-133:1; Ellestad Dep. 123:23-124:2, 169:3-6; Robbins Dep. 123:6-20; Beckett Dep. 127:10-21; Menard Dec. ¶ 12.

[101] In any event, Plaintiffs admit that no Premier supervisor was ever on-site. (Parrish Dep. 131:15-133:1; Ellestad Dep. 122:15-25, 123:23-124:2, 169:3-6; Robbins Dep. 123:6-20; Beckett Dep. 127:10-21; Menard Dec. ¶ 12.) Parrish admits at more than 75% of the jobs he worked he never even saw a safety officer or DD coordinator at a rig. (Parrish Dep. 131:15-133:8.) Such rare and limited interactions do not evidence control. *See Gate Guard* 2013 WL 593418 at *3-6; *see also Thibault*, 612 F.3d at 847 (supervisor only occasionally at worksite and did not tell workers how to do job).

[102] Parrish Dep. 54:14-55:10, 232:3-11, Ex. 6; Ellestad Dep. 13:4-17, 168:15-169:6, Ex. 8; Robbins Dep. 30:16-18, 42:6-9, 131:18-24, Ex. 2; Alfaro Dep. 111:14-112:13, Ex. 3; Beckett Dep. 19:1-20:17, 132:16-22, Ex. 1; Menard Dep. 169:23-25; Oliver Dep. 50:2-5.

[103] Oliver Dep. 88:5-9; Geoffroy Dec. ¶ 11; Mims Dec. ¶ 27; Menard Dec. ¶¶ 12-13.

[104] *See Talbert*, 405 F. App'x at 856 (independent contractor expected to handle work without

Plaintiffs also had control over their schedule because they could accept or reject work as they saw fit.[105] This fact was probative of independent contractor status in *Gate Guard*, even when the work was offered on a "take-it or leave-it basis".[106] Also, as in *Gate Guard*, Plaintiffs could engage in personal activities of their choosing when they had time.[107] 2013 WL 593418 at *3-6.[108] Indeed, several contractor DDs had side businesses to which they could tend when not on-duty on a rig, such as Ellestad's goat farm, Raspberry's hydro-graphics company, and Richard's gutter business. (*Id.*) That Plaintiffs could choose how to apportion their time between their directional drilling business and other ventures is probative of an independent contractor relationship.[109]

Any *safety* training is irrelevant because it had nothing to do with how to do directional drilling.[110] In *Gate Guard*, the workers received safety training but were still independent contractors because they received "no training or instruction on how to do their work."[111] In any event, safety measures do **not** evidence the type of control indicative of employment.[112] Likewise, the fact that

---

supervision); *Gate Guard*, 2013 WL 593418 at *5 (lack of day-to-day supervision showed independent contractor status); *Mack*, 2012 WL 1067398 at *2 (same).

[105] Parrish Dep. 248:11-21, 251:10-22, 253:13-256:2; Alfaro Dep. 151:19-154:4; Beckett Dep. 43:3-9; Ellestad Dep. 80:20-81:11, 135:14-16; Robbins Dep. 136:19-137:9; Geoffroy Dep. 35:20-36:2; 93:18-20; Oliver Dep. 66:4-7; Menard Dec. ¶ 3; Mims Dec. ¶ 3.

[106] 2013 WL 593418 at *7; *see also Mack*, 2012 WL 1067398 at *2 (control factor weighed in favor of independent contractor status where the workers could decline a request to work)

[107] Parrish Dep. 38:7-10, 40:2-14, 129:2-21, Ex. 5; Menard Dep. 259:15-25; Alfaro Dep. 92:11-93:2, 197:17-22; Beckett Dep. 65:5-24, 66:2-7, 78:22-79:18, 130:13-22, Exs. 3-5; Ellestad Dep. 56:16-57:7, 71:25-72:6, Ex. 3; Robbins Dep. 127:25-128:21; Mims Dec. ¶ 4.

[108] *See also Mack*, 2012 WL 1067398 at *1-2 (independent contractor status where the workers (1) could control the length of their shifts; (2) could turn down projects; and (3) were not restricted from providing gate guard services to other companies during the time they worked for defendant).

[109] *Talbert v. American Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (plaintiff was independent contractor where she could control how much she worked for the alleged employer).

[110] Parrish Dep. 172:11-173:7, 182:9-18, Ex. 15; Alfaro Dep. 194:15-19; Ellestad Dep. 154:16-20; Robbins Dep. 159:4-161:8; Geoffroy Dep. 56:2-10; Menard Dep. 320:5-322:13; Oliver Dep. 50:2-5; Schmidt Dep. II at 104:23-24, 130:12-132:22, Ex. 13; Geoffroy Dec. ¶ 17.

[111] 2013 WL 593418 at *3-6.

