**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| WILLIAM PARRISH, individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiffs, ) | |
| v. ) | Civ. Act. No. 5:16-cv-00417-DAE |
| ) | |
| PREMIER DIRECTIONAL DRILLING, L.P., ) ) | |
| Defendant. ) ) | |

**PREMIER DIRECTIONAL DRILLING L.P.'S**
**RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The question in this case is whether, as a matter of economic reality, Plaintiffs were in business for themselves. Plaintiffs' Motion for Summary Judgment, however, ignores their own sworn deposition testimony, which shows their true economic independence. Plaintiffs admittedly controlled every aspect of their work – from setting up their own consulting firms, to accepting or rejecting jobs as they saw fit, to negotiating their rates, to purchasing necessary tools and equipment, to managing their expenses, to filing taxes and writing off business expenses. On these admissions alone, it is indisputable that Plaintiffs were independent contractors. Tellingly, Plaintiffs cannot cite to a single case in which directional drillers were found to have been improperly classified as independent contractors.

Plaintiffs' heavy reliance on a Consultant Agreement (rather than their own admissions) to prove their case is unavailing. This agreement, entered into only by Parrish and not the others, was not even applicable during the limitations period.[1] Moreover, the agreement is between Parrish and Directional Personnel (a staffing agency), not Premier Directional Drilling ("Premier"). Even if it was applicable here, and it is not, Plaintiffs ignore that the agreement plainly states: "**Consultant [Parrish] is an independent contractor to Company [Premier]** and Service Provider [Directional Personnel]. Consultant is not entitled to employee benefits provided for employees of Company or Service Provider. **Consultant acknowledges it is an independent contractor to Company** and Service Provider[.]"[2] Plaintiffs cannot prove they were employees of Premier by relying on a contract that states they were independent contractors of Directional Personnel. Plaintiffs' reliance on the agreement is, in short, a red herring.

Plaintiffs struggle to point to any interactions between Plaintiffs and Premier that could evidence an employment relationship. They merely contend that Premier: interviewed them; hired them; provided driving directions to the job site; and terminated their contracts. Indeed, these examples underscore the complete absence of any employment relationship.

---

[1] Geoffroy Dep. at 39:10-16; Geoffroy Dec. ¶ 3; Oliver Dep. at 54:1-18.

[2] Parrish Dep. Ex. 7, ¶ 13 (emphases added).

Equally as weak is Plaintiffs assertion that Premier's safety and quality control measures evidence "employment" control. This argument misstates the law. It is common sense that safety measures in the oilfield are required whether a worker is a contractor or an employee. And independent contractors can be required to do good quality work without becoming employees. Safety and quality control is not the kind of "control" that evidences an employment relationship. As one court explained, "acceptance of the owner's interpretation of the specifications, quality control over the materials used, workmanlike performance, time requirements, and safety standards are legitimate concerns . . . even though the contractor is, and remains an independent business concern."[3] Plaintiffs cannot and do not cite any authority to the contrary.

The scant evidence presented by Plaintiffs, coupled with their own admissions that they were economically independent, makes it abundantly clear that Plaintiffs' Motion for Summary Judgment is frivolous. The undisputed material facts do not support Plaintiffs' position. To the contrary, the undisputed evidence shows that *Premier* is entitled to judgment as a matter of law.

## ARGUMENT AND CITATION OF AUTHORITY

## I.     PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IS RIDDLED WITH FALSEHOODS AND UNSUPPORTED FACTS

The record evidence points in only one direction – that Plaintiffs were in business for themselves. Plaintiff's Motion, however, rests on <u>false</u> statements, convenient omission of their own admissions, and misrepresentations of the deposition testimony.[4] While Premier cannot address every misrepresentation, it will address the most egregious examples as follows.

First, in attempting to minimize their investments in their own businesses, Plaintiffs claim that "DDs spent hundreds of dollars per year (to be generous)." (Mot. at 10). This assertion would surely come as a surprise to the IRS, with whom Plaintiffs filed tax returns claiming *hundreds of thousands* of dollars in write-offs as business expenses. The indisputable evidence shows that Plaintiffs spent an average of about **<u>$121,000</u>** per year on their businesses:

---

[3] *Ray v. Monsanto Co.*, 420 F.2d 915, 919 (9th Cir. 1970).

[4] In ruling on Plaintiffs' Motion, the Court must take the facts in the light most favorable to Premier. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 601 (1986).

| YEAR | PLAINTIFF | BUSINESS EXPENSES[5] |
|---|---|---|
| 2013 | Parrish | **$ 118,000** |
| 2014 | Parrish | **$ 115,000** |
| | Ellestad | **$ 200,000** (approx.) |
| | Beckett | **$ 194,295** annualized ($ 64,765 actual) |
| 2015 | Parrish | **$ 132,000** annualized ($ 33,000 actual) |
| | Ellestad | **$ 87,000** |
| | Alfaro | **$ 519,948** annualized ($ 43,329 actual) |
| | Beckett | **$ 91,065** annualized ($ 30,355 actual) |

Plaintiffs' claim that they invested "hundreds of dollars per year (to be generous)" is a blatant misrepresentation of the record evidence.

A second example is Plaintiffs' assertion that "[t]here is no evidence of any one of Plaintiffs ever negotiating his rate of pay or turning down a job." (Mot. at 11). Again, this statement is false. Named Plaintiff William Parrish testified that <u>he negotiated his pay</u>:

> Q. Did somebody tell you that you weren't allowed to ask for more money?
>
> A. I had did – **I did ask for more money at different points of time** for, like, the first time when I went to working my first day job – or after I completed my first day job, which I didn't get. And then another time after these rates changed and there was something came out that I had talked to another coordinator about saying, well, I'm already this level of DD, so my pay should be this. And it's not, it's this.[6]

And Mr. Parrish also testified, contrary to Plaintiffs' Motion, that he in fact rejected jobs:

> Q. I think it was your – your testimony earlier that you have – you have never turned down a job that was offered to you by Premier; is that right?
>
> A. I – I've never turned down a job. There has been just times where I couldn't physically be there. **If I was on days off, out of town with my family and they called and said, hey, I need you to go here, someone needs to fill in, there's just been times where I couldn't make it.** But if I was home doing nothing I never turned down a job.
>
> Q. Okay. And when you had something else going on or some – some reason that you couldn't take the job, did you –
>
> A. There was probably like two or three times. Very – a handful of times where I might have been out of town and just physically not there to go.
>
> Q. Got it. Did you – did you still get called for – when another job came up –
>
> A. Yes.[7]

---

[5] Parrish Dep. at 40:15-41:6, Exs. 3-5; Alfaro Dep. at 104:5-13, Ex. 2 p.5; Beckett Dep. at 74:9-15, 81:24-82:1, Exs. 4, 5; Ellestad Dep. Exs. 4-5.

[6] Parrish Dep. 140:19-141:4 (emphasis added).

