# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| WILLIAM PARRISH, Individually and On Behalf of Others Similarly Situated, | **Case No.: 5:16-cv-00417-DAE** <br> Collective Action |
| v. | Judge David A. Ezra |
| PREMIER DIRECTIONAL DRILLING, L.P. | Magistrate John W. Primomo |

## PARRISH'S RESPONSE TO PREMIER'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

**BRUCKNER BURCH PLLC**
    Richard J. (Rex) Burch
    Texas Bar No. 24001807
    Matthew S. Parmet
    Texas Bar No. 24069719
8 Greenway Plaza, Suite 1500
Houston, Texas 77046
Telephone:    (713) 877-8788
Telecopier:    (713) 877-8065
rburch@brucknerburch.com
mparmet@brucknerburch.com

**JOSEPHSON DUNLAP LAW FIRM**
    Michael A. Josephson
    Texas Bar No. 24014780
    Andrew W. Dunlap
    Texas Bar No. 24078444
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Telephone:    (713) 352-1100
Telecopier:    (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

**Attorneys in Charge for Plaintiffs**

**TABLE OF CONTENTS**

**A.**      **SUMMARY** ........................................................................................................... 1

**B.**      **PARRISH'S RESPONSE TO PREMIER'S STATEMENT OF UNDISPUTED FACTS** ..................... 1

**C.**      **ARGUMENT & AUTHORITIES** ................................................................................. 4

     1.     Skills & Initiative: Plaintiffs were no different than the employee DDs that Premier employed at the same time. ................................................................. 4

     2.     Skills & Initiative: Plaintiffs' work was consistent with employees. ...................... 6

     3.     Control: Premier supervised the work of IC DDs. ................................................ 7

     4.     Control: Premier required its IC DDs to adhere to its training requirements. ..................... 8

     5.     Control: Premier had total contractual control. .................................................... 9

     6.     Relative Investments: Premier selectively applies the relative investment test to bury its substantial investment in the directional drilling business. ...................... 10

     7.     Profit & Loss: Premier controlled the DDs opportunity for profit and loss. .................... 13

     8.     Permanence: Plaintiffs' lengths of employment are consistent with directional drillers in general and Premier's directional drillers, more specifically. .................... 16

     9.     Subjective perceptions and tax records are red herrings. ...................................... 16

     10.    Premier's litigation position can't stand under its own weight. .............................. 17

     11.    Industry standard is not a defense in an FLSA case—and even if it was, Premier has no support for such a defense. ........................................................................... 18

     12.    A finding of employee status furthers the FLSA's remedial purpose. ................... 20

**D.**      **CONCLUSION** .................................................................................................... 20

**TABLE OF EXHIBITS**

| Ex. | Document | ECF No. |
|---|---|---|
| 1 | Deposition excerpts | 149-1 |
| 2 | Consultant Agreement (Directional Personnel) | 149-2 |
| 3 | DD Consultant Requirements (Directional Personnel) | 149-3 |
| 4 | Non-Disclosure and Confidentiality Agreement | 149-4 |
| 5 | Pay Rate Schedule 1 | 149-5 |
| 6 | Pay Rate Schedule 2 | 149-6 |
| 7 | Travel Pay Schedule | 149-7 |
| 8 | Pay Date Schedule | 149-8 |
| 9 | 2014 Pay Calendar | 149-9 |
| 10 | Alfaro Separation Form | 149-10 |
| 11 | Robbins Separation Form | 149-11 |
| 12 | Premier Financial Audits | 149-12 |
| 13 | MWD Tool Invoices | 149-13 |
| 14 | Dell Invoice | 149-14 |
| 15 | WinServe Invoices | 149-15 |
| 16 | Billing invoices to Premier customers | 149-16 |
| 17 | Email regarding well plans | 149-17 |
| 18 | Email regarding training 1 | 149-18 |
| 19 | Email regarding training 2 | 149-19 |
| 20 | Email regarding training 3 | 149-20 |
| 21 | Email regarding training 4 | 149-21 |
| 22 | Email regarding training 5 | 149-22 |
| 23 | Email regarding training 6 | 149-23 |
| 24 | Email regarding training 7 | 149-24 |
| 25 | Emails regarding policies and procedures | 149-25 |
| 26 | Email regarding travel pay | 149-26 |
| 27 | Email requiring use of JSA forms | 149-27 |
| 28 | Emails regarding Level 2 contract hands | 149-28 |
| 29 | Email regarding directions | 149-29 |

| Ex. | Document | ECF No. |
|---|---|---|
| 30 | Parrish's Pay Stubs | 149-30 |
| 31 | Alfaro's Pay Stubs | 149-31 |
| 32 | Beckett's Pay Stubs | 149-32 |
| 33 | Ellestad's Pay Stubs | 149-33 |
| 34 | Robbins' Pay Stubs | 149-34 |
| 35 | Parrish's First Invoice | 149-35 |
| 36 | Alfaro's First Invoice | 149-36 |
| 37 | Robbins' First Invoice | 149-37 |
| 38 | Master Services Agreements | 149-38 |
| 39 | Premier's Amended Objections and Answers to Pls' Interrogatories | 149-39 |
| 40 | Allis-Chalmers Complaint | 149-40 |
| 41 | Premier's Signed Stipulation as to Relative Investments, May 11, 2017 | 149-41 |
| 42 | Plaintiffs' Damages Summary | 149-42 |
| 43 | Decl. of Andrew W. Dunlap, Jul. 21, 2017 | 149-43 |
| 44 | Berson, *IRS Gets Class Conscious: Switching to Independent Contractors Draws Scrutiny* (ABA J. Apr. 1, 2011) | --- |
| 45 | Idalski, *Defending Your Independent Contractor Classifications*, Apr. 1, 2015 | --- |
| 46 | Helfand & Boss, *Double Agent: Contractor or Employee?* | --- |
| 47 | Email from Cassie Ramsay, Oct. 12, 2010 | --- |
| 48 | Deposition Excerpts | --- |
| 49 | Premier's 2013 Tax Return | --- |
| 50 | Premier's 2014 Tax Return | --- |
| 51 | Premier Directional Drilling Handbook | --- |
| 52 | Decl. of Andrew W. Dunlap, Aug. 18, 2017 | --- |

## Cases

*Baker v. Barnard Constr. Co., Inc.*, 860 F.Supp. 766 (D.N.M. 1994) ...................................................... passim

*Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436 (10th Cir. 1998) .................................................. 4, 6, 7, 16

*Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728 (1981) ............................................................ 20

*Breaux and Daigle, Inc. v. United States*, 900 F.2d 49 (5th Cir. 1990) ............................................... 20

*Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042 (5th Cir. 1987) ........................................................... 15, 16

*Caballero v. Archer*, No. SA-04-CA-561-OG, 2007 WL 628755 (W.D. Tex. Feb. 1, 2007) ...................... 19

*Carrell v. Sunland Constr., Inc.*, 998 F.2d 330 (5th Cir. 1993) ............................................................. 10

*Dole v. Snell*, 875 F.2d 802 (10th Cir. 1989) ........................................................................................... 14