[112] *See, e.g.*, *Gate Guard*, 2013 WL 593418 at *6; *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004) (control exercised to "ensur[e] compliance with safety and security regulations" is

Plaintiffs submitted daily drilling reports does not evidence "control" because daily reporting allowed Premier to ensure its customers were receiving quality service from Plaintiffs.[113] Like safety, quality control measures are not indicative of employment.[114]

Given the lack of supervision, and that the only requirements imposed were safety training and quality control reporting, Premier did not exert the type control indicative of an employer.

### D.   Plaintiffs Made Substantial Investments in Their Businesses

Substantial investment in one's own business shows economic independence, and therefore independent contractor status.[115] Here, Plaintiffs invested tens of thousands of dollars in their directional drilling consulting businesses, as evidenced by the tens of thousands of dollars in business expenses they wrote off on their taxes.[116] In total, Parrish (through Parrish Consulting, LLC) reported **more than $266,000 in expenses** – including $118,000 in 2013; $115,000 in 2014; and $33,000 for just three months of work in 2015.[117] Ellestad, despite earning $190,000 from Premier in 2014, reported a *loss* to the IRS of $18,650, evidencing more than **$200,000 in expenses**.[118] Again, Ellestad reported a *loss* of more than $50,000 in 2015, despite earning $37,000 from Premier, evidencing **$87,000 in expenses**.[119] Alfaro (through V. Hughes Services) reported $43,329 in expenses in just a few months in 2015.[120] And Beckett reported **$64,765** in expenses in 2014 and **$30,355** in expenses

---

"qualitatively different" from employment); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 691-92 (D. Md. 2010) (quality control and safety measures did not show employment); *Zampos v. W&E Comm'ns, Inc.*, 970 F. Supp. 2d 794, 804 (N.D. Ill. 2013) ("quality control and compliance-monitoring that stem from the nature of the business…are qualitatively different from control that stems from the nature of the relationship between the employees and the putative employer").

[113] Schmidt Dec. ¶ 8.

[114] *See, e.g.*, *Jacobson,* 740 F. Supp. 2d at 690-91 (quality control is not indicative of employment).

[115] *See Carrell*, 998 F.2d at 333.

[116] Ellestad Dep. 47:20-48:23, Ex. 3, 5; Parrish Dep. 40:15-41:6, Exs. 3-5; Alfaro Dep. 104:5-13, Ex. 2; Beckett Dep. 74:9-15, 81:24-82:1, Exs. 4, 5.

[117] Parrish Dep. 40:15-41:6, Exs. 3-5.

[118] Ellestad Dep. 48:17-23, Ex. 3.

[119] Ellestad Dep. 64:23-65:4, 67:12-69:4, Ex. 4, 5.

[120] Alfaro Dep. 104:5-13, Ex. 2.

in 2015.[121] In short, Plaintiffs each built businesses that generated hundreds of thousands of dollars annually in revenue, and that held tens of thousands of dollars in assets and consumables.

Premier's investment in its business has nothing to do with whether the Plaintiffs had gained economic independence. In any event, the Court should not focus on Premier's investment relative to Plaintiffs' investments.[122] For example, in *Gate Guard*, the court **did not even refer to** Gate Guard's overall investment, focusing instead on the fact that the plaintiffs had invested up to $72,000 in their businesses.[123] Here, even viewing Plaintiffs' investments in the context of Premier's investment in a given project, the result is more indicative of economic independence than in *Gate Guard*. In that case, Gate Guard invested up to $20,000 in each project;[124] by contrast, Premier's investment is at most an $1,100 laptop, and access to WinServe ($4,500 plus $900 annually).[125]

### E.   Plaintiffs' Controlled Their Own Opportunities for Profit or Loss

Independent contractors control their own opportunity for profit or loss, which can turn on their ability to (1) negotiate compensation for their services, (2) control costs and deduct business expenses, and (3) earn additional income.[126] First, like the workers in *Gate Guard*, Plaintiffs could demand more money or offer a discount, with rates ranging from $425 to $1,500 per day.[127]

Second, the focus is on Plaintiffs' tax returns. In *Carrell*, the Fifth Circuit found that the plaintiffs' tax returns showed they could control their profit margins.[128] Similarly, in *Thibault* the

---

[121] Beckett Dep. 74:9-15, 81:24-82:1, Exs. 4, 5.

[122] *See Carrell*, 998 F.2d at 333 (investment of $19,000 caused factor to weigh in favor of independent contractor status despite the alleged employer's "obviously significant" overall investment); *Thibault*, 612 F.3d at 847 (citing *Carrell*).

[123] 2013 WL 593418 at *7; *see also Carrell*, 998 F.2d at 333; *Thibault*, 612 F.3d at 847-48.

[124] 2013 WL 593418 at *7.

[125] Schmidt Decl. at ¶¶ 10, 11, Ex. 1. *See also Carrell*, 998 F.2d at 333.