[7] Parrish Dep. 134:10-135:4 (emphasis added).

Perhaps the most egregious factual misrepresentations concern the Directional Personnel Consultant Agreement. For example, Plaintiffs argue that "they couldn't bring in any business since Premier's Consultant Agreement made them surrender any ability to market themselves and appoint Premier as their exclusive 'Marketing Agent.'" (Mot. at 12). None of that is true:

- The Directional Personnel Consulting Agreement is <u>not</u> Premier's. Parrish entered into this Agreement with Directional Personnel, a third party Parrish used to receive notice of available jobs. (Mot., Ex. 2, ¶ 1; Geoffroy Dec. (Doc. No. 158-11) at ¶ 3.)

- The "Service Provider" that is designated as the "Marketing Agent" is Directional Personnel – not Premier. (Mot., Ex. 2, para. 1).

- The Marketing Agent is <u>not</u> exclusive – this is pure fiction. The Agreement states that "Consultant [Parrish] has agreed that Service Provider [Directional Personnel] is Marketing Agent[.]" (Mot., Ex. 2, ¶ 6). It says <u>nothing</u> about exclusivity; Plaintiffs were free to market to whoever they chose.

- Moreover, the only Plaintiff to sign the Directional Personnel Consulting Agreement was Parrish; <u>none</u> of the other Plaintiffs signed that agreement. (Parrish Dep. Ex. 7; Geoffroy Dep. at 39:10-16; Geoffroy Dec. ¶ 3; Oliver Dep. at 54:1-18.)

- Plaintiffs fail to mention that the Directional Personnel Consulting Agreement on which they rely was signed <u>before</u> the limitations period. During the limitations period, Inpetro's Mutual Non-Disclosure and Confidentiality Agreement applied. It said nothing about "marketing agents" and does not even mention "exclusivity" or any prohibition on bringing in business or working for other companies. To the contrary, Inpetro's agreement stated: "**Contractor is an independent contractor**. Nothing in this Agreement shall create or be deemed to create the relationship of employer/employee[.]" (Mot., Ex. 4, ¶ 11 (emphasis added)).

Plaintiffs also falsely claim that the Directional Personnel Consulting Agreement contains a "non-compete clause." (Mot. at 6). It does not. The language to which Plaintiffs refer is: "If Consultant [Parrish] were to leave Service Provider [Directional Personnel] prior to the conclusion of the specific job or project, then Consultant agrees not to work with or provide service to Company [Premier], either directly or indirectly through another firm." (Parrish Dep. Ex. 7, ¶ 6.) This is not a noncompete clause like an employee might sign. Rather, it is an agreement in which a staffing agency asks the person receiving placement services (Parrish) not to cut out the middle-man and work directly for the staffing agency's client (Premier), at least until the current project is finished. There is <u>nothing</u> about this clause that suggests Premier exercised such control over Plaintiffs that they ceased to be independent contractors.

Plaintiffs also misrepresent the testimony of Vice President Ward Geoffroy when they claim he testified that Premier "swapped" (i.e., merely changed titles or status) employee DDs to independent contractor status. (Mot. at 7). Mr. Geoffroy was clear that there were no mere changes in titles or status – Plaintiffs were laid off, and chose to go into business for themselves:

> Q. You understand that he [Alfaro] was swapped from employee to contract?
>
> A. No. . . . I know he was laid off because work slowed down.
>
> Q. Okay.
>
> A. And he was told that if he – if something came up if he was a contract hand – at the time we need – if we need a hand, we would work him.[8]

Former DD Coordinator Casin Oliver – who actually filled out the document containing the term "swap" that Plaintiffs rely so heavily upon – was directly asked "if there was a reduction of … workforce … because times were slow, Premier would swap them over to contract, correct?", to which Mr. Oliver answered unequivocally "No." (Oliver Dep. 33:19-24). In fact, Mr. Oliver went on to explain the document he filled out:

> What is actually happening is they were being laid off. And when I laid them off, I called them and – they were laid off; and they had an option of if we had any work come available, then they could get their contract stuff filled out and be ready to go if something came up.[9]

In short, Plaintiffs' claim that IC DDs had a mere status change is contradicted by the record.

## II. PLAINTIFFS WERE ECONOMICALLY INDEPENDENT CONTRACTORS

To be entitled to summary judgment on their overtime claims, Plaintiffs must first prove that they were employees, not independent contractors.[10] The Fifth Circuit has framed the

---

[8] Geoffroy Dep. 35:11-19. Geoffroy further testified that the document to which Plaintiffs point as evidence of "swapping" contained a semantics error. (Geoffroy Dep. at 46:14-18) ("All I can say is to my opinion Casin [Oliver] put the wrong thing on there.")

[9] Oliver Dep. 73:22-74:2. Other witnesses testified similarly: Office Manager Bonnie Selby testified that "They were never swapped to contract. They had an opportunity. . . . When they were laid off for lack of work, they had an opportunity to be a contract hand for any company." (Selby Dep. 78:22-79:2). Premier's CFO stated, "[a]fter laid off from Premier, Mario Alfaro and Michael S. Robbins chose to go into business for themselves and offer to work projects for Premier on an as-needed basis." (Schmidt Dec. ¶ 13 [Doc. No. 158-10]).

[10] *Chapman v. A.S.U.I. Healthcare of Texas, Inc.*, No. H-11-3025, 2012 WL 3614187, at *2 (S.D. Tex. Aug. 21, 2012) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)); *Kalferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 264 (5th Cir. 1987); *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1188 (5th Cir. 1979).

question as "whether the individual is, as a matter of economic reality, in business for himself."[11] To answer that question, courts in the Fifth Circuit look to five factors: (1) control over the details of work performance; (2) the independent contractor's investment in his own business; (3) the permanency of the relationship; (4) the skill and initiative required; and (5) the degree to which the worker controls his profit or loss.[12] Not all factors must weigh in favor of independent contractor status for the worker to be an independent contractor as a matter of law.[13]

The Court need not look further than Plaintiffs' own admissions to grant summary judgment in favor of Premier. Plaintiffs admittedly had their own corporations, including V. Hughes Services, LLC; Parrish Consulting, LLC; and JD Ellestad, Inc.;[14] claimed that they had their own business on their tax returns and wrote off hundreds of thousands of dollars (*id.*); worked only on a project-by-project basis with lengthy breaks in between;[15] were highly skilled, commanding large daily rates of up to $1,400, which was more than directional driller employees could earn;[16] could reject jobs;[17] and could work for other companies besides Premier.[18]

### A. Premier Did Not Control the Details of Plaintiffs' Work

#### 1. Premier Did Not "Assign" Work or "Supervise" Plaintiffs

Plaintiffs' incorrectly assert that "Premier *assigned* IC DDs to its job sites for its clients."

---

[11] *Carrell v. Sunland Construction, Inc.*, 998 F.2d 330, 332 (5th Cir. 1998).