*Donovan v. Am. Airlines, Inc.*, 686 F.2d 267 (5th Cir. 1982) ................................................................. 17

*FedEx Home Delivery v. N.L.R.B.*, 563 F.3d 492 (D.C. Cir. 2009) ........................................................ 8

*Gate Guard Svcs., L.P. v. Solis*, C.A. No. V-10-91, 2013 WL 593418 (S.D. Tex. Feb. 13, 2013) .......... 8, 15

*Harvey v. Blake*, 913 F.2d 226 (5th Cir. 1990) ..................................................................................... 11

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299 (5th Cir. 1998) ...................... 11

*Hopkins v. Cornerstone Am.*, 545 F.3d 338 (5th Cir. 2008) ................................................................ passim

*Jacobson v. Comcast Corp.*, 740 F.Supp.2d 683 (D. Md. 2010) ........................................................... 8

*Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of Am.*, 325 U.S. 161 (1945) ................... 20

*Johnson v. Big Lots Store, Inc.*, 604 F.Supp.2d 903 (E.D. La. 2009) .................................................. 19

*Johnson v. VCG Holding Corp.*, 845 F.Supp.2d 353, 360 (D. Me. 2012) ........................................... 9

*Karna v. BP Corp. N. Am., Inc.*, C.A. No. H-12-0101, 2013 WL 1155485 (S.D. Tex. Mar. 19, 2013) 4, 6, 15

*Mancia v. Twin Stone Designs & Installations, Inc.*, No. 15-23376-CIV-MORENO, 2016 WL 899313 (S.D. Fla. Mar. 2, 2016) ......................................................................................................................... 9

*Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3d Cir. 1991) ........................................................ 19

*Mednick v. Albert Enterps., Inc.*, 508 F.2d 297 (5th Cir. 1975) ........................................................... 14

*Mid-Continent Cas. Co. v. Davis*, 683 F.3d 651 (5th Cir. 2012) ........................................................... 18

*Mid-Continent Cas. Co. v. Davis*, No. 3:08-CV-1478-P, 2011 WL 13727 (N.D. Tex. Jan. 3, 2011) ..... 18, 19

*Mitchell v. John R. Cowley & Bro, Inc.*, 292 F.2d 105 (5th Cir. 1961) ............................................... 16

*Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423 (5th Cir. 1987) ........................................... 11

*Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004) ............................................................................ 9

*Morley v. Nine Energy Service, LLC*, Civ. A. No. H-15-1809, ECF No. 40 (S.D. Tex. Oct. 31, 2016) .... 19

*Reich v. Southern New England Telecom. Corp.*, 121 F.3d 58 (2d Cir. 1997) ................................... 19

*Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662 (5th Cir. 1983) ................................................ 17

*Robles v. RFJD Holding Co., Inc.,* No. 11-62069-CIV, 2013 WL 2422625 (S.D. Fla. Jun. 3, 2013) ............ 6

*Ruiz v. Affinity Logistics Corp.,* 754 F.3d 1093 (9th Cir. 2014) ................................................ 9

*Ruiz v. Affinity Logistics Corp.,* 887 F.Supp.2d 1034 (S.D. Cal. 2012) ........................................ 8

*Rutherford Food Corp. v. McComb,* 331 U.S. 722 (1947) ........................................................ 20

*Schultz v. Capital Int'l Sec., Inc.,* 466 F.3d 298 (4th Cir. 2006) .............................................. 6

*Taylor v. Waddell & Reed, Inc.,* No. 09CV2909 AJB WVG, 2012 WL 3584942 (S.D. Cal. Aug. 20, 2012) .................................................................................................................. 9

*Texas Refrig. Supply, Inc. v. F.D.I.C.,* 953 F.2d 975 (5th Cir. 1992) ........................................ 11

*Thibault v. Bell South Telecomms., Inc.,* 612 F.3d 843 (5th Cir. 2010) ...................................... 10

*Trustees of Mich. Reg'l Council of Carpenters Employee Bens. Fund v. Fox Bros. Co.,* No. 05-CV-70262-DT, 2005 WL 3579173 (E.D. Mich. Dec. 27, 2005) ............................................................. 19

*United States v. Rosenwasser,* 323 U.S. 360 (1945) ............................................................. 20

*Usery v. Pilgrim Equip. Co., Inc.,* 527 F.2d 1308 (5th Cir. 1976) ........................................ 17, 20

*Zampos v. W&E Commc'ns, Inc.,* 970 F.Supp.2d 794 (N.D. Ill. 2013) ............................................ 9

*Zavala v. Wal Mart Stores Inc.,* 691 F.3d 527 (3d Cir. 2012) ................................................... 20

*Zavala v. Wal-Mart Stores, Inc.,* 393 F.Supp.2d 295 (D.N.J. 2005) .............................................. 20

## A.    Summary

Under the five-factor FLSA independent contractor ("IC") test,[1] the directional driller ("DD") Plaintiffs were misclassified as ICs: (a) Premier controlled Plaintiffs' work and work schedule; (b) Premier's investment in its directional drilling business far outweighed any investment made by Plaintiffs; (c) Plaintiffs had no ability for profit or loss, as their income was determined solely by the number of days that they worked for Premier; (d) Plaintiffs had no unique skill or initiative not possessed by any other DD, including Premier's employee DDs; and (e) Plaintiffs worked for Premier on an ongoing, indefinite basis, and they did not bid for or otherwise re-sign with Premier for each job that they did.

These and other facts mandate only one conclusion—Plaintiffs were misclassified as ICs. That is why Premier and its Counsel resort to misstating the factual record, distorting applicable law, and aiming a barrage of unsupported, personal attacks at Plaintiffs and their Counsel.

Premier's misclassification of its **most "integral" employees** and its failure to pay them overtime violates the Fair Labor Standards Act ("FLSA"). Premier's motion for summary judgment should be denied, and summary judgment should instead be entered for Plaintiffs.

## B.    Parrish's Response to Premier's Statement of Undisputed Facts[2]

1.    Premier is not a "staffing company." Ex. 48-F, Schmidt 2, at 160:17-22.

2.    Premier is a directional drilling company. Ex. 48-B, Kennedy, at 83:24-84:2.

3.    DDs are an integral part of Premier's business. Ex. 48-B, Kennedy, at 266:22-267:1.

4.    Premier couldn't offer directional drilling services without DDs. Ex. 48-D, Oliver, at 35:14-18.

5.    Plaintiffs were paid a day rate for each day worked. Ex. 48-F, Schmidt 2, at 50:5-7.

6.    Plaintiffs were not paid for any day they did not work. Ex. 48-F, Schmidt 2, at 51:16-23.

7.    Plaintiffs' pay was dependent solely on whether they worked for Premier on a given day. Ex.

---

[1] *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008).
[2] *See* Plaintiffs' Objections to, and Motion to Strike, Premier's Statement of Undisputed Facts.

48-F, Schmidt 2, at 51:16-23.

8.  Plaintiffs do not provide consulting services to Premier's customers. Ex. 48-G, Parrish, at 100:22-25; Ex. 48-J, Ellestad, at 180:6-24; Ex. 48-K, Robbins, at 22:11-14; Ex. 48-H, Alfaro, at 212:18-213:8; Ex. 48-I, Beckett, at 120:22-121:6.