[126] *See Carrell*, 998 F.2d at 333-34; *Gate Guard*, 2013 WL 593418 at *8-9; *Carrell*, 998 F.2d at 333; *Thibault*, 612 F.3d at 848*; Mack*, 2012 WL 1067398 at *3-4.

[127] Alfaro Dep. 154:20-23; Heath Dec. ¶ 27. *See* 2013 WL 593418 at *8.

[128] *Carrell*, 998 F.2d at 333-34.

plaintiffs controlled their costs and expenses.[129] Like the plaintiffs in *Carrell* and *Thibault*, **Plaintiffs alone controlled their costs.** Plaintiffs determined what vehicle(s) they used; what tools they used; what personal protective equipment they bought; what office supplies they bought; food and entertainment costs; what insurance they obtained; and what cell phone and internet costs they incurred.[130] As a result, Plaintiffs sometimes reported a profit, and sometimes reported a loss on their taxes. Employees, of course, cannot write off business expenses or realize a net <u>loss</u> on their income.

Third, Plaintiffs earned income apart from the work they performed for Premier. Ellestad operated a goat farm that generated cash flow from the sale of goats, but realized a net annual loss.[131] Alfaro and Beckett provided directional driller services to other directional drilling companies.[132] Indeed, Beckett earned $306,218 as a consultant in 2014, including ***$201,321 from sources other than Premier***.[133] Beckett also earned **$29,392** in 2015 from other, non-Premier sources.[134]

That the Plaintiffs had sufficient control over their schedules to focus on other business ventures shows independent contractor status.[135] Here, Plaintiffs had weeks off between jobs.[136] Plaintiffs could also develop their own goodwill with Premier and/or its clients.[137] Thus, each Plaintiffs' opportunity for profit or loss depended on his own ability and willingness to accept or locate additional work either inside or outside of the oil field industry. Because Plaintiffs could negotiate their pay, control their expenses, and engage in additional work, they had the kind of

---

[129] 612 F.3d at 848.

[130] Parrish Dep., Exs. 1, 3, 5; Ellestad Dep., Exs. 3, 4; Alfaro Dep., Ex. 2; Beckett Dep., Ex. 4.

[131] Ellestad Dep. 41:24-42:11, 56:16-57:7, Ex. 3.

[132] Beckett Dep. 65:5-66:2-7, Ex. 3, 5; Alfaro Dep. 92:11-93:2.

[133] Beckett Dep. 65:5-24, Ex. 3.

[134] Beckett Dep. 66:2-7, Ex. 3, 5.

[135] *Mack*, 2012 WL 1067398 at *4; *see also Gate Guard*, 2013 WL 593418 at *8 (gate attendants could take other jobs, with oil and gas companies or otherwise, "during the extended periods of time [one or more months] they have off between jobs they work for" defendant).

[136] Parrish Dep. 129:2-21, Ex. 5; Menard Dep. 259:15-25; Alfaro Dep. 197:17-22; Beckett Dep. 130:13-22, Exs. 3-5; Ellestad Dep. 71:25-72:6, Ex. 3; Robbins Dep. 127:25-128:21.

[137] Parrish Dep. 188:3-189:24; Robbins Dep. 135:16-136:3; Menard Dep. 269:1-14.

control over their opportunity for profit that is the hallmark of an independent contractor.

### F.   Other Factors Also Weigh in Favor of Independent Contractor Status

#### 1.   Express Written Agreements

Plaintiffs agreed to their independent contractor status. In fact, Alfaro, Robbins, and Ellestad all signed agreements stating that "Contractor is an independent contractor.  Nothing in this Agreement shall create or be deemed to create the relationship of employer/employee[.]"[138] This agreement, combined with Plaintiffs' tax returns in which they swore under oath to the IRS that they were independent contractors, is highly probative of independent contractor status.[139]

#### 2.   Industry Standard and Custom

The court may also consider that it is customary in the industry for certain kinds of workers to be independent contractors.[140] "[T]the Fifth Circuit has stated that 'courts must make allowances for those operational characteristics that are unique or intrinsic to the particular business or industry, and to the workers they employ.'"[141] Accordingly, in *Gate Guard*, the fact that gate attendants were commonly engaged as independent contractors weighed in favor of independent contractor status.[142]

Here, the fluctuations in the oil industry, combined with the high level of skill required to do the kind of directional drilling that Premier's customers engage in, makes it necessary for oilfield services companies like Premier to have the flexibility to engage independent contractors to satisfy project-specific needs. Contrary to Plaintiffs' apparent belief, there is nothing inherently wrong or suspicious with either Plaintiffs' desire to control their own destinies by going into business for

---

[138] Ellestad Dep., Exs. 1, 2; Robbins Dep., Exs. 4, 5; Alfaro Dep., Ex. 7.