[12] *See Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332-33 (5th Cir. 1993).

[13] *Carrell*, 998 F.2d at 334; *Thibault v. Bell S. Tele. Inc.*, 612 F.3d 843, 846 (5th Cir. 2010).

[14] Parrish Dep. 82:11-83:25, Exs. 1, 3, 5; Ellestad Dep. 44:20-21, Ex. 3-5; Alfaro Dep. 88:5-11, 138:13-22, Ex. 2.

[15] Parrish Dep. 62:5-15, 128:16-129:1, Ex. 9; Ellestad Dep. 25:4-13, Ex. 6; Oliver Dep. 50:6-17; Geoffroy Dep. 96:16-19; Mims Dec. ¶ 8.

[16] Parrish Dep. 138:3-5, 139:7-11, 140:3-12; Alfaro Dep. 152:7-11, 154:20-24; Beckett Dep. 115:24-116:2; Ellestad Dep. 178:5-13, Ex. 13; Robbins Dep. Ex. 6.

[17] Parrish Dep. 134:10-135:5, 216:4-23, 248:11-21, 253:13-254:1; Alfaro Dep. 151:19-154:4; Beckett Dep. 43:3-9; Ellestad Dep. 80:20-81:11, 135:14-16; Geoffroy Dep. 93:18-20; Kennedy Dep. 75:16-76:11; Oliver Dep. 66:4-7; Menard Dep. 264:4-22; Menard Dec. ¶ 3; Mims Dec. ¶ 3.

[18] Parrish Dep. at 129:2-21; Menard Dep. at 259:15-25; Alfaro Dep. at 197:17-22; Ellestad Dep. at 71:25-72:6; Beckett Dep. at 130:13-22; Selby Dep. at 21:24-22:1; Kennedy Dep. at 75:16-25; *see also* Mims Dec. ¶ 4; Schmidt Dec. ¶ 12.

(Mot. at 7) (emphasis added). Plaintiffs do not and cannot cite to <u>any</u> evidence that supports this claim because it is contradicted by the undisputed evidence. As Parrish admitted, he was free to reject projects when he chose.[19] One DD Coordinator explained that there were no *assignments* when it came to independent contractors: "An employee actually works for the company, and they get told where to go and how to work and all that good stuff. A contractor can actually turn down work or turn down projects or what have you."[20]

Plaintiffs' claim that Premier's coordinators "supervised" the details of Plaintiffs' work is also unsupported by the record. (Mot. at 7). Former DD Coordinator Casin Oliver explained what the term "supervise" meant with regard to coordinators: "I'm not really supervising the directional drillers. I am over the – the certain jobs and send tools to those jobs . . . And I'm here for like help or guidance, if – if they run into any issues."[21] Plaintiffs do not cite to any contradictory evidence. Instead, they argue that the DD Coordinators: "interviewed" them, "hired" them, gave them directions to the job site, "terminated" their "relationship"; and provided them with the "well plan". (Mot. at 7). To say that these things amount to supervision is preposterous. No one would have a builder build an extension on their home without first interviewing the builder to figure out whether he was qualified, hiring the builder, telling the builder where the house was, describing the plans for the extension, and then checking in to make sure the work was progressing. It would be a total abdication of common sense to find that these basic steps constitute *control* sufficient to transform someone into an "employee."

Plaintiffs' other allegations of "supervision" fare no better. For example, Plaintiffs claim Premier supervised Ellestad and Alfaro by "swapping" them to contract status. (Mot. at 7). First, no employee ever underwent a mere title or status change, as Plaintiffs suggest; rather, Ellestad and Alfaro were terminated due to lack of work and had the option of going into business for

---

[19] Parrish Dep. at 134:10-135:5, 216:4-23, 248:11-21, 253:13-254:1

[20] R. Menard Depo. 327:24-328:3

[21] Oliver Dep. at 20:12-17.

themselves.[22] Second, even if true, changing pay methods says nothing about control over the method and manner in which Plaintiffs performed their work, which is what matters.[23] Plaintiffs also claim that they were "controlled" because they had to submit requests for time off. (Mot. at 7). But this is contrary to the record.[24] In fact, Parrish testified that if he had something else he would rather do than work, he simply turned down the project.[25] And again, this says nothing about the kind of control that matters, control over the method and manner of work performance.[26] Finally, Plaintiffs argue that they were required to follow Premier's "policies and procedures." (Mot. at 7). **But Plaintiffs do not describe what those "policies and procedures" were**, much less offer proof that they were <u>required</u> to follow them or that those procedures resulted in Premier controlling the method and manner in which they performed their work.

### 2. There Is No Contract that Controls the Details of Plaintiffs' Work

Plaintiffs' first argument for contractual control is a hyperbolic statement that Premier controlled "everything Plaintiffs did, including on location, through its Master Services Agreements … with Premier's clients." (Mot. at 5-6). But beyond this bald assertion, Plaintiffs identify nothing in the Master Services Agreements that gives Premier any right to control Plaintiffs in any way. (Mot., Ex. 38). Premier's warranty to its customer that it would "meet the quality and performance standards set forth by the client" does not prove that Premier controlled Plaintiffs' day-to-day work, even if Plaintiffs were somehow bound by Premier's contract with its client. As one circuit court held, a "standard quality assurance provision by which the [putative employer] reserves the right to determine whether it is satisfied with the services it is

---

[22] Schmidt Dep. II at 38:11-25, 64:14-18, 67:15-20; Geoffroy Dep. at 35:11-36:2; Selby Dep. at 78:16-79:9; Oliver Dep. at 33:19-34:16; Schmidt Dec. ¶ 13.

[23] *Thibault v. Bellsouth Commun's, Inc.*, 612 F.3d 843, 846-47 (5th Cir. 2010) (finding lack of control where putative employer "never specified how Thibault should do the splicing . . . [It] was up to Thibault to go out and fix the problem.").

[24] Menard Dep. at 53:2-54:6, 56:3-57:4, 62:5-17; Oliver Dep. at 86:16-25.

[25] Parrish Dep. at 251:10-22, 253:13-254:1.

[26] *Thibault*, 612 F.3d at 846-47.

purchasing under the contract" is entirely consistent with independent contractor status.[27]

Plaintiffs' next argument is based on the Directional Personnel Consultant Agreement, which, as noted above, predates the limitations period and was not signed by any Plaintiff but Parrish. Moreover, Plaintiffs' claim that Paragraph 1 of the agreement "obligated the DDs to follow the policies and procedures of the oilfield services companies to which Premier assigned them" is **not true**. Paragraph 1 states that the contractor will provide services "under terms and conditions set out severally in a Master Service Agreement, Country Agreement or Work Order" with Premier. (Mot., Ex. 2, ¶ 1). But there is no reference to "policies and procedures" or any control over the details of work in the Master Service Agreement. (Mot., Ex. 38).