9.  Plaintiffs steer the drill. Ex. 48-G, Parrish, at 100:22-25; Ex. 48-J, Ellestad, at 180:6-24; Ex. 48-K, Robbins, at 22:11-14; Ex. 48-H, Alfaro, at 212:18-213:8; Ex. 48-I, Beckett, at 120:22-121:6.

10. No degree is required to be a DD. Ex. 48-C, Menard, at 180:7-9.

11. No college education is required to be a DD Ex. 48-C, Menard, at 180:24-181:1.

12. A person becomes a DD through on the job training. Ex. 48-C, Menard, at 180:13-23.

13. Mistakes by a DD can be costly. ECF No. 163, at *4.

14. Premier has not sought reimbursement for any costs incurred by it as a result of an IC DD's error. Ex. 48-E, Schmidt 1, at 149:22-150:17.

15. Premier's IC and employee DDs worked for Premier for long periods of time, sometimes years. Ex. 48-A, Geoffroy, at 94:13-95:3.

16. Premier fired employee DDs, immediately hiring them back as ICs. ECF No. 149-10, at *11.

17. Plaintiffs did not have unique skills different from employees. Ex. 48-A, Geoffroy, at 31:8-11.

18. There were no differences in the job duties between employee and IC DDs. Ex. 48-A, Geoffroy, at 35:20-36:2.

19. Premier utilized the services of DDs that were classified as employees and ICs working for Premier at the same time. Ex. 48-D, Oliver, at 46:19-25; Menard, at 299:6-23.

20. Premier's DD coordinators provided the same supervision to employee and IC DDs. Ex. 48-D, Oliver, at 106:14-21.

21. Premier's DDs perform the same work, regardless of whether they are classified as ICs or employees. Ex. 48-C, Menard, at 212:7-10.

22. Plaintiffs were not permitted to work for other directional drilling companies while working for Premier. ECF No. 149-2, at ¶ 6.

23. Premier's IC DDs were not permitted to subcontract out their work for Premier or Premier's clients. Ex. 48-D, Oliver, at 37:17-23.

24. Premier set the pay scale for IC DDs. Ex. 48-D, Oliver, at 65:12-19.

25. Premier saved money by classifying DDs as ICs. Ex. 48-E, Schmidt 1, at 147:17-148:21.

26. Parrish was not a good DD. Ex. 48-D, Oliver, at 88:21-22.

27. Premier provides all the essential tools for the DD to perform their work. Ex. 48-D, Oliver, at 102:2-103:4.

28. Premier provides all the essential equipment for the DD to perform their work. Ex. 48-D, Oliver, at 102:2-103:4.

29. Premier required employee and IC DDs to undergo training. Ex. 48-F, Schmidt 2, at 131:5-12; Ex. 48-C, Menard Depo, at 321:14-23.

30. Premier required its IC DDs to follow Premier's policies and procedures. Ex. 48-D, Oliver, at 69:14-19.

31. Premier requires its IC DDs to use a specific system and format for reports. Ex. 48-C, Menard, at 148:5-21.

32. Premier requires its IC DDs to follow its safety procedures. Ex. 48-D, Oliver, at 75:2-12.

33. Premier requires its IC DDs to use the WinSERVE format. Ex. 48-A, Geoffroy, at 82:19-22.

34. Premier requires its IC DDs to operate the directional equipment within certain specifications. Ex. 48-A, Geoffroy, at 90:5-8.

35. Premier considers the IC DDs as their representative on the wellsite. Ex. 48-A, Geoffroy, at 53:21-54:1.

36. Premier unilaterally swapped Alfaro to work as an IC. ECF No. 149-10; Ex. 48-H, Alfaro, at 163:12-165:17.

37. Premier unilaterally swapped Robbins to work as an IC. ECF No. 149-11; Robbins, at 162:21-163:15.

38. In making decisions regarding separation of DDs, Premier kept the most experienced DDs as employees. Ex. 48-A, Geoffroy, at 43:18-23.

39. Premier did not inform its customers when it was using IC DDs. Ex. 48-A, Geoffroy, at 12-16.

40. Premier billed its directional drilling customers in the same manner whether the job was staffed by employee or IC DDs. ECF No. 149-16.

41. There is no difference between the work performed by IC DDs and employee DDs Ex. 48-C, Menard, at 212:7-10.

42. While working as ICs for Premier, Plaintiffs did not share in Premier's profits or losses. Ex. 48-E, Schmidt 1, at 153:23-154:7.

43. Premier did not require Plaintiffs to obtain general liability insurance to perform DD work.

Ex. 48-F, Schmidt 2, at 91:15-22.

44. Premier's IC DDs are not responsible for downtime or financial loss. Ex. 48-C, Menard, at 267:24-269:3.

45. If Premier's IC DDs performed poor work, the only potential loss for the DD was his job. Ex. 48-D, Oliver, at 50:18-51:1.

46. In addition to DDs, Premier supplies MWDs to drilling operators. ECF No. 158-10, Schmidt decl, at ¶ 3.

47. MWDs are essential to completing directional drilling work. Ex. 48-D, Oliver, at 39:17-19.

48. Premier provided the MWDs that worked on jobs with DDs. Ex. 48-B, Kennedy, at 193:23-194:2.

49. Premier paid the MWDs that worked on jobs with DDs. Ex. 48-B, Kennedy, at 141:5-6, 252:10-25.

50. Premier paid for the equipment that DDs used on location. Ex. 48-B, Kennedy, at 252:24-25.

51. Premier's customers provide lodging for both its employee and IC DDs. Ex. 48-E, Schmidt 1, at 155:5-12.

52. Plaintiffs did not work for any other directional drilling companies while working for Premier. Ex. 48-D, Oliver, at 67:12-16.

## C.  ARGUMENT & AUTHORITIES

To determine whether an individual is an employee under the FLSA, the Fifth Circuit considers whether "as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins*, 545 F.3d at 343.

### 1.  Skills & Initiative: Plaintiffs were no different than the employee DDs that Premier employed at the same time.

It is nearly—if not completely—dispositive that Premier had employee DDs performing the exact same job in the exact same way as its purported IC DDs. *See Karna v. BP Corp. N. Am., Inc.*, C.A. No. H-12-0101, 2013 WL 1155485 (S.D. Tex. Mar. 19, 2013); *Baker v. Barnard Constr. Co., Inc.*, 860 F.Supp. 766, 770 (D.N.M. 1994), *aff'd sub nom. Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436 (10th Cir. 1998). Indeed, Premier's DD Coordinators provide the same supervision to employee and IC DDs alike. Ex. 1-E, Oliver, at 106:14-21; Ex. 1-E, Oliver, at 33:21-34:11, 210:21-211:02.