[139] *See Thibault*, 612 F.3d at 845-46 (independent contractor agreement is relevant); *Gate Guard*, 2013 WL 593418 at *11 (contract was relevant where it "mirror[ed] economic reality"); *see also Carrell*, 998 F.2d at 334 (plaintiffs were aware of independent contractor status).

[140] *See Gate Guard*, 2013 WL 593418 at *11-12.

[141] 2013 WL 593418 at *12.

[142] *Id.*; *Mid–Continent Cas. Co. v. Davis*, No. 3:08–CV–1478–P, 2011 WL 13727, *4 (N.D. Tex. Jan.3, 2011) (recognizing that industry standard was to treat workers as independent contractors); *Trustees of the Mich. Reg. Council of Carpenters Emp. Benefits Fund v. Fox Bros. Co.*, No. 05-CV-70262-DT, 2005 WL 3579173, *6 (E.D. Mich. Dec. 27, 2005).

themselves, or with Premier's engaging independent contractors. Maintaining a group of employees "and engaging others as independent contractors as needed when and where customer demand increases" is "an eminently reasonable business practice."[143] Accordingly, industry standard and custom further supports a finding that Plaintiffs are independent contractors.

### 3. Plaintiffs' Classification as Independent Contractors Does Not Frustrate the Underlying Purpose of the FLSA

Plaintiffs are <u>not</u> the kind of low-wage workers the FLSA was designed to protect.[144] On an annualized basis, their revenues are staggering: (1) Parrish was paid **$230,033** in 2013, **$279,777** in 2014, and **$174,032** in 2015; (2) Alfaro was paid **$102,000** in 2015; (3) Beckett was paid **$314,691** in 2014 and **$337,809** in 2015; (4) Ellestad was paid **$253,333** in 2014 and **$292,164** in 2015; and (5) Robbins was paid **$111,800** in 2015.[145] This level of compensation benefits Plaintiffs' roles as CEOs of their own businesses.  If such highly compensated workers are also paid overtime, it will surely cripple businesses such as Premier and have a profound effect on the domestic oil drilling industry.

### CONCLUSION

Plaintiffs did what millions of workers across the country only dream of doing – cast off the yoke of employment by using their skills and expertise, developed over years of hard work, to go into business for themselves. To deny summary judgment – that is, to allow Plaintiffs to continue seeking overtime on top of the hundreds of thousands of dollars they have already made – would be a miscarriage of justice. It would also allow Plaintiffs to have saved tens of thousands of dollars in taxes by swearing to the IRS that they were independent contractors, only to reap thousands more in overtime. Premier requests that the Court grant its Motion for Summary Judgment and award Premier its reasonable attorneys' fees and costs.

This 24th day of July, 2017.                    By:     _s/ Annette A. Idalski_____

---

[143] *Smith v. Keypoint Gov't Solutions, Inc.*, No. 15-cv-865-REB-KLM, 2016 WL 7324606, *2 (D. Colo. Dec. 16, 2016).

[144] *Usery*, 527 F.2d at 1311 (citation omitted).

[145] Parrish Dep. 135:19-136:1, Ex. 8; Ellestad Dep. 178:5-13, Ex. 13; Robbins Dep. Ex. 6; Alfaro Dep. 219:10-14, Ex. 11; Beckett Dep. 133:22-134:5, Ex. 14.

Annette A. Idalski
Texas Bar No. 00793235
Peter N. Hall, *pro hac vice*
CHAMBERLAIN, HRDLICKA, WHITE
WILLIAMS & AUGHTRY
191 Peachtree Street, N.E., 46th floor
Atlanta, GA 30303-1747
Tel: (404) 658-5386
annette.idalski@chamberlainlaw.com
peter.hall@chamberlainlaw.com

*Counsel for Defendant Premier
Directional Drilling, L.P.*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this day I have electronically filed the foregoing with the Clerk of Court via the CM/ECF system which will send notification to all parties and/or counsel of record, including:

| | |
|---|---|
| Michael A. Josephson | Richard J. Burch |
| Andrew W. Dunlap | Matthew Scott Parmet |
| Lindsay R. Itkin | Bruckner Burch PLLC |
| Jessica M. Bresler | 8 Greenway Plaza, Suite 1500 |
| Josephson Dunlap Law Firm | Houston, TX 77046 |
| 11 Greenway Plaza, Suite 3050 | rburch@brucknerburch.com |
| Houston, TX 77046 | mparmet@brucknerburch.com |
| mjosephson@mybackwages.com | |
| adunlap@mybackwages.com | |
| litkin@mybackwages.com | |
| jbresler@mybackwages.com | |

      Respectfully submitted this 24th day of July, 2017.

              **CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY**

              *s/ Annette A. Idalski*
              Annette A. Idalski

2614853.2
150101.000004