Next, Plaintiffs claim the contracts somehow "limited DDs' ability to work for other companies." (Mot. at 6.) As an initial matter, no contract says this – neither the Directional Personnel Consultant Agreement nor the Inpetro Confidentiality Agreement has any restriction on Plaintiffs' ability to work for whoever they wanted. (Parrish Dep. Ex. 7; Ellestad Dep. Ex. 2.)

Moreover, even if there were such a restriction in the contracts – and there is not – the indisputable evidence shows that Plaintiffs could nevertheless work for other companies, including Premier's competitors.[28] Plaintiff Ellestad's consulting firm, JD Ellestad, Inc., also operated a goat farm, for example. (Ellestad Dep. 41:24-42:11, 56:16-57:7.) Thus, the Fifth Circuit's holding in *Brennan v. Partida* is directly applicable: "[i]t is not significant how one 'could have' acted under the contract terms. The controlling realities are reflected by the way one actually acts."[29] There is no evidence that Plaintiffs were ever prevented from working for

---

[27] *Duplan v. Harper*, 188 F.3d 1195, 1201 (10th Cir. 1999); *see also Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 690 (D. Md. 2010) ("Indeed, detailed instructions and close monitoring are key components in many independent contractor and franchise relationships.").

[28] Parrish Dep. at 129:2-21; Menard Dep. at 259:15-25; Alfaro Dep. at 197:17-22; Ellestad Dep. at 71:25-72:6; Beckett Dep. at 130:13-22; Selby Dep. at 21:24-22:1; Kennedy Dep. at 75:16-25; *see also* Mims Dec. ¶ 4; Schmidt Dec. ¶ 12.

[29] 492 F.2d 707, 709 (5th Cir. 1974); *see also Hopkins v. Cornerstone America*, 512 F. Supp. 2d 672, 691 (N.D. Tex. 2007) ("it's not what the parties 'could have done' that counts, but as a matter of economic reality what they actually do that is dispositive.").

another company besides Premier; they were free to sell their services to whoever they wanted.[30]

### 3. Safety and Quality Control Requirements Are Not Evidence of Control over the Details of Plaintiffs' Work Performance

Plaintiffs argue that they were "controlled" by Premier because they were subjected to a background check and drug test, and attended safety training. (Mot. at 7-8). But these are merely safety requirements, and safety requirements have nothing to do with independent contractor status. Plaintiffs' argument to the contrary contradicts persuasive authority across the country. *See, e.g., Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004) ("ensuring compliance with safety and security regulations" is "qualitatively different" from employment control).[31]

Plaintiffs also argue that they were required to follow Premier's "policies and procedures." (Mot. at 2.) However, Plaintiffs fail to identify the "policies and procedures" they are referring to, and further fail to disclose that the only arguable "policies" identified during discovery relate to quality control paperwork. But agreeing to do a good job and submit documentation as requested does not make one an employee; every independent contractor does that. *Jacobson*, 740 F. Supp. 2d at 691-92 ("detailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship"); *Taylor v. Waddell & Reed, Inc.*, No. 09-cv-2909-AJB, 2012 WL 3584942, at *5 n.9 (S.D. Cal. 8/20/12) ("compliance with legal requirements is not indicative of control for purposes of establishing the employer-employee relationship"). As one court noted, "quality control and compliance-monitoring that stem from the nature of the business … are qualitatively different from control that stems from the nature of the relationship between the employees and the putative employer."[32]

Conspicuously absent from Plaintiffs' Motion is any evidence of control related to actual

---

[30] Parrish Dep. at 129:2-21; Menard Dep. at 259:15-25; Alfaro Dep. at 197:17-22; Ellestad Dep. at 71:25-72:6; Beckett Dep. at 130:13-22; Selby Dep. at 21:24-22:1; Kennedy Dep. at 75:16-25; *see also* Mims Dec. ¶ 4; Schmidt Dec. ¶ 12.

[31] *See also Gate Guard Services, LP v. Solis*, No. v-10-91, 2013 WL 593418, *6 (S.D. Tex. 2/13/13) (quality control measures do not indicate employment); *Lawrence v. Adderly Indus., Inc.*, No. CV-09-2309, 2011 WL 666304, at *8 (E.D.N.Y. 2/11/11).

[32] *Zampos v. W&E Comm'ns, Inc.*, 970 F. Supp. 2d 794, 804 (N.D. Ill. 2013).

work performance. It is undisputed that Plaintiffs were not supervised on a day-to-day basis.[33] They received no work-related training, performance reviews, or discipline from Premier.[34] Indeed, Premier's former DD Coordinator, Casin Oliver, testified that Premier did not even have a "set way that it wanted its directional drillers to perform their jobs." (Oliver Dep. 83:23-84:2). In short, Plaintiffs had the kind of freedom that comes with being in business for themselves.

**B.**     **Plaintiffs Made Substantial Investments in Their Businesses**

In determining independent contractor status, courts analyze the investments workers make in their businesses because the ultimate question is whether, as a matter of economic reality, the workers are in business for themselves.[35] The more an individual invests in his own business, the more likely that individual is to be an economically independent contractor.

Plaintiffs' claim that they spent only hundreds of dollars per year, and invested only in the same types of things that employees invest in, is contradicted by the record. (Mot. at 10). According to their tax returns, Plaintiffs did not just invest in tally books, calipers, calculators, and personal protective equipment; they also invested in vehicles, computers, office space, insurance, internet service, office equipment (printers, copiers, etc.), and travel/entertainment expenses.[36] Plaintiffs spent about $121,000 per Plaintiff on an annualized average. In *Carrell v. Sunland Constr., Inc.*, the welders supplied their own trucks, equipment, maintenance costs, lodging, meals, and insurance – an investment of $19,000. 998 F.2d 330, 333 (5th Cir. 1993). In *Gate Guard*, the plaintiffs supplied their own vehicles, maintenance, utilities, cell phones, safety equipment, lodging, and food, investing up to $72,000 in their businesses. 2013 WL 593418 at *7. In both those cases, the plaintiffs – who made similar kinds of investments, but to a far lesser

---

[33] Parrish Dep. 131:15-133:1; Ellestad Dep. 123:23-124:2, 169:3-6; Robbins Dep. 123:6-20; Beckett Dep. 127:10-21; Menard Dec. ¶ 12.

[34] Parrish Dep. 54:14-55:10, 232:3-11, Ex. 6; Ellestad Dep. 13:4-17, 168:15-169:6, Ex. 8; Robbins Dep. 30:16-18, 42:6-9, 131:18-24, Ex. 2; Alfaro Dep. 111:14-112:13, Ex. 3; Beckett Dep. 19:1-20:17, 132:16-22, Ex. 1; Menard Dep. 169:23-25; Oliver Dep. 50:2-5.

[35] *Carrell*, 998 F.2d at 332 ("Essentially, our task is to determine whether the individual is, as a matter of economic reality, in business for himself.")