Premier's management readily admitted that Premier's IC DDs were treated identically to their employee DDs with regard to their work:

> Q.    Is the work any different that's being performed by an employee DD versus a consultant DD?
> **A.    On the job site, no.**[3]

Their job duties:

> Q.    Can you think of any differences between the job duties between an independent contractor and employee -- and employee directional driller at Premier?
>
> * * *
>
> **A.    Job duty differences?  No.**[4]

Their reporting requirements to Premier's DD coordinators:

> Q.    Are there any reporting requirements for employee DD's that do not exist for consultant DD's on the job site?
> **A.    For the job, no, I don't believe so.**[5]

Their supervision by Premier's DD coordinators:

> Q.    Okay.  And, so, as -- as a directional driller coordinator, you coordinated both employee and consultant or contractor directional drillers, correct?
> **A.    I was more coordinator of the job, yes.**
> Q.    Okay.  And, so -- and that's regardless of if the job was staffed with employees or independent contractors?
> **A.    Correct.**[6]

And the scrutiny of IC DDs' work by Premier's DD coordinators:

> Q.    You QC the reports that you get from the field from DD's, right?
> **A.    Yes.**
> Q.    And you do that regardless of whether you're getting a report from a consultant DD or an employee DD, right?
> **A.    That is correct.**[7]

As we will see, Premier's claim that IC DDs could turn down work or negotiate their pay is

---

[3] Ex. 48-C, Menard, at 202:7-10
[4] Ex. 48-D, Oliver, at 34:21-35:1.
[5] Ex. 48-C, Menard, at 212:1-10.
[6] Ex. 48-D, Oliver, at 106:14-106:21.
[7] Ex. 48-C, Menard, at 81:22-82:3.

pure fantasy. So the employee and IC DDs were different in name only:

> Q.    And the only difference between an independent contractor directional driller and an employee directional driller, according to Premier, is their ability to turn down work; isn't that correct?
> **A.    And negotiate their pay.**
> Q.    Okay. And those are the only two differences, correct? Excuse me?
> **A    Yes.**[8]

Premier is not saved by the fact that some of its policies and procedures were mandated by its customers. Instructions provided by an employer's customers that the worker is required to follow are treated just like instructions from the employer itself. *See, e.g., Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 307 (4th Cir. 2006); *Robles v. RFJD Holding Co., Inc.*, No. 11-62069-CIV, 2013 WL 2422625, at *4 (S.D. Fla. Jun. 3, 2013).

Premier has not, and cannot, meaningfully distinguish its employee and IC DDs.

### 2.    Skills & Initiative: Plaintiffs' work was consistent with employees.

Unique skills or an ability to exercise significant initiative within the business are indicative of ICs status. *Hopkins*, 545 F.3d at 345. Even if a worker uses special skills, this in itself is not indicative of ICs status, especially if the worker does not use those skills in any independent way. *Karna*, 2013 WL 1155485, at *11.

Premier argues that Plaintiffs had the ability to operate their own business, negotiate their pay, chose which work to accept or reject, and determine how much focus to place on obtaining work from Premier. ECF No 163, at *14. But "Generally speaking, an independent contractor has the ability to make a profit or sustain a loss due to the ability to bid on projects at a flat rate and to complete projects as it sees fit." *Flint Eng'g*, 137 F.3d at 1444. As in this case, "plaintiffs have neither the ability to bid on projects nor to complete their work in an independent fashion."

Premier's employees testified that DDs like Plaintiffs typically worked 12 hours each day. Ex.

---

[8] Ex. 48-A, Geoffroy, at 95:7-95:15.

1-C, Menard, at 296:19-297:12. This schedule is indicative of the day or night shift work Plaintiffs perform. As a result, Plaintiffs are stripped of the ability to complete the projects as they see fit and "There is no incentive for plaintiffs to work faster or more efficiently in order to increase their opportunity for profit." *Flint Eng'g*, 137 F.3d at 1441.

Premier argues that Plaintiffs' independence at the job site justifies IC classification. But evidence shows Premier controls IC DDs' jobs sufficiently to remove any doubt they were employees:

> One would not say that a secretary has independence consistent with independent contractor status simply because his supervisor does not tell him how to type. A laborer on a construction site, who is told where and when to dig, does not exhibit characteristics of an independent contractor if the company does not actually tell him how to use a shovel.

*Barnard Constr.*, 860 F.Supp. at 771. "Skill and initiative that evidence independence cannot include routine duties or responsibilities normally expected of an employee in the same position. Rather, skill and initiative should demonstrate independent entrepreneurism." *Hopkins*, 512 F.Supp.2d at 691.

### 3. Control: Premier supervised the work of IC DDs.

Like all its employees, Premier assigned IC DDs to its job sites for its clients. And Premier placed each IC DD under the supervision of a Premier DD Coordinator. Ex. 1-B, Kennedy, at 137:8-138:14, 142:9-13, 175:6-19, 211:19-25; Ex. 1-E, Oliver, at 46:19-47:13, 101:4-102:19. DD Coordinators supervised the IC DDs by doing the following:

- Interviewing potential IC DDs. Ex. 1-C, Menard, at 63:18-23.
- Hiring IC DDs. Ex. 1-B, Kennedy, at 284:6-9; Ex. 1-E, Oliver, at 52:9-53:16, 54:21-58:9.
- Promoting IC DDs to a higher level. Ex. 1-E, Oliver, at 31:3-32:6, 58:17-59:12, 118:17-120:12.
- Terminating IC DDs relationship with Premier. Ex. 1-B, Kennedy, at 169:24:170:17; Ex. 1-E, Oliver, at 48:22-49:23, 50:18-51:01.
- Swapping employee DDs to IC DDs. Ex. 10, 11; Ex. 1-A, Geoffroy, at 45:22-46:02.
- Approving time off requests for IC DDs. Ex. 1-B, Kennedy, at 242:11-19; Ex. 1-E, Oliver, at 85:25-86:25.
- Providing IC DDs with job-specific information. Ex. 1-A, Geoffroy, at 36:20-37:16; Ex. 1-C, Menard, at 152:12-25, 153:12-14, 183:6-184:13, 256:8-22; Ex. 1-E, Oliver, at 77:19-78:1; Exs. 17, 25, 29.

- Ensuring IC DDs followed the job packet—containing, among other things, the well plan—provided by Premier. Ex. 1-E, Oliver, at 40:5-17. DDs were also required to follow the program ("prog") from the Premier's client. *Id.* at 40:18-47:1.
- Ensuring IC DDs followed Premier's policies and procedures. Ex. 1-A, Geoffroy, at 53:21-54:22, 55:20-56:1, 82:19-22, 90:5-8, 90:14-24; Ex. 1-B, Kennedy, at 213:2-214:7; Ex. 1-C, Menard, at 81:22-82:15, 147:17-22, 148:5-7, 211:20-212:10; Ex. 1-E, Oliver, at 69:14-19, 71:10-15, 75:2-12, 77:1-4, 84:20-24, 90:7-25; Exs. 22, 25, 27.