[36] Parrish Dep. Exs. 1, 3, 5; Alfaro Dep. Ex. 2; Beckett Dep. Exs. 4, 5; Ellestad Dep. Exs. 3-5.

extent than Plaintiffs here – were found to be in business for themselves.[37]

Attempting to distract from their own investments, Plaintiffs focus on Premier's investment in its business. (Mot. at 8-10). But Premier obviously is an independent business entity – that is not the question; the question is whether <u>Plaintiffs</u> are in business for themselves as a matter of economic reality.[38] For example, Target Corp. has invested hundreds of millions of dollars in its stores; this does not make the small businesses it hires to provide janitorial services any less of an independent contractor. In *Carrell* the defendant had an "obviously significant" investment in its business, but the plaintiffs' investments in their own businesses ($19,000) were significant enough to show that they were, as a matter of economic reality, in business for themselves.[39] In *Thibault*, the Fifth Circuit noted that the alleged employer's investment may be "recognized," but was not the focus of the inquiry; in fact, the employer's overall investment in its business was deemed irrelevant.[40] And in *Gate Guard*, the court did not even mention the alleged employer's overall investment in its business.[41] <u>In short, under Fifth Circuit case law, Plaintiffs' excessive focus on Premier's overall investment in its business is a red herring</u>.

To the extent Premier's investments are at all relevant to the question of whether Plaintiffs were in business for themselves, it can only be Premier's investment in the specific projects for which Plaintiffs were retained that matters.[42] And that investment was at most just

---

[37] Plaintiffs' citation to *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988) and *Chapman v. ASUI Healthcare*, 2012 WL 3614187, is unavailing. First, Plaintiffs do not cite to those cases for the investments factor. (Mot. at 8). Second, the cases are distinguishable. In *Brock*, the plaintiffs' investment was "negligible." 840 F.2d at 1059. And in *Chapman*, the plaintiffs' (nurses) investment was limited to the cost of their uniforms. 2012 WL 36145187 at *5.

[38] *Carrell*, 998 F.2d at 332 (*citing Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir. 1981)).

[39] *Carrell*, 998 F.2d at 333.

[40] *See Thibault*, 612 F.3d at 847 (stating "[t]he court in *Carrell* 'recognized' the overall investment by the alleged employer, but did not focus on it…").

[41] *Gate Guard*, 2013 WL 593418 at *7 (court **did not even refer to** Gate Guard's overall investment, focusing **solely** on project-specific investments)

[42] *See Thibault*, 612 F.3d at 847 (court should "compare[] the amount the alleged employer and employee each contribute to the specific job the employee undertakes"); *see also Trahan v. Honghua Am., LLC*, No. H-11-2271, 2013 WL 2617894, *7 (S.D. Tex. 6/10/13) (investment factor focuses on "the specific job"); *Faulkner v. Patters-UTI Drilling Co.*, No. 6:12-cv-104, 2014 WL 12567150, *4 (E.D. Tex. 1/30/14) (court looks at investments "in the job at hand").

$6,526 for a laptop and software.[43] Plaintiffs provided all the other project-specific costs, including vehicles, repairs, food, clothes, and consumable and reusable equipment, to the tune of about $121,000 annually.[44] Thus, this factor weighs in favor of independent contractor status.

### C. Plaintiffs' Work Was Short-Term and on a Project-to-Project Basis

Under the permanency factor, the question is whether Plaintiffs worked on a project-to-project basis.[45] The permanency factor weighs in favor of employee status only when "work is done *continuously* and for a long period of time."[46] Here, the undisputed evidence shows that Plaintiffs did not work continuously for a long period of time; they worked on a project-to-project basis.[47] Plaintiffs admittedly: (1) often had up to several weeks off between projects;[48] (2) were free to accept or decline projects;[49] (3) were not guaranteed future work;[50] (4) could find their own replacements;[51] and (5) controlled their own schedule by choosing which jobs to accept.[52] Plaintiffs could also do other work between Premier projects.[53]

---

[43] Schmidt Decl. at ¶¶ 10, 11, Exs. 1, 2. Notably, this ignores the fact that Premier reused laptops and software for multiple projects, making the project-specific cost much less than $6,526. *See Gate Guard*, 2013 WL 593418 at *7

[44] Parrish Dep., Exs. 1, 3, 5; Ellestad Dep., Exs. 3, 4; Alfaro Dep., Ex. 2; Beckett Dep., Ex. 4.

[45] *See Thibault*, 612 F.3d at 846; *Carrell*, 998 F.2d at 332; *Mack*, 2012 WL 1067398 at *4-6.

[46] *Chapman*, 2012 WL 3614187 at *6 (emphasis added).

[47] Parrish Dep. 129:2-21; Alfaro Dep. 197:17-22, 220:20-221:3; Beckett Dep. 130:13-22; Ellestad Dep. 71:25-72:6; Geoffroy Dep. 34:21-36:2, 80:11-23, 99:11-12.

[48] Parrish Dep. 62:5-15, 128:16-129:1, Ex. 9; Ellestad Dep. 25:4-13, 76:11-77:21, 82:11-19, 83:5-18, Ex. 6.

[49] Parrish Dep. 134:10-135:5, 216:4-23, 248:11-21, 253:13-254:1; Alfaro Dep. 151:19-154:4; Beckett Dep. 43:3-9; Ellestad Dep. 80:20-81:11, 135:14-16; Geoffroy Dep. 93:18-20; Kennedy Dep. 75:16-76:11; Oliver Dep. 66:4-7; Menard Dep. 264:4-22; Menard Dec. ¶ 3; Mims Dec. ¶ 3.

[50] Parrish Dep. 62:5-15, 128:16-129:1, Exs. 9, 17; Alfaro Dep. Ex. 10; Beckett Dep. Ex. 13; Ellestad Dep. 25:4-13, 82:11-83:18, 168:11-14, Exs. 6, 12; Robbins Dep. 120:7-10.

[51] Parrish Dep. 207:18-209:7; Menard Dep. 171:11-172:5.

[52] Parrish Dep. 254:13-256:2, Ex. 33; Beckett Dep. 145:22-146:7; Alfaro Dep. 220:20-23; Geoffroy Dep. 35:20-36:2; Schmidt Dep. II at 76:7-10; Oliver Dep. 86:16-25, 112:4-12, 117:18-14. *See Talbert*, 405 F. App'x at 856 (plaintiff was independent contractor where she "ultimately controlled the number of hours she worked.").

[53] Parrish Dep. 129:2-21; Menard Dep. 259:15-25; Alfaro Dep. 92:11-93:2, 197:17-22; Beckett Dep. 130:13-22; Ellestad Dep. 56:16-57:7, 71:25-72:6, Ex. 3; Robbins Dep. 127:25-128:21.