### 4. Control: Premier required its IC DDs to adhere to its training requirements.

Even though Plaintiffs worked for Premier as IC DDs, they were not exempt from Premier's rigorous training requirements. Ex. 1-C, Menard, at 321:1-11. Plaintiffs were required to regularly complete mandatory training modules to receive various safety related issues from Premier—that is, at least once each month. Ex. 18 ("These topics are part of Premier complying with standards by OSHA and our industry to annually educate or to monthly train **our employees** on the hazards of our field." (emphasis added)). Chief among Premier's concerns was how training of all DDs would reflect on it **as a company**. Ex. 19 ("This number moving forward can adversely affect us **as a company** and the only way to improve this number is to log hours in without a recordable. These monthly safety certification tests can be used as an indication of commitment towards a safety program in the workplace." (emphasis added)). Exs. 17, 20, 21, 23, 26.

Premier tries to create a distinction between safety and other training provided by employers. ECF No. 163, at *16. But that distinction is created wholecloth by Premier and **doesn't exist in any of Premier's cited authority**. Not one of Premier's cited authority address safety training in the context of determining IC status. In fact, other than *Gate Guard*, they don't mention safety training at all. *Gate Guard Svcs., L.P. v. Solis*, C.A. No. V-10-91, 2013 WL 593418, at *6 (S.D. Tex. Feb. 13, 2013) (only recounting the employer's position and not even analyzing it or indicating how it weighed in the court's decision); *Jacobson v. Comcast Corp.*, 740 F.Supp.2d 683, 691 (D. Md. 2010) (no mention of safety training); *FedEx Home Delivery v. N.L.R.B.*, 563 F.3d 492, 501 (D.C. Cir. 2009) (same); *Ruiz v. Affinity Logistics Corp.*, 887 F.Supp.2d 1034, 1038 (S.D. Cal. 2012), *rev'd and remanded*, 754 F.3d 1093 (9th Cir.

2014) (same); *Taylor v. Waddell & Reed, Inc.*, No. 09CV2909 AJB WVG, 2012 WL 3584942, at *2 (S.D. Cal. Aug. 20, 2012) (same); *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004) (same); *Zampos v. W&E Commc'ns, Inc.*, 970 F.Supp.2d 794, 803 (N.D. Ill. 2013) (same).

Cases that **have looked at IC status with respect to training** do not draw Premier's artificial distinction. *Mancia v. Twin Stone Designs & Installations, Inc.*, No. 15-23376-CIV-MORENO, 2016 WL 899313, at *5 (S.D. Fla. Mar. 2, 2016) (finding OSHA training consistent with employee status); *Johnson v. VCG Holding Corp.*, 845 F.Supp.2d 353, 360 (D. Me. 2012) (finding sexual harassment training consistent with employee status). The fact is that Premier mandated Plaintiffs undergo training—the same training as their employee DDs. This shows employee status.

### 5. Control: Premier had total contractual control.

Premier maintained control over everything Plaintiffs did, including on the wellsite, through its Master Services Agreements ("MSAs") with Premier's clients and through the Consultant Agreement that Premier required Plaintiffs to sign. *See, e.g.*, Exs. 2, 38. Premier even warrantied that the work it performed would meet the quality and performance standards set forth by the client and that it (and consequently, any IC or employee DD) would strictly comply with all performance obligations and deadlines. Ex. 38. Premier's Consultant Agreements dictated the manner in which they performed their work and waived certain legal rights. Ex. 2. For instance, the Consultant Agreements obligated the DDs to follow the policies and procedures of the oilfield services companies to which Premier assigned them and to perform their work in a "good and workmanlike manner." Ex. 2, C.A., at ¶¶ 1, 2. In this regard, Premier regularly dictated what it expected from its DDs. *Id.* Premier also maintained the right to observe and inspect the work performed by its DDs to ensure the work was being performed in accordance with Premier's policies, procedures, and other requirements. *Id.*

Premier also required its IC DDs to utilize approved staffing companies, complete "onboarding" paperwork, and sign a non-disclosure agreement before it would assign the DDs to any

job. Exs. 3, 4; Ex. 1-A, Geoffroy, at 39:7-41:16, 50:7-12, 59:20-23, 62:4-63:4; Ex. 1-B, Kennedy at 108:8-23. The onboarding process also included a background check and a drug testing prerequisite. Ex. 1-A, Geoffroy, at 42:7-13, 61:17-20.

### 6. Relative Investments: Premier selectively applies the relative investment test to bury its substantial investment in the directional drilling business.

Premier turns to *Gate Guard* as authority to support its contention that relative investment focuses on the investment in each specific job, not the investment in the overall business in which the job is performed. To reach its conclusion, however, *Gate Guard* misapplied its central authority, *Thibault v. Bell South Telecommunications, Inc.*, 612 F.3d 843 (5th Cir. 2010).

*Thibault* does not conclude that the relative investment analysis is limited to the specific job the employee undertakes. *Thibault*, 612 F.3d at 847-48. *Thibault* cites *Carrell v. Sunland Construction, Inc.*, stating "The court in *Carrell* 'recognized' the overall investment by the alleged employer, but it did not focus on it, as Thibault does in his brief. Instead, *Carrell* compares the amount the alleged employer and employee each contribute to the specific job the employee undertakes." *Id.* at 847 (citing *Carrell*, 998 F.2d 330, 333 (5th Cir. 1993)). That statement did not forever change the scope of the relevant investment test, as Premier proposes.

*Thibault* merely used *Carrell* as a guide because *Carrell* considered welders to be similar to the splicers at issue in *Thibault*. *Id.* Naturally, *Thibault* undertook a similar analysis to *Carrell*. And *Thibault*'s statements regarding the relative investment test are based on *Carrell*, which is clear that the relative investment applies to the overall work performed by the employer. *Carrell*, 998 F.2d at 333 (recognizing "Sunland's overall investment in each pipeline construction project was obviously significant," and citing the employment of welder helpers, use of tack rigs, and the provision of welding products as some examples). While *Carrell* "focused on" the relative amounts invested in each job at hand, it did not hold that the entire project investments were irrelevant. *Id.* Neither did *Thibault*.

Nor could *Thibault* have reached that extreme conclusion, as Premier would have us believe, because **several** earlier panels of the Fifth Circuit determined the proposed employer's "overall investment in the business scheme" was relevant,[9] including the amounts spent on "corporate offices, printing brochures and contracts, providing accounting services, and developing and underwriting … products[.]" *E.g.*, *Hopkins*, 545 F.3d at 344; *see also Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998) (comparing proposed employee's individual investment with the employer's overall investment in the business).

And even though Premier argues (incorrectly) that the investments should be examined on a job-by-job basis, Premier analyzes Plaintiffs' investment on an **annual basis**. Premier cites Plaintiffs' annual business expenses, ranging from $34,355 to $118,000. ECF No. 163, at *16. Further, Premier doesn't carve out what Plaintiffs' expenses are for, whether they are related to Plaintiffs' work at Premier, or how they were applicable to Premier's job by job analysis. *See id.*

All the while, in 2013 Premier spent $1,413,581 on insurance, $2,816,269 on equipment lost in hole, $2,108,992 on transportation and travel, $123,030 on advertising, and $14,828,715 on contract labor. Ex. 49, at 007530. In 2014, Premier spent $677,875 on insurance, $3,762,645 on equipment lost in hole, $2,590,388 on transportation and travel, $425,149 on advertising, and $24,689,514 on contract labor. Ex. 50, at 007568.