Plaintiffs misinterpret the *Mr. W. Fireworks* case because they fail to recognize that the Fifth Circuit was dealing with <u>seasonal</u> workers who could work only during Texas' two fireworks seasons.[54] In substituting the word "transient" in their Motion where the Fifth Circuit was focusing on "seasonal" workers, Plaintiffs render *Mr. W Fireworks* inconsistent with the more recent Fifth Circuit cases of *Thibault* and *Carrell*. In both *Carrell* and *Thibault*, the workers were "transient" but not "seasonal" because they were hired on a project-by-project basis.[55] As the Fifth Circuit recognized in *Carrell* and again in *Thibault*, the question is not, as Plaintiffs put it, whether the worker stayed for the duration of a project, but whether the nature of the work was project-to-project in the first place.[56] Where the nature of the work shows a "temporary, project-by-project, on-again-off-again relationship" with the putative employer, the factor weighs in favor of independent contractor status.[57]

Even if the Court were to examine the time between the first project and the last project, Plaintiffs still had short-term, temporary relationships with Premier. Robbins contracted with Premier for **only four days**; Alfaro contracted with Premier a few times over the course of just **two months**; Beckett provided services to Premier over the course of only **seven months**; and Ellestad provided services over the course of **ten months**.[58] Several courts in the Fifth Circuit have found that similar short-term, temporary work – where the contracting period ranged from three weeks to up to 20 months – weighs in favor of independent contractor status.[59]

---

[54] 814 F.2d at 1045 ("The fireworks business is by nature seasonal[.]").

[55] *Carrell*, 998 F.2d at 332 ("Sunland hired the Welders on a project-by-project basis"); *Thibault*, 612 F.3d at 846 ("Splicers travel from job-to-job and from state-to-state looking for work.").

[56] 998 F.2d at 334 (plaintiffs worked "from job to job"); *see also Mack*, 2012 WL 1067398 at *4-6 (independent contractors "were hired on a job-by-job basis", worked "off and on", could work for other companies, and could reject projects); *Gate Guard*, 2013 WL 593418 at *10-11(same).

[57] *See, e.g., Thibault*, 612 F.3d at 849 (focusing on whether workers had "temporary, project-by-project, on-again-off-again relationship with their purported employer").

[58] Parrish Dep. 11:4-5, 21:22-24, 41:14-16; Alfaro Dep. 102:2-6; Beckett Dep. 114:1-5; Ellestad Dep. 86:25-87:3; Robbins Dep. 17:16-18:24. Alfaro's and Robbins' tenure with Premier as *employees* is irrelevant to the permanency of their relationship as independent contractors.

[59] *See Mack*, 2012 WL 1067398 at *5 (average of nine to 20 months); *Carrell*, 998 F.2d at 332 (three to sixteen weeks); *Lindsley v. Bellsouth Telecomms., Inc.*, 401 F. App'x 944, 945 (5th Cir. 2010) (three months); *Gate Guard*, 2013 WL 593418 at *10 (average of four months).

**D.** **Plaintiffs Were Highly Skilled and Demonstrated Significant Initiative**

To illustrate skill indicative of an independent contractor relationship, the worker must possess a "unique skill set" or an "ability to exercise significant initiative in the business."[60] It is only "routine work which requires industry and efficiency [that] is not indicative of independence and nonemployee status".[61]

Plaintiffs assert that they lacked the skills and initiative indicative of economic independence because "Premier could not identify any unique skill or initiative." (Mot. at 13). But this is the wrong standard; <u>Plaintiffs</u> are "required to produce evidence that [they] could not 'exert initiative in the operation of [the] business.'"[62] They have not even attempted to do so.

The undisputed evidence, as Premier pointed out in its Motion for Summary Judgment [Doc. No. 163], shows that Plaintiffs exercised skill and initiative. In fact, the entire raison d'etre of directional drillers is their special skill set, which allows them to advise the driller on how to purposefully bend the wellbore to the target. (Alfaro Dep. 230:10-231:3; Menard Dec. ¶ 14; Mims Dec. ¶ 16.) Plaintiffs needed to be able to "analyz[e] well plans and gamma markers to maximize time spent in the production zone."[63] This, in turn, required a "[s]ound mathematical background in directional drilling operations." (*Id.*) Plaintiff must also have the skills needed for the formation that is being drilled.[64] Plaintiffs gained these skills through *specialized* on-the-job training and experience. (*Id.*; Parrish Dep. 47:23-25, 51:20-52:1, 54:14-55:10, Ex. 6.)

As owners of their own consulting firms, Plaintiffs also exercised initiative in finding and ensuring revenues continued, controlling costs, and handling the administrative aspects of

---

[60] *Hopkins v. Cornerstone America*, 545 F.3d 338, 345 (5th Cir. 2008).

[61] *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976).

[62] *Eberline v. Media Net, LLC*, 636 F. App'x 225, 229 (5th Cir. 2016) (quoting *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983)).

[63] Alfaro Dep. Ex. 3; Beckett Dep. Ex. 1.

[64] Parrish Dep. 56:5-22, 60:13-17, 61:17-25, 155:8-24; Alfaro Dep. 222:6-24; Beckett Dep. 31:18-33:1, Ex. 1; Ellestad Dep. 23:17-20, 165:16-166:8, Ex. 8; Robbins Dep. 80:20-24, Ex. 2; Schmidt Dep. II at 61:18-22, 69:9-13; Menard Dec. ¶¶ 14-15; Mims Dec. ¶¶ 16, 18.

business ownership, such as setting up separate business entities and filing taxes.[65] There is simply little question that Plaintiffs were in business for themselves. Indeed, in a recent case, the Fifth Circuit held that workers showed the initiative of an independent contractor when they – like Plaintiffs – could obtain more work for themselves, and decide which days to work.[66]

Instead of rebutting those facts, Plaintiffs argue that they were not independent contractors because they were not <u>more skilled</u> than employee DDs at Premier. (Mot. at 13). But the question is not who has more skills, for surely an independent contractor does not become an employee just because the company hires an employee with a higher skill level. Rather, the question is "whether the worker exhibits the <u>type</u> of skill and initiative typically indicative of independent-contractor status."[67] Plaintiffs make no showing in this regard. Instead, Plaintiffs rely on *Karna v. BP Corp.* (Mot. at 12). In *Karna*, the court held with regard to skills and initiative only that "as a matter of economic reality, the *mere* fact that Karna possessed a unique skill set does not *require* finding independent contractor status here."[68] But it is not the "mere fact" of Plaintiffs' special skills that makes them independent contractors, but this fact <u>combined</u> with all the other factors, which entitles Premier to judgment as a matter of law.

###### E.    <u>Plaintiffs Controlled Their Own Opportunities for Profit or Loss</u>

Plaintiffs assert that Premier controlled their opportunity for profit or loss because: (1) Premier controlled their hours worked; (2) Premier controlled their pay; (3) Plaintiffs made only "minor additional income" from unrelated work; and (4) Plaintiffs did not share in the losses allegedly suffered by Premier. (Mot. at 10-12.) The evidence is to the contrary.