Premier Directional Drilling is certainly a "directional drilling" company whose revenue depends largely on its DDs' work for its clients. According to Premier's tax returns, its "principal

---

[9] It is well established that one panel of the Fifth Circuit cannot overrule an earlier panel. *Texas Refrig. Supply, Inc. v. F.D.I.C.*, 953 F.2d 975, 983 (5th Cir. 1992). In order to preserve 'institutional orderliness,' Fifth Circuit precedent dictates that "in the absence of intervening Supreme Court precedent, one panel cannot overturn another panel, regardless of how wrong the earlier panel decision may seem to be." *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 425-26 (5th Cir. 1987). And such decisions should, when possible, be read as consistently as possible. *See Harvey v. Blake*, 913 F.2d 226, 228 (5th Cir. 1990) ("The seeming conflict … is in appearance only …."). "When two panel opinions appear in conflict, it is the earlier which controls." *Id.* at 228.

product or service" is "directional drilling." Ex. 49, at 007505. To operate, Premier invested considerable money in operational costs for:

- office space (around $19,000.00 per month)
- liability and property insurance (around $500,000.00 per year)
- employee benefits (at least $750,000.00 per year)
- computers (around $1,000.00 to $1,500.00 each for "less than a hundred")
- accounting and payroll services along with workers' compensation insurance, provided by a related company (around $1.5 million per month).

Ex. 1-F, Schmidt, at 64:24-65:2, 92:25-93:9, 137:13-138:25. Plus, Premier provided expensive oilfield machinery and other field equipment necessary for DDs to do their jobs.

- 16 EVO tools (approximately $800,000 each—with a principal and interest payment of $130,000 per month)
- 7 electromagnetic survey ("EM") tools
- WinServe subscriptions for DD reporting software (around $4,000 to $5,000 per year per computer)
- computers (around $1,000.00 to $1,500.00 each for around 25 rig-assigned laptops)
- Rental of mud motors (between $90 and $150 per operating hour)

Ex. 39, at Rogs 18, 21, Ex. 1-F, Schmidt, at 65:6-66:3, 67:15-22, 82:22-83:5, 95:10-13, 161:13-22. All this operating equipment, and more, was provided by Premier and its clients. Ex. 1-B, Kennedy, at 240:12-17; Ex. 1-E, Oliver, at 102:20-104:22. And that doesn't account for the cost of MWDs, whose work is essential to the DD's job, and whose pay was provided solely by Premier. Ex. 1-B, Kennedy, at 252:20-24. Premier also supplied software and computers for employee and IC DDs, if needed. Ex. 1-B, Kennedy, at 146:7-19; Ex. 1-C, Menard, at 141:18-143:12, 145:16-25, 245:15-247:10, 249:12-250:1. None of these costs were passed back to the DDs—including pay of the MWD. Ex. 1-B, Kennedy, at 138:17-141:6, 151:22-152:1.

In contrast to the substantial investment made by Premier, the DD's investments were limited to basic items any oilfield employee would supply for themselves, such as tally books, a caliper, a scientific calculator, a tape measure, and personal protective equipment, such as a hard hat, steel-toed boots, safety goggles, gloves, and fire-retardant clothing. Ex. 1-E, Oliver, at 38:9-40:4, 81:20-83:16; Ex.

1-B, Kennedy, at 145:16-145:20, 215:5-216:17; Ex. 1-C, Menard, at 293:20-294:22.

Premier knows the relative investment isn't even close. Premier was spending tens of thousands of dollars per job and hundreds of thousands of dollars per month on oilfield equipment alone—and millions when accounting for operating costs. Ex. 12. In contrast, DDs spent hundreds of dollars per year (to be generous). Premier already admitted that Premier's annual relative investment exceeded Plaintiffs',[10] and the investment factor weighs **heavily** in favor of employee status.

### 7. Profit & Loss: Premier controlled the DDs opportunity for profit and loss.

Premier had control over every aspect of the DDs' profit or loss. Premier unilaterally decided to pay IC DDs a day rate regardless of hours worked, instead of a salary or otherwise. Ex. 1-B, Kennedy, at 214:08-215:25, 282:23-283:2; Ex. 1-E, Oliver, at 115:7-25. Just like its employee DDs, Premier required IC DDs to work at least 12 hours a day. Ex. 1-C, Menard, at 296:19-297:12. Premier also set employee and DD pay rates according to the same scale, based solely on their field experience. Exs. 5, 6, 7, 9, 28; Ex. 1-A, Geoffroy, at 52:5-17; Ex. 1-B, Kennedy, at 60:7-61:10, 78:12-80:15; Ex. 1-C, Menard, at 306:24-307:6; Ex. 1-E, Oliver, at 33:10-34:16, 59:20-62:15, 63:14-63:19, 65:12-19, 119:04-120:12; Ex. 1-D, Selby, at 51:8-17, 52:11-54:11. Premier even dictated the date that payment would be issued. Ex. 1-E, Oliver, at 63:3-10; Ex. 8. Plaintiffs were not able to negotiate their rates of pay, nor to turn down a job. Ex. 1-E, Oliver, at 66:4-67:16; Ex. 39, at Rog 9. And Premier billed its clients the same whether employees or IC DDs were staffed to the job. Ex. 16.

Like true employees, Premier did not share costs or losses with its IC DDs. Ex. 1-B, Kennedy, at 141:18-142:8, 143:9-13, 167:21-168:23, 240:19-241:4; Ex. 1-C, Menard, at 267:24-269:3. Moreover, IC DDs did not have to return any pay if a job was completed in less time than expected. Ex. 1-B, Kennedy, at 142:21-143:7.  IC DDs also could not subcontract out their work at Premier. Ex. 1-B,

---

[10] *See* Ex. 41 (Premier's signed stipulation on relative investments).

Kennedy, at 184:15-25; 187:9-15; Ex. 1-C, Menard, at 276:19-23; 281:14-16; Ex. 1-E, Oliver, at 37:17-23. IC DDs relied on Premier as an employer, as there was no requirement for IC DDs to market or bring in business. Ex. 1-B, Kennedy, at 237:24-238:3. Of course, they couldn't bring in any business, since Premier's Consultant Agreement made them surrender any ability to market themselves and appoint InPetro as their exclusive "Marketing Agent," which in turn made Premier the only company for which they were allowed to work. Ex. 2, C.A., at ¶ 6.

Plaintiffs made their money by doing work for Premier. It is true that the more days they worked, the more money they made. "But toiling for money on a [day rate] basis is more like wages than an opportunity for 'profit.'" *See Dole v. Snell*, 875 F.2d 802, 809 (10th Cir. 1989) (referring to piecemeal work); *see also Baker*, 860 F.Supp. at 774 (analogizing piecemeal work to hourly work regarding the purported IC's inability to make a profit). In all:

> No potential exists for a [DD] to increase his pay by taking initiative on the job site. In fact, if [the DDs' work] is unsatisfactory, a [DD] is not required to [fix it] on his own time. Therefore, the only potential loss for a [DD] for doing poor work is to lose his job.