First, Plaintiffs controlled their hours worked because they controlled whether they accepted or rejected jobs, the length of time they offered services to Premier, and their schedule

---

[65] *See Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983) (running a business shows initiative); *see also Donovan v. Dial Am. Marketing, Inc.*, 757 F.2d 1376, 1387 (3d Cir. 1985).

[66] *Eberline v. Media Net, LLC*, 636 F. App'x 225, 229 (5th Cir. 2016).

[67] *Hopkins*, 545 F.3d at 345 (citing *Usery* 527 F.2d at 1314) (emphasis added).

[68] No. H-12-0101, 2013 WL 1155485, *12 (S.D. Tex. 3/19/13) (emphases added).

at each job worked.[69] The mere fact that Plaintiffs worked a 12 hour shift does not prove that Premier controlled their schedules. For instance, in *Carrell*, independent contractors were required to "work the same days and hours as the remainder of [defendant's] crew, including taking the same daily break periods." 998 F.2d at 332-33. Nevertheless, the Fifth Circuit found the workers were independent contractors because they had a far more important kind of control – control over whether to accept or reject the job in the first place. *Id.*

Second, Plaintiffs claim "[t]here is no evidence of any one of Plaintiffs ever negotiating his rate of pay or turning down a job." (Mot. at 11). As shown above, **Parrish admitted** he negotiated his pay.[70] And it is indisputable that Plaintiffs had the right to accept or reject jobs as they saw fit.[71] Because Plaintiffs negotiated their pay, accepted or rejected work, and controlled their schedules, this factor weighs in favor of independent contractor status.[72]

Third, Plaintiffs' financial dealings outside of Premier were not "minor" by any stretch. Beckett earned $201,321 from sources other than Premier in 2014 – **about two-thirds of his income that year**. (Beckett Dep. 65:5-24, Ex. 3.) And Ellestad's company invested in another business that allowed him to take a <u>loss</u> on his taxes despite receiving over $190,000 from Premier. (Ellestad Dep. 48:17-23, Ex. 3.)

Fourth, Plaintiffs argue they were employees because they "did not have to return pay if a job was completed in less time than expected" and they were not required to market for Premier.

---

[69] Parrish Dep. at 134:10-135:5, 216:4-23, 248:11-21, 253:13-256:2, Ex. 33; Alfaro Dep. at 220:20-23, 151:19-154:4; Beckett Dep. at 43:3-9, 145:22-146:7; Ellestad Dep. 80:20-81:11, 135:14-16; Geoffroy Dep. at 35:20-36:2, 93:18-20; Kennedy Dep. 75:16-76:11; Oliver Dep. at 66:4-7, 86:16-25, 112:4-12, 117:18-14; Menard Dep. 264:4-22; Schmidt Dep. II at 76:7-10; Menard Dec. ¶ 3; Mims Dec. ¶ 3.

[70] Parrish Dep. at 140:19-141:4, 142:13-144:11; *see also* Oliver Dep. at 112:4-12, 117:18-14.

[71] *Id.*; Ellestad Dep. at 80:20-81:11, 135:14-16; Menard Dep. at 53:15-54:6, 264:4-22; Alfaro Dep. at 151:19-154:4; Beckett Dep. at 43:3-9, 129:8-130:2; Kennedy Dep. at 75:16-76:11; *see also* Oliver Dep. at 66:4-7; Geoffroy Dep. at 35:20-36:2; 93:18-20; Menard Dec. ¶ 3.

[72] *Karna v. BP Corp. North America, Inc.*, No. H-12-0101, 2013 WL 1155485, at *10 (S.D. Tex. Mar. 19, 2013) (factor shows IC status where worker can "control how much he earned from working for the defendant") (citing *Herman v. Express Sixty-Minutes Delivery Svc., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998); *Hickey*, 699 F.2d at 750, 752).

(Mot. at 12.) But, Plaintiffs were paid only for those days they worked.[73] As a result, there would be no pay to return. Plaintiffs also argue that like "true employees, Premier did not share costs or losses with its IC DDs." (Mot. at 12). As an initial matter, only an independent contractor could realize a "profit" or "loss." The fact that Plaintiffs' profits and losses did <u>not</u> move in lockstep with Premier's shows that Premier and Plaintiffs were independent economic entities.

Plaintiffs ignore the fact that they controlled their own profits by managing their own costs. For instance, in *Carrell*, the defendant controlled welders' hours and hourly pay, but the welders' year-end profit/loss depended on their ability to find work and minimize work-related costs. 998 F.2d at 333-34. Likewise, in *Thibault*, the plaintiffs were independent contractors where their profits depended on their ability to generate revenue and control costs. *Thibault*, 612 F.3d at 848. Here, Plaintiffs alone controlled their costs because they decided: what vehicles they used; what tools they used; what equipment they bought; what office supplies they bought; food and lodging costs; insurance costs; and cell phone and internet costs.[74] As a result, Plaintiffs sometimes reported a profit, and sometimes reported a loss on their taxes. *Id.*

Plaintiffs had sufficient control over their schedules to focus on other business ventures, often taking weeks off between jobs.[75] Ellestad was able to work on his company's goat farm, and others of Premier's IC DDs ran other businesses in addition to their DD consulting firms. (Richard Decl. ¶ 4; Raspberry Decl. ¶ 4.) Plaintiffs could also develop their own goodwill with Premier and/or its clients.[76] Thus, each Plaintiff's profits depended in part on his own ability to find work. Thus, this factor weighs in favor of Plaintiffs' independent contractor classification.

### F. Other Factors Also Weigh in Favor of Independent Contractor Status

---

[73] Parrish Dep. at Exs. 8-9; Alfaro Dep. at Ex. 5, 12; Beckett Dep. at Exs. 12, 14; Ellestad Dep. at Exs. 13, 15; Robins Dep. at Ex. 6; Schmidt Dep. II at 50:5-13.

[74] Parrish Dep., Exs. 1, 3, 5; Ellestad Dep., Exs. 3, 4; Alfaro Dep., Ex. 2; Beckett Dep., Ex. 4.

[75] Parrish Dep. 129:2-21, Ex. 5; Menard Dep. 259:15-25; Alfaro Dep. 197:17-22; Beckett Dep. 130:13-22, Exs. 3-5; Ellestad Dep. 71:25-72:6, Ex. 3; Robbins Dep. 127:25-128:21. *Mack*, 2012 WL 1067398 at *4; *see also Gate Guard*, 2013 WL 593418 at *8 (gate attendants could take other jobs "during the extended periods of time they have off between jobs").

[76] Parrish Dep. 188:3-189:24; Robbins Dep. 135:16-136:3; Menard Dep. 269:1-14.