*See id.* at 769; *see also Mednick v. Albert Enterps., Inc.*, 508 F.2d 297, 301 (5th Cir. 1975) ("[Plaintiff] had other means of increasing his 'profits,' but the means available were really indistinguishable from those available to any employee who [is similarly compensated]."). Even though a DD's mistakes could be expensive for Premier,[11] Premier did not once seek reimbursement for a mistake from an IC; and Premier did not ask them to share in any other losses:

> Q.   When you've had economic loss, have you asked the DD contractors to -- to share in that loss?
> **A.   I mean, if we have a loss at the company level, that's the risk of loss we take by being in business.**
> Q.   So, what I said is [ ] correct, that the DD contractors don't have to take that --
> **A.   I will say, to my knowledge, we've never asked them to participate in that.[12]**

---

[11] Ex. 48-E, Schmidt 1, at 149:22-150:22.
[12] Ex. 48-E, Schmidt 1, at 153:23-154:7.

Plaintiffs are in no way like the gate attendants in *Gate Guard*, who negotiate their rate of pay, "perform other jobs while at the well site," take "jobs with other general contractors, landowners, or oil companies during the extended periods of time they have off between jobs they worked," work on a "job-by-job basis," and pay their own "relief workers directly and also decide the amount to pay them." 2013 WL 593418, at *8. None of those facts are present in this case.

Premier's only evidence of outside businesses is "Ellestad's goat farm, Raspberry's hydro-graphics company, and Richard's gutter business." ECF No. 163, at *16. Only a couple problems. First, there are no plaintiffs Raspberry or Richard. *See generally*, Docket. Raspberry and Richard were both "happy campers" whose self-serving declarations were submitted by Premier in opposition to certification and do not contain any details of their alleged businesses. ECF Nos. 25-7, -4. In any event, what Raspberry and Richard did has nothing to do with this case. *See, e.g.*, *Usery*, 527 F.2d at 1312 ("It is not significant how one 'could have' acted …. The controlling economic realities are reflected by the way one actually acts."). Further, Ellestad's hobby of raising goats does not interfere with his exclusive work for Premier as a DD, it is not in the same industry, and is it done while at Premier's wellsites. And "minor additional income made from work which is not connected with the actual business under examination is not relevant to a court's determination of employee status." *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1049 (5th Cir. 1987); *see Karna*, 2013 WL 1155485, at *10 (same).

Nor is Premier's tax argument persuasive. Certainly, Plaintiffs had some expenditures and business deductions since Premier forced them to be classified as ICs. *See Baker*, 860 F.Supp. at 772-73. But such tax deductions are of little import. "[R]eviewing the [DDs'] tax returns probably suggests more about their creative accounting methods (or lack thereof) than it does about their ability to control costs." *Id.*

### 8. Permanence: Plaintiffs' lengths of employment are consistent with directional drillers in general and Premier's directional drillers, more specifically.

Premier completely neglects to consider that the permanence of the working relationship, must account for a business' operational characteristics that are unique or intrinsic to the particular business or industry and to the workers the business employs. *Mr. W Fireworks, Inc.*, 814 F.2d at 1054; *Mitchell v. John R. Cowley & Bro, Inc.*, 292 F.2d 105, 108 (5th Cir. 1961).

It is undisputed Premier engaged Plaintiffs in long-term employment. Ex. 1-A, Geoffroy, at 94:13-95:15; Ex. 1-B, Kennedy, at 210:17-21. Their lengths of employment range up to 3.5 years. Exs. 10, 31, 36. And only one Plaintiff worked for less than 6 months. Exs. 11, 30, 32, 33, 34, 35, 36, 37.

And not only were Plaintiffs long-employed by Premier, but their hitches and time between jobs were identical to its employees. Just as crucially, their contracts with Premier are consistent with employee DDs in the oilfield. They were for an indefinite period of time. *See* Ex. 2, C.A. They did not specify any jobs and contain no specifications for any particular jobs. *See id.* They don't provide any details of compensation. *See id.* Identical contracts have led to findings of employee status. *Flint Eng'g*, 137 F.3d at 1439 ("The agreements did not indicate how long the 'independent relationship' was to last, did not refer to specific projects or project specifications, and did not indicate how much the welder was to be paid."); *see also* Ex. 46 at card 18 ("Don't Hire Independent Contactors Indefinitely – Must be Project-by-Project."); Ex. 45, Idalski, *Defending Your IC Classification*, at *3 ("You should enter into a new agreement for each project assigned ….").

### 9. Subjective perceptions and tax records are red herrings.

Premier's motion puts far too much stock in claiming that the Court should focus on Plaintiffs' signing of ICs agreements, completion of tax forms, and other representations that they were ICs.

The Fifth Circuit has long held that "[n]either contraction recitations nor subjective intent" can alter the reality of an employment relationship. *E.g.*, *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308,

1315 (5th Cir. 1976). In other words, "An employee is not permitted to waive employee status." *Baker*, 860 F.Supp. at 772 (citing *Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 269 n.3 (5th Cir. 1982)).

And here, the workers were told by Premier that they would be classified as ICs rather than employees. *E.g.*, Ex. 48-K, Robbins depo, at 162:21-163:15; Ex. 48-H, Alfaro depo, at 163:12-165:17. So, "the Plaintiffs[s'] treating themselves as independent contractors on their tax forms was a reaction to the Defendants[s'] non-negotiable policy." *Baker*, 860 F.Supp. at 772-73. Likewise, Premier's claims in its Statement of Material Facts that Parrish reaffirmed his contractor status misstates his deposition testimony. *See* ECF No. 163, at *7. In context, Parrish was testifying about his classification by Premier with respect to how his taxes were completed. Ex. 48-G, Parrish depo, at 36:24-37:12.

At bottom, the subjective perceptions or (mis)representations of employment/contractor status do not alter the reality that Plaintiffs were Premier's employees. *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983).

### 10. Premier's litigation position can't stand under its own weight.

Premier's argument that Premier's IC DDs were "experts in directional drilling" is a fiction created for this litigation that doesn't even make sense and is contradicted by Premier's own testimony.

Premier's motion claims Premier used a "flexible staffing model." ECF No. 163, at *4. Premier's motion crafts the narrative that, after the recent slowdown in the oil and gas industry, Premier decided to respond by … **laying off its most qualified DDs** so that it could **keep its least qualified DDs as employees**. Of course, it makes little logical or business sense that a company would purposefully retain a stable of less skilled workers so that it would have to negotiate job-by-job with its more skilled workers, who would also now be free to work for its competitors. And that's why this fantasy didn't happen.