Plaintiffs agreed to their independent contractor status, which mirrors economic reality.[77] In fact, they swore under oath to the IRS that they were independent contractors.[78] And Parrish still agrees that he was an independent contractor.[79]

Further, DDs commonly work as independent contractors in the oilfield.[80] In *Gate Guard*, the fact that gate attendants were commonly independent contractors weighed in favor of independent contractor status.[81] Here, fluctuations in the oil industry, combined with the high skill level required to do directional drilling, makes it common for oilfield services companies like Premier to engage independent contractors to satisfy project-specific needs. Having some employees "and engaging others as independent contractors as needed when and where customer demand increases" is "an eminently reasonable business practice."[82] Thus, industry standard supports Plaintiffs' status as independent contractors.

Moreover, Plaintiffs are not the kind of low-wage workers the FLSA was designed to protect.[83] Their revenues are staggering: (1) Parrish made **$230,033** in 2013, **$279,777** in 2014, and **$174,032** in 2015; (2) Alfaro made **$102,000** in 2015; (3) Beckett made **$314,691** in 2014 and **$337,809** in 2015; (4) Ellestad made **$253,333** in 2014 and **$292,164** in 2015; and (5) Robbins made **$111,800** in 2015.[84] This level of compensation befits Plaintiffs' roles as CEOs of their own businesses – it does not show any level of economic dependence on Premier.

---

[77] Ellestad Dep., Exs. 1, 2; Robbins Dep., Exs. 4, 5; Alfaro Dep., Ex. 7. *See Gate Guard*, 2013 WL 593148 at *11 (citing *Hopkins*, 545 F.3d at 346).

[78] *See Thibault*, 612 F.3d at 845-46 (independent contractor agreement is relevant); *Gate Guard*, 2013 WL 593418 at *11 (contract was relevant where it "mirror[ed] economic reality"); *see also Carrell*, 998 F.2d at 334 (plaintiffs were aware of independent contractor status).

[79] Parrish Dep. at 37:7-12, 124:7-13.

[80] *See Gate Guard*, 2013 WL 593418 at *11-12 (industry standards are relevant).

[81] *Id.*; *Mid–Continent Cas. Co. v. Davis*, 2011 WL 13727, *4 (N.D. Tex. 1/3/11) (industry standard to treat workers as independent contractors); *Trustees of the Mich. Reg. Council of Carpenters Emp. Benefits Fund v. Fox Bros. Co.,* 2005 WL 3579173, *6 (E.D. Mich. 12/27/05).

[82] *Smith v. Keypoint Gov't Solutions, Inc.*, 2016 WL 7324606, *2 (D. Colo. 12/16/16).

[83] *Usery*, 527 F.2d at 1311 (citation omitted).

[84] Parrish Dep. 135:19-136:1, Ex. 8; Ellestad Dep. 178:5-13, Ex. 13; Robbins Dep. Ex. 6; Alfaro Dep. 219:10-14, Ex. 11; Beckett Dep. 133:22-134:5, Ex. 14.

## III.   PREMIER ACTED IN GOOD FAITH

Liquidated damages should be eliminated when the employer shows it acted in good faith and had reasonable grounds to believe it properly classified plaintiffs.[85] Good faith has both a subjective and objective component.[86] Here, there is no dispute that Premier believed that it complied with the FLSA.[87] Moreover, Premier considered Plaintiffs to be independent contractors based on its analysis of Plaintiffs' relationship to the company, Plaintiffs' representation that they were in business for themselves, a survey of similar oilfield companies to establish industry standards, and advice of legal counsel.[88] While Plaintiffs argue that any one of these steps *alone* is insufficient, that Premier took *all* such steps in determining Plaintiffs' classification clearly shows its belief was objectively reasonable. Thus, summary judgment must be denied to Plaintiffs on Premier's good faith defense.[89]

## CONCLUSION

Plaintiffs have failed to present undisputed material facts supporting their claim for damages under the FLSA. Rather, the undisputed facts show that Plaintiffs operated their own independent DD consulting firms and were in business for themselves. By their own admission, Plaintiffs were independent contractors of Premier. Accordingly, Plaintiffs have failed to meet their burden as a summary judgment movant of showing that the undisputed material facts entitle them to judgment as a matter of law. The Court should deny Plaintiffs' Motion in its entirety.

---

[85] *See* 29 U.S.C. § 260; *Reich v. Tiller Helicopter Svcs., Inc.*, 8 F.3d 1018, 1031 (5th Cir. 1993).

[86] *See Mireles v. Frio Foods*, 899 F.2d 1407, 1414 (5th Cir. 1990).

[87] Geoffroy Dep. 73:4-14; Kennedy Dep. at 156:10-12; Schmidt Dep. II at 54:10-20, 165:15-24.

[88] (Schmidt Dep. II at 25:25-26:8, 27:5-12, 29:22-34:3, 54:2-9, 55:21-56:1.) While Premier did not seek legal counsel until Plaintiffs' counsel first sued Premier, in 2015, the reliance on counsel's advice thereafter is relevant to Plaintiffs' continued classification and illustrates the validity of Premier's subjective belief that it complied with the FLSA. *See Burns v. Blackhawk Mgmt. Corp.*, 494 F. Supp. 2d 427, 436 (S.D. Miss. 2007) (post hoc investigation confirming classification is evidence of good faith belief in original classification).

[89] Because summary judgment should be denied as to Plaintiffs' underlying claims, summary judgment as to damages should also be denied. Also, Plaintiffs, who only provide the end results of their calculations and not the underlying data, have entirely failed to carry their burden of proving they are entitled to judgment as a matter of law. *See Chapman*, 2012 WL 3614187, *2.

This 18th day of August, 2017.   By:   *s/ Annette A. Idalski*
Annette A. Idalski
Texas Bar No. 00793235
Peter N. Hall, *pro hac vice*
CHAMBERLAIN, HRDLICKA, WHITE
WILLIAMS & AUGHTRY
191 Peachtree Street, N.E., 46th floor
Atlanta, GA 30303-1747
Tel: (404) 658-5386
annette.idalski@chamberlainlaw.com
peter.hall@chamberlainlaw.com

*Counsel for Defendant Premier Directional Drilling, L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I have electronically filed the foregoing with the Clerk of Court via the CM/ECF system which will send notification to all parties and/or counsel of record, including:

Michael A. Josephson                     Richard J. Burch
Andrew W. Dunlap                         Matthew Scott Parmet
Lindsay R. Itkin                         Bruckner Burch PLLC
Jessica M. Bresler                       8 Greenway Plaza, Suite 1500
Josephson Dunlap Law Firm                Houston, TX 77046
11 Greenway Plaza, Suite 3050            rburch@brucknerburch.com
Houston, TX 77046                        mparmet@brucknerburch.com
mjosephson@mybackwages.com
adunlap@mybackwages.com
litkin@mybackwages.com
jbresler@mybackwages.com


Respectfully submitted this 18th day of August, 2017.

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY**


*s/ Annette A. Idalski*
Annette A. Idalski

2641853.1
150101.000004