Premier's corporate representative, VP Ward Geoffroy, testified that Premier did in fact keep the most experienced of all their DDs as employees:

Q. Okay. And if he was a high-level employee, high-skill employee, do you know why he wasn't kept at Premier?

**A. Because we had a lot of high-level or quality employees and we kept the ones that had the most experience that we knew.**[13]

Premier's newly crafted narrative also conflicts with the testimony of Plaintiffs' supervisors, like Parrish's DD coordinator at Premier, who had little respect for Parrish's work, to say the least:

Q. Was Mr. Parrish a good directional driller?

**A. No.**

Q. Was he skilled, though?

**A. Was he skilled? I mean, he's better than what I could get at [ ] Walmart.**[14]

Premier's IC DDs did the same work under the same conditions as its employee DDs. And, as Premier confirmed, nothing changed for those DDs who were "swapped" from employee to contractor treatment. *E.g.*, Ex. 48-A, Geoffroy, at 35:20-36:2. Premier's own lawyers have warned companies against similar plots to skirt federal law: "'**Companies should be wary of laying off workers only to hire them back as independent contractors**.'" Ex. 44, Berson, *IRS Gets Class Conscious: Switching to ICs Draws Scrutiny* (emphasis added) (quoting Premier's Counsel, Annette Idalski).

Premier's use of ICs to do the same directional drilling work that others (including converted DDs) did as employees wasn't part of any "flexible staffing model." It was just an FLSA- and tax-avoidance scheme.

**11. Industry standard is not a defense in an FLSA case—and even if it was, Premier has no support for such a defense.**

Premier cites to its old standby, *Gate Guard*, to support its wild assertion that industry standard justifies the use of ICs in the oil industry. Respectfully, however, *Gate Guard*'s reasoning on this issue is seriously flawed. Every case that is cited for support in *Gate Guard* (the same ones cited by Premier) is not an FLSA case. *Gate Guard* (and Premier) rely on *Mid-Continent Cas. Co. v. Davis*, No. 3:08-CV-1478-P, 2011 WL 13727, at *4 (N.D. Tex. Jan. 3, 2011), *aff'd*, 683 F.3d 651 (5th Cir. 2012), *Caballero v.*

---

[13] Ex. 48-A, Geoffroy, at 43:18-23.
[14] Ex. 48-D, Oliver, at 88:21-89:2.

*Archer*, No. SA-04-CA-561-OG, 2007 WL 628755 (W.D. Tex. Feb. 1, 2007), and *Trustees of Mich. Reg'l Council of Carpenters Employee Bens. Fund v. Fox Bros. Co.,* No. 05-CV-70262-DT, 2005 WL 3579173 (E.D. Mich. Dec. 27, 2005). *Mid-Continent* involves an insurance coverage dispute arising from a personal injury. 2011 WL 13727, at *4. *Caballero* is a personal injury case. 2007 WL 628755, at *3. Both *Mid-Continent* and *Caballero* applied Texas common law to discuss ICs status. *Fox Bros.* is an ERISA case; and ERISA utilizes "the common law agency test" to determine ICs status. 2005 WL 3579173, at *3.

FLSA authority—which is the relevant standard in an FLSA case—is crystal clear that an employer's "reliance on industry standards is not sufficient to prove good faith." *Morley v. Nine Energy Service, LLC*, Civ. A. No. H-15-1809, ECF No. 40, at *5 (S.D. Tex. Oct. 31, 2016) (granting oilfield employees' motion for summary judgment on employer's good faith defense where employer claimed its pay practice was proper based on industry standard); *see also Reich v. Southern New England Telecom. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997) ("Nor is good faith demonstrated by the … simple conformity with industry-wide practice."); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 910 (3d Cir. 1991) (conformance with "well-established and widely accepted industry practice is not ground for dining a reasonable goof faith violation of the Act."); *Johnson v. Big Lots Store, Inc.*, 604 F.Supp.2d 903, 926 (E.D. La. 2009) (rejecting industry practice as proof of good faith).

But Premier couldn't meet an industry standard defense even if there was one. Premier's defense hinges on owner Michael Kennedy's previous employment experience at Allis-Chalmers. But Allis-Chalmers was found by the Texas Workforce Commission in 2010 (two years before Premier was even founded) to have misclassified ICs and ordered to pay damages. During the investigation, Allis-Chalmers singled out Kennedy's group in particular as a potential liability for violating wage laws with respect to ICs. Ex. 47.

As Allis-Chalmers itself predicted, the company was sued for misclassification of its oilfield ICs the following year, **while Kennedy still worked there**. Ex. 1-B, Kennedy, at 246:22-247:2, 260:5-

260:18, 263:23-264:7; Ex. 40. Allis-Chalmers eventually resolved that litigation and reclassified those workers to employees. Nonetheless, Kennedy went on to Premier, where he utilized the very same misclassification system. The defense fails.

### 12. A finding of employee status furthers the FLSA's remedial purpose.

Premier's claim that the FLSA was designed to protect only low-wage workers is patently false.[15] ECF No. 163, at *21. No less than the Supreme Court has affirmed—in no uncertain terms—and on no less two occasions—that "employees are not to be deprived of the benefits of the Act simply because they are well paid[.]" *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of Am.*, 325 U.S. 161, 167 (1945); *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 741 n.18 (1981). The FLSA's remedial goals are thus furthered by "eliminating the practices of companies who sought to reduce their labor costs (and to avoid their obligations under federal labor laws) by using illegitimate contractors." *Zavala v. Wal-Mart Stores, Inc.*, 393 F.Supp.2d 295, 327 (D.N.J. 2005), *aff'd sub nom. Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527 (3d Cir. 2012) (citing *United States v. Rosenwasser*, 323 U.S. 360, 363 & n. 3 (1945)). And as the Fifth Circuit has stated, to achieve the FLSA's purposes, any doubts regarding a worker's employment status must be resolved in favor of employment. *See Breaux and Daigle, Inc. v. United States*, 900 F.2d 49, 52 (5th Cir. 1990).

For these reasons, public policy is served by looking beyond Plaintiffs' pay and analyzing this case based solely on the question of whether Plaintiffs' misclassification.

### D. CONCLUSION

For these reasons and those set forth in Plaintiffs' motion for summary judgment, the Court should find Plaintiffs were Premier's employees.

---

[15] Premier's statement is not supported by its citation to *Usery*, where the Fifth Circuit said only that the FLSA's purpose was to "'eliminate low wages,'" and at the same time made the unqualified statement that the FLSA's "wage and hour provisions [are] applicable to **employees**." 527 F.2d at 1310 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947)) (emphasis added).

Respectfully submitted,

*/s/ Andrew W. Dunlap*

By: _____
      Michael A. Josephson
      Texas Bar No. 24014780
      Andrew W. Dunlap
      Texas Bar No. 24078444
**JOSEPHSON DUNLAP LAW FIRM**
11 Greenway Plaza, Ste. 3050
Houston, Texas 77046
Telephone:    (713) 352-1100
Telecopier:    (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com


Richard J. (Rex) Burch
Texas Bar No. 24001807
Matthew S. Parmet
Texas Bar No. 24069719
**BRUCKNER BURCH PLLC**
8 Greenway Plaza, Suite 1500
Houston, Texas 77046
Telephone:    (713) 877-8788
Telecopier:    (713) 877-8065
rburch@brucknerburch.com
mparmet@brucknerburch.com

**Attorneys for Plaintiff**


**CERTIFICATE OF SERVICE**

On August 18, 2017, I served a copy of this document on all registered parties and/or their counsel of record, via the Court's CM/ECF system.

*/s/ Andrew W. Dunlap*
_____
Andrew W. Dunlap