IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

WILLIAM PARRISH, on behalf of       §       No. 5:16-CV-417-DAE
himself and all others similarly situated, §
                                    §
        Plaintiff,                  §
                                    §
vs.                                 §
                                    §
PREMIER DIRECTIONAL                 §
DRILLING, L.P.,                     §
                                    §
        Defendant.                  §
_____   §

ORDER: (1) DENYING PREMIER'S MOTION FOR SUMMARY JUDGMENT;
(2) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT;
(3) OVERRULING IN PART, DENYING IN PART, AND DENYING AS MOOT
IN PART OBJECTIONS AND MOTIONS TO STRIKE; AND (4) DENYING AS
MOOT MOTION TO STRIKE

Before the Court are various motions filed by the parties:

(1) Defendant Premier Directional Drilling, L.P.'s ("Premier") Motion for

Summary Judgment as to all Plaintiffs (Dkt. # 163); (2) Plaintiffs William Parrish

("Plaintiffs" or "Parrish"), on behalf of himself and all others similarly situated,[1]

Motion for Summary Judgment as to Employee Status, Liability/Backwages, and

Premier's Good Faith Defense (Dkt. # 150); (3) Parrish's Objections to, and

Motion to Strike, Premier's Improper Affidavit Testimony (Dkt. # 170);

(4) Parrish's Objections to, and Motion to Strike, Premier's Statement of

_____
[1] There are four other plaintiffs who have opted-in to this lawsuit.

Undisputed Facts (Dkt. # 172); and (5) Premier's Motion to Strike Plaintiff's New Evidence on Reply (Dkt. # 187).  Pursuant to Rule CV-7(h) the Court finds this matter suitable for disposition without a hearing.

After careful consideration of the memoranda in support of and in opposition to the motions, the Court, for the reasons that follow, **DENIES** Premier's motion for summary judgment (Dkt. # 163), **GRANTS** Plaintiffs' motion for summary judgment (Dkt. # 150), **OVERRULES IN PART, DENIES IN PART, AND DENIES AS MOOT IN PART** Plaintiffs' Objections and Motions to Strike (Dkts. ## 170, 172), and **DENIES AS MOOT** Premier's motion to strike (Dkt. # 187).

<u>BACKGROUND</u>

Premier is a drilling company with oil and gas operations throughout several locations in the United States, including the Eagle Ford Shale in Texas. (Dkt. # 1 at 3.)  Premier is based out of Houston, Texas, and employs individuals as Directional Drillers Consultants ("DDs") and Measurement While Drilling Consultants ("MWDs").  (<u>Id.</u>)  According to Plaintiffs, Premier employs DDs and MWDs as both W-2 employees and independent contractors, but there are no appreciable differences between the two classifications.  (<u>Id.</u>)  Plaintiffs assert that Premier did not adequately compensate DDs and MWDs, labeled as independent contractors, who worked in excess of forty hours.  (<u>Id.</u>)  On May 5, 2016, Plaintiffs

2

filed a collective-action suit against Premier, alleging claims for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 207, and 215(a)(2).  (Id. at 5.)

On July 21, 2017, the parties filed the pending motions for summary judgment.  (Dkts. ## 150, 163.)  Each party filed their respective responses to the motions for summary judgment on August 18, 2017 (Dkts. ## 174, 175); the parties filed replies on August 25, 2017 (Dkts. ## 179, 180).  On August 18, 2017, Parrish filed two motions to strike Premier's evidence in support of summary judgment.  (Dkts. ## 170, 172.)  Premier filed responses in opposition on August 25, 2017 (Dkts. ## 181, 182); Parrish filed replies to its motions on September 11, 2017 (Dkts. ## 189, 190).  On August 30, 2017, Premier filed a motion to strike Parrish's New Evidence on Reply (Dkt. # 187); Parrish filed a response in opposition on September 6, 2017 (Dkt. # 188); Premier filed a reply on September 13, 2017 (Dkt. # 191).  These motions are addressed below.

I.    Premier's Motion for Summary Judgment

Premier has filed a motion for summary judgment on all of Plaintiffs' claims.  (Dkt. # 163.)  Premier contends that summary judgment is appropriate because the plaintiffs are all independent contractors for whom the FLSA does not apply.  (Id. at 10.)

A.     Applicable Law

A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact," and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enters., L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial.  Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence."  Tiblier v. Dlabal, 743 F.3d

1004, 1007 (5th Cir. 2014) (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>,

530 U.S. 133, 150 (2000)).  At the summary judgment stage, evidence need not be

authenticated or otherwise presented in an admissible form.  <u>See</u> Fed. R. Civ. P.

56(c); <u>Lee v. Offshore Logistical & Transp., LLC</u>, 859 F.3d 353, 355 (5th Cir.

2017).  However, "[u]nsubstantiated assertions, improbable inferences, and

unsupported speculation are not sufficient to defeat a motion for summary

judgment."  <u>United States v. Renda Marine, Inc.</u>, 667 F.3d 651, 655 (5th Cir. 2012)

(quoting <u>Brown v. City of Hous.</u>, 337 F.3d 539, 541 (5th Cir. 2003)).

      B.     <u>Fair Labor Standards Act</u>

      The Fair Labor Standards Act, 29 U.S.C. § 201, <u>et seq.</u> ("FLSA"),

mandates that "no employer may employ any non-exempt employee 'for a

workweek longer than forty hours unless such employee receives compensation for

his employment in excess of the hours above specified at a rate not less than one

and one-half times the regular rate at which he is employed.'"  <u>Garcia v. U Pull It</u>

<u>Auto & Truck Salvage, Inc.</u>, No. 16-10257, 2016 WL 49326173, at *2 (5th Cir.

Sep. 15, 2016) (quoting 29 U.S.C. § 207(a)(1)).  In other words, the FLSA

"requires employers to provide overtime pay to any employee who works more

than forty hours per week unless an exemption from this protection applies."

<u>Halle v. Galliano Marine Serv., L.L.C.</u>, No. 16-30558, 2017 WL 1399697, at *2

(5th Cir. Apr. 19, 2017) (citing 29 U.S.C. §§ 207, 213).

An employee who brings a FLSA action for unpaid overtime compensation must demonstrate, by a preponderance of the evidence: "(1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due."  Johnson v. Heckmann Water Resources (CVR), Inc., 758 F.3d 627, 630 (5th Cir. 2014).

Once the employee establishes his prima facie case, the burden shifts to the employer to either (1) show evidence of the precise amount of work performed or (2) negate the reasonableness of the inference to be made from the employee's evidence.  Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 441 (5th Cir. 2005) (quoting Anderson v. Mount Clemens Pottery Co., 328 U.S. 680, 687-88 (1946)) (internal quotations omitted).

C.    Analysis

The issue the Court must decide in regard to Premier's motion for summary judgment is whether Plaintiffs are employees of Premier within the meaning of the FLSA, or independent contractors and thus not subject to the FLSA's compensation requirements.

The determination of whether Plaintiffs are employees under the FLSA is a legal, not a factual, finding.  See Lindsley v. BellSouth Telecomms. Inc., 401 F. App'x 944, 945 (5th Cir. Nov. 15, 2010) (citing Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1045 (5th Cir. 1987)).  The Court determines whether a worker qualifies as an employee under the FLSA by focusing on "whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself."  Hopkins v. Cornerstone Am., 545 F.3d 338, 343 (5th Cir. 2008).  "The determination of whether an individual is an employee or independent contractor is highly dependent on the particular situation presented."  Thibault v. Bellsouth Telecomms., Inc., 612 F.3d 843, 848 (5th Cir. 2010).  No single factor will be determinative of the Court's inquiry.  Hopkins, 545 F.3d at 343.

The five non-exhaustive factors most often considered by the courts are: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship."  Hopkins, 545 F.3d at 343.  The Court will consider each factor below.

1.    <u>Degree of Control</u>

Degree of control refers to whether the plaintiffs possess "real independence" in the economic relationship.  <u>Hopkins</u>, 545 F.3d at 343.  The Fifth Circuit has recognized that "[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity."  <u>Id.</u> (citing <u>Mr. W Fireworks</u>, 814 F.2d at 1049); <u>see also</u> <u>Reich v. Priba Corp.</u>, 890 F. Supp. 586, 592 (N.D. Tex. 1995).  In analyzing this factor, the Fifth Circuit has previously considered the extent to which an alleged employer directs, oversees, or manages how a worker performs his tasks.  <u>See</u> <u>Thibault</u>, 612 F.3d at 846–47 (considering, in analyzing degree of control, the fact that the defendant determined the work hours and breaks splicer would get, but not the manner and method by which the plaintiff was to do his splicing); <u>Carrell v. Sunland Const., Inc.</u>, 998 F.2d 330, 332–33 (5th Cir. 1993) (discussing competing facts relevant to degree of control determination, including that the defendant assigned specific welding work to the plaintiffs, and set their hours, but customers tested and certified each welder, and welders placed their identification on each weld so that the customer could determine who was responsible for improper welds); <u>Robicheaux v. Radclif Material, Inc.</u>, 697 F.2d 662, 664 (5th Cir. 1983) (recognizing that the defendant exercised "substantial if not complete control over the hours worked and the jobs done by the welders");

8

Cromwell v. Driftwood Elec. Contractors, Inc., 348 F. App'x 57, 58–59 (5th Cir.

2009) (noting that the defendant provided descriptions of the work needed and

certain general specifications, and checked on the progress of the work, but did not

train the plaintiffs or control the details of how their tasks would be completed).

However, "the lack of supervision over minor regular tasks cannot be bootstrapped

into an appearance of real independence." Hopkins, 545 F.3d at 343 (citing Mr. W

Fireworks, 814 F.2d at 1049).  In analyzing the "control" factor, courts focus on

whether the alleged employer controlled the details of the job, including, for

example, the worker's schedule, timing of breaks, training, compensation,

supervision, and manner and method of the work performed.  Carrell, 998 F.2d at

332, 334.

Premier argues that at no time did Plaintiffs, labeled by Premier as

independent contractor DDs ("IC DD"), receive any supervision for their work.

(Dkt. # 163 at 15.)  Additionally, Premier asserts that Plaintiffs received limited

safety training, but no other training, performance reviews, or discipline from a

Premier supervisor.  (Id.; Dkt. # 152 at 33; Parrish Dep. at 172:11–173:7, 182:9–

18, Ex. 15; Ellestad Dep. at 154:16–20; Robbins Dep. at 159:4–161:8; Menard

Dep. at 320:5–322:13; Schmidt Dep. II at 130:12–131:12; Oliver Dep. at 50:2–5.)

Instead, Premier argues that Plaintiffs were highly skilled individuals who had

years of experience and were paid up to $300,000 per year for their work and,

therefore, needed no direct oversight or supervision from Premier.  (Dkt. # 163 at 14.)

Premier also contends that IC DDs had to make their own decisions out in the field regarding what direction to drill, for instance, without any oversight from Premier.  (Id.; Oliver Dep. at 93:3–18.)  Premier also asserts that Plaintiffs had some control over their schedule and could accept or reject work as they needed.  (Dkt. # 163 at 16; Parrish Dep. at 133:14–134:9, 248:11–21, 251: 10–22, 253: 13–256:2; Ellestad Dep. at 80:20–81:11; 123:1–4, 135:14–16; Robbins Dep. at 136:19–137:9.)

In response, Plaintiffs assert that IC DDs—who were technically labeled as an independent contractors but functioned in the same capacity as those DDs actually employed by Premier—were still placed under the supervision of a Premier DD Coordinator, who supervised IC DDs in the following ways: (1) interviewing, hiring, promoting, and terminating (Menard Dep. 63:18–23; Kennedy Dep. 169:24:170:17, 284:6–9; Oliver Dep. 31:3–32:6, 48:22–49:23, 50:18–51:01, 52:9–53:16, 54:21–58:9, 58:17–59:12, 118:17–120:12)  (2) swapping employees from DDs employed with Premier to IC DDs (Geoffroy Dep. 45:22–46:02); (3) approving time-off requests for IC DDs (Kennedy Dep. 242:11–19; Oliver Dep. 85:25–86:25); (4) providing IC DDs with job-specific information (Geoffroy Dep. 36:20–37:16; Menard Dep. 152:12–25, 153:12–14, 183:6–184:13,

256:8–22; Oliver Dep. 77:19–78:1); (5) ensuring IC DDs followed the job packet, including following the well plan provided by Premier (Oliver Dep. 40:5–17); and (6) ensuring IC DDs followed Premier's policies and procedures (Geoffroy Dep. 53:21–54:22, 55:20–56:1, 82:19–22, 90:5–8, 90:14–24; Kennedy Dep. 213:2–214:7; Menard Dep. 81:22–82:15, 147:17–22, 148:5–7, 211:20–212:10; Oliver Dep. 69:14–19, 71:10–15, 75:2–12, 77:1–4, 84:20–24, 90:7–25).  (Dkt. # 175 at 13–14.)  Plaintiffs also argue that Premier required its IC DD's to complete rigorous training modules on safety.  (Dkt. # 175 at 14.)

> Additionally, Plaintiffs assert that Premier had total contractual control over everything each of its IC DDs did on the wellsite, through its Master Services Agreements ("MSAs") with Premier's clients and through a Consultant Agreement that Premier required Plaintiffs to sign.  (Id. at 15; Dkt. # 149-2.) According to Plaintiffs, through the Consultant Agreements, Premier dictated its expectations to Plaintiffs and that it maintained the right to observe and inspect their work performance and to ensure work was being performed in accordance with Premier's policies and procedures.  (Id.)  Plaintiffs further contend that Premier required IC DDs to utilize approved staffing companies, complete certain paperwork, and sign non-disclosure agreements prior to assigning the IC DDs to any jobs.  (Id. at 15–16; Geoffroy Dep. 39:7–41:16, 50:7–12, 59:20–23, 62:4–63:4; Kennedy Dep. 108:8–23.)  Plaintiffs assert that these requirements also included

that IC DDs obtain background checks and drug testing.  (Dkt. # 175 at 15;

Geoffroy, at 42:7–13, 61:17–20.)

      Here, Plaintiffs' evidence that Premier exercised control over the IC

DDs work schedules and subjected them to certain personnel policies, such as drug

testing and safety trainings, as well as requiring non-disclosure agreements, favors

a finding of employee status.  Nevertheless, Premier has presented evidence that

Plaintiffs were highly skilled workers who performed work without any additional

training, and without significant direct supervision at the work site.  Such evidence

supports Premier's position that Plaintiffs were independent contractors.

Accordingly, because the parties' evidence does not substantially favor either

classification, this factor is neutral in the economic dependence analysis.

### 2.   Relative Investments

      Under this factor, courts balance the alleged employee's investment

against the employer's investment in the specific job at hand.  Thibault, 612 F.3d at

847 (comparing "the amount the alleged employer and employee each contribute to

the specific job the employee undertakes").  Where the employer's investment in

the job surpasses the worker's, this factor favors employee status.  Herman v.

Express Sixty-Minutes Delivery Service, Inc., 161 F.3d 299 (5th Cir. 1998)

(finding the plaintiffs' investment in delivery vehicles, insurance, radios, fuel, and

delivery supplies insignificant compared to the defendant's investment in office

space, office equipment, payroll, and other expenses).  However, where the alleged

employee's investment in the task is substantial compared to the employer's, this

factor favors independent contractor status.  Thibault, 612 F.3d at 847–48 (finding

independent contractor status where plaintiff provided his own bucket truck, safety

equipment, tools, temporary housing, and food while defendant provided only a

temporary base of operations and the necessary materials).

   Premier contends that Plaintiffs invested thousands of dollars in their

own directional drilling consulting businesses.  (Dkt. # 163 at 17.)  Premier

includes evidence indicating that Parrish owned his own consulting firm, Parrish

Consulting LLC (Dkt. # 153-1 at 5; Parrish Dep. 11:24–12:23), and that the other

plaintiffs each had their own consulting firms as well (Ellestad Dep. 35:8–37:6;

Alfaro Dep. 24:5–26:7).  As evidence, Premier includes the tax returns and other

associated documents and testimony of Plaintiffs, which indicate that (1) one

plaintiff reported more than $266,000 in expenses for the years 2013 through 2015

(Dkt. # 153-1); (2) another plaintiff expended $287,000 for 2014 and 2015

(Ellestad Dep. 64:23–65:4, 67:12–69:4); (3) another plaintiff expended $ 43,329 in

2015 (Alfaro Dep. 104:5–13); and (4) a fourth plaintiff expended close to $100,000

for 2014 and 2015 (Beckett Dep. 74:9–15; 81:24–82:1).  Thus, according to

Premier, Plaintiffs each built businesses that generated hundreds of thousands of

dollars in revenue each year, and that held thousands of dollars in assets and consumables.  (Dkt. # 163 at 18.)

Plaintiffs, on the other hand, argue that there is no question that Premier made substantial investments *in the job at hand* that are incomparable to anything Plaintiffs may have invested.  (Dkt. # 175 at 18.)  For instance, Plaintiffs cite evidence of Premier's operational costs for office space, insurance, employee benefits, computers, accounting and payroll services, etc., totalling millions of dollars.  (Id.)  Plaintiffs contend that they only spent hundreds of dollars a year, if even that much.  (Id. at 19.)  Plaintiffs assert that the Court should only compare the investments into Premier and not any side jobs or investments in their consulting firms when comparing the two.  (Id.)

Despite the parties varied interpretation of this factor,[2] the Court will analyze this factor by looking into the individual investment each party made for *the specific job at hand*—here, the job the IC DDs were hired to perform, as the Fifth Circuit has done in similar cases.  See, e.g., Thibault, 612 F.3d at 847; Carrell, 998 F.2d at 333.  Under Fifth Circuit precedent, each Plaintiff's investment is balanced against the alleged employer's investment in the job at hand.  Thibault, 612 F.3d at 847 (comparing "the amount the alleged employer and employee each contribute to the specific job the employee undertakes").  Thus, the Court will

---

[2] The parties apparently do not generally dispute the facts for this factor, but rather the appropriate comparison for "relative investment."

consider Plaintiffs expenses in supplying their own materials, equipment, tools, supplies, etc. in comparison to Premier's expenditure on these items to perform the job of directional drilling.

Here, in general, the IC DD's job was to oversee and steer the direction of the automatic drill on a job site, normally by way of a "touch screen." (See, e.g., Dkt. # 177-1 at 61, 75.)  To perform this function, Plaintiffs provide evidence of Premier's Chief Financial Officer who testified that Premier provided IC DD's oilfield equipment, including (1) spending at least $800,000 each on 16 "EVO tools"[3]; (2) purchasing seven electromagnetic survey tools; (3) purchasing WinServe subscriptions for DD reporting software at a price around $4,000 to $5,000 per year per computer; (4) spending approximately $1,000 for twenty-five rig-assigned laptops; and (5) renting "mud motors" for between $90 and $150 per operating hour.  (Dkt. # 150-2 at 322–327, 330, 333.)  In contrast, Plaintiffs also provide evidence that they invested significantly less in performing their job for Premier.  Plaintiffs' evidence indicates that their investments included only basic supplies such as tally books, calipers, scientific calculators, tape measures, protective gear, hard hats, steel-toed boots, safety goggles, gloves, and fire-retardant clothing—items which cost significantly less than Premier's

---

[3] "EVO tools" are used by MWD engineers to survey and receive data "from down hole."  (Dkt. # 150-2 at 325.)

purchases for the performance of IC DD's job of overseeing the direction of drill at a well.  (See Dkt. # 150-2 at 216, 256, 291–293.)

On the evidence presented to the Court in regard to this factor, the Court finds that Plaintiffs' investment in the job at hand is significantly less than Premier's investment in the same.  Accordingly, this factor favors a finding of employee status.

### 3.   Opportunity for Profit and Loss

The profit and loss factor favors independent contractor status when the alleged employee has significant influence over his opportunity for profit and loss.  Where the worker can control his own costs and has the responsibility of pursuing consistent work, the opportunity for profit and loss is greater.  Thibault, 612 F.3d at 848; Carrell, 989 F.2d at 333–34.  However, when the alleged employer exerts such significant control over the worker's schedule that doing other paid work is practically impossible, the worker's control over profit and loss is limited.  Cromwell, 348 F. App'x at 61.  Similarly, a fixed, nonnegotiable, hourly rate that is not subject to a bidding or proposal process constrains the worker's opportunity for profit and loss.  Thibault, 612 F.3d at 848; Carrell, 998 F.2d at 333.

In Carrell, the Fifth Circuit found the fact that the defendant controlled the welders' hours of work and hourly rate was indicative of the

defendant's control over the welders' profits.  <u>Carrell</u>, 998 F.2d at 333–34.

However, the <u>Carrell</u> Court also recognized that, other factors, such as the fact that

welders could control their own costs and worked for other companies suggested

the plaintiffs retained the opportunity to control their profits and losses.  <u>Id.</u>

    In support of independent contractor status for this factor, Premier

contends that Plaintiffs could demand more money for their work or offer a

discount, with rates ranging from $425 to $1,500 per day.  (Dkt. # 163 at 18.)

Premier also argues that Plaintiffs' own tax returns demonstrate that only they

could control their costs.  (<u>Id.</u> at 18–19.)  For instance, Premier asserts that

Plaintiffs determined what vehicles and tools they used, what protective gear and

office supplies they bought, their food and entertainment costs, what insurance

they obtained, and what cell phone and internet costs they incurred.  (<u>Id.</u> at 19.)

Premier also contends that Plaintiffs earned income separate from their work at

Premier, including one Plaintiff operating a goat farm, and two other Plaintiffs

provided directional drilling services to other companies.  (<u>Id.</u>)  Additionally,

Premier asserts that Plaintiffs had significant control over their work schedules,

which allowed them to take weeks off between jobs.  (<u>Id.</u>)

    Plaintiffs, on the other hand, contend that Premier controlled every

aspect of an IC DD's profit or loss.  (Dkt. # 175 at 19.)  Plaintiffs assert that

Premier unilaterally decided to pay an IC DD a day rate regardless of the number

of hours worked, not a salary.  (Id.)  Plaintiffs argue that they were required by Premier to work twelve hours a day, just like Premier's employee DDs.  (Id.) According to Plaintiffs, they were not able to negotiate their rates of pay, nor turn down a job.  (Id.)  Additionally, Plaintiffs argue that Premier did not share its profits or losses with IC DDs, and that the IC DDs did not have to return any pay if a job was completed in less time than anticipated.  (Id.)  Plaintiffs also argue that they could not subcontract out their work at Premier.  (Id.)  Plaintiffs also rely on their Consultant Agreement with Premier, which prohibited them from marketing themselves out and bringing in other business.  (Id. at 20.)  Plaintiffs also dispute that a plaintiff's goat farming hobby and the other two plaintiffs' consulting businesses are proof of independent contractor status for this factor.  (Id.)  They assert that goat farming was a hobby for that plaintiff, and the other two plaintiffs' business expenditures for consulting businesses are natural consequences of being classified as an independent contractor by Premier.  (Id.)

The record in this case indicates that Premier, and not Plaintiffs, determined how much each IC DD would be paid for their daily rate.  (Dkt. # 149-1 at 315–16.)  And, although an IC DD could ask for a higher rate of daily pay, they generally could not negotiate their daily rate.  (Id. at 314.)  Additionally, Premier required IC DDs to work a twelve-hour shift.  (Id. at 201–02.)  Thus, it appears that Premier had near complete control over Plaintiffs' pay and schedule.

The record also indicates that when Plaintiffs were called for work by Premier, they generally did not turn work down for fear they would not be called back for additional jobs.  (Id. at 282–83.)  And, although they often had time off between jobs and may have had other drilling work, the evidence of Plaintiffs' tax returns does not sufficiently demonstrate a true ability to control their profits and losses separate from their work with Premier.  Accordingly, the Court finds that during the time that Plaintiffs worked for Premier, the company paid them a nonnegotiable daily rate and controlled the number of hours that they worked, "severely limiting any opportunity for profit or loss."  Cromwell, 348 F. App'x at 61.  Thus, this factor weighs in favor of employee status.

### 4.   Skill and Initiative

When weighing this factor, courts consider the initiative needed in both daily tasks and in the long-term success of the worker, as well as the amount of skill required for the actual tasks the worker performs.  When a worker is assigned daily tasks with limited discretion, this factor indicates employee status. Cromwell, 348 F. App'x at 61; Carrell, 998 F.2d at 333.  On the other hand, where a worker's success depends on taking the initiative to find consistent work, this factor favors independent contractor status.  Thibault, 612 F.3d at 847; Carrell, 998 F.2d at 333.  Similarly, the more specialized the skills needed by the worker, the

more likely the worker is properly considered an independent contractor.  See Carrell, 998 F.2d at 333.

Premier contends that Plaintiffs' work was highly specialized, and Plaintiffs were experts in directional drilling who could come in on a project and give advice to an operator on how best to use equipment to achieve a smooth wellbore that hits the ideal zone.  (Dkt. # 163 at 13.)  Premier argues that Plaintiffs achieved this specialized training through on-the-job training and years of experience.  (Id. at 14.)

Plaintiffs, on the other hand, argue that there are no differences from IC DDs and employee DDs who worked for Premier.  (Dkt. # 175 at 10.)  Plaintiffs contend that they both had the same skills and training levels and that they were both supervised by Premier's DD Coordinators.  (Id.)  In support, Plaintiffs rely on deposition testimony from Premier's management employees, who concede that there are no appreciable differences in the skill set and the work performed on the job between employee DDs and IC DDs.  (Dkt. # 150-2 at 212, 253–54.)

Here, there is no dispute that Plaintiffs, as IC DDs, are highly skilled individuals who performed their directional drilling tasks using their own discretion, thus favoring a finding of independent contractor status.  Nevertheless, there does not appear to be any appreciable differences between IC DDs and those

DDs employed by Premier.  Thus, the Court finds this factor neutral in the

economic reality analysis.

### 5.    Permanency of the Relationship

This factor considers the length of time the alleged employee worked

for the employer, the basis on which the worker is hired, and the exclusivity of the

work.  The longer a worker remains exclusively at one company, the more likely

the worker is an employee.  Cromwell, 348 F. App'x at 61 (holding that splicers

who worked exclusively at one company for eleven months were employees);

Carrell, 998 F.2d at 332 (finding welders who worked from three weeks to sixteen

weeks per year and frequently moved between jobs were independent contractors);

Robicheaux, 697 F.2d at 666 (classifying welders who worked from ten months to

three years almost exclusively for one company as employees).  Additionally,

workers hired on a project-by-project basis are much more likely independent

contractors than those hired on an ongoing basis.  Compare Thibault, 612 F.3d at

846 (finding independent contractor status where the plaintiff worked for

defendant on a single project), and Carrell, 998 F.2d at 332 (finding independent

contractor status where the defendant "hired the Welders on a project-by-project

basis, but made an effort to move the Welders to subsequent projects") with

Cromwell, 348 F. App'x at 60 (finding employee status where the plaintiffs did not

have a "temporary, project-by-project, on-again-off-again relationship with the purported employers").

Premier argues that Plaintiffs' work was short-term and only on a project-by-project basis.  (Dkt. # 173 at 11.)  Premier contends that Plaintiffs (1) often had weeks off between projects; (2) were free to accept or decline projects; (3) were not guaranteed future work; (4) could find their own replacement; and (5) controlled their own schedule by choosing which jobs they would accept.  (Id. at 11–12.)  Premier also asserts that Plaintiffs could do other work between Premier projects, including work for Premier's competitors.  (Id. at 12.)

In response, Plaintiffs contend that Premier engaged them in long-term work, and that only one Plaintiff worked less than six months for Premier.  (Dkt. # 175 at 22.)  Plaintiffs also assert that their breaks in time between jobs with Premier are consistent with the employee DDs as well as the industry standards for this type of employment.  (Id.)

The deposition testimony on record in this case indicates varying dates for each Plaintiff in regard to the time span that they performed work as an IC DD for Premier.  One plaintiff did work at Premier from 2012 until March 2015, or approximately three years.  (Dkt. # 174-5 at 3–4.)  However, three other plaintiffs in this case did work for Premier for, respectively (1) two months (Dkt.

# 174-10 at 6), (2) seven months (Dkt. # 174-11 at 14), and (3) ten months (Dkt. # 174-12 at 18–19).  Additionally, the remaining plaintiff in this case worked for Premier for only four days.  (Dkt. # 174-19.)

A line of cases from the Fifth Circuit has suggested that, where a plaintiff works for a defendant for ten months, the engagement begins to resemble an employment relationship.  Robicheaux, 697 F.2d at 666 (characterizing relationships between plaintiffs and defendant which spanned from ten months to three years as lasting a "substantial period of time"); see also Lindsley, 401 F. App'x at 946 (noting that the Cromwell splicers worked for their employers for eleven months, similar to the Robicheaux welders who worked for the employer for periods ranging from ten months to three years, and unlike the Carrell welders who worked annually for the contractor for three to sixteen weeks, and the Thibault splicers who worked for the contractor for approximately three months).  While the Court notes that the length of the relationship cannot resolve the entire inquiry for this factor, the Court cannot agree that it does not bear any relevance.  Indeed, the Fifth Circuit has repeatedly mentioned the length of the relationship as an important consideration, and used it to distinguish cases from each other.  See, e.g., Lindsley, 401 F. App'x at 946 (noting that "[s]imilar to Thibault, Lindsley worked for Parker for approximately three months, unlike the eleven month employment in Cromwell"); Cromwell, 348 F. App'x at 60 (pointing out that

"[t]he plaintiffs in this case worked full-time exclusively for the defendants for approximately eleven months, within the time range that the <u>Robicheaux</u> welders had worked for the defendant in that case.").  Here, only two of the five Plaintiffs worked at Premier for at least ten months, a time within the range that the Fifth Circuit has previously found indicative of employee status.

Given the overall short length of time the Plaintiffs in this case worked for Premier—and the fact that one plaintiff only worked four days for Premier—the Court finds this factor weighs in favor of independent contractor status.

### 6.   Other Factors

Premier urges the Court to consider other factors, including (1) that each Plaintiff signed an express agreement with Premier acknowledging their status as an independent contractor; (2) the industry custom and standard; and (3) the fact that Plaintiffs, as highly-compensated workers, are not the workers the FLSA is designed to protect.  (Dkt. # 163 at 20–21.)

### i.   Express Agreement

The Fifth Circuit has instructed that "[t]he contractual designation of the worker as independent contractor is not necessarily controlling."  <u>Thibault</u>, 612 F.3d at 845–46 (citing <u>Hopkins</u>, 545 F.3d at 346).  "Subjective beliefs cannot transmogrify objective economic realities.  A person's subjective opinion that he is

a businessman rather than an employee does not change his status." <u>Hopkins</u>, 545

F.3d at 346 (quoting <u>Mr. W Fireworks</u>, 814 F.2d at 1049).  Additionally, "facile

labels . . . are only relevant to the extent that they mirror economic reality."  <u>Id.</u>

Given this guidance from the Fifth Circuit, the Court will not rely on Plaintiffs'

contractual agreement with Premier to prove independent contractor status.

ii.   <u>Industry Standard</u>

Premier contends that it is customary in the industry for certain kinds

of workers to be independent contractors.  (Dkt. # 163 at 20.)  Premier argues that

fluctuations in the oilfield industry, combined with the high level of skill required

to do the kind of directional drilling that Premier's customers engage in, makes it

necessary for oilfield companies like Premier to have the flexibility to hire

independent contractors.

"Case law is somewhat sparse and inconsistent with respect to

whether industry custom or standard may be considered in determining whether

individuals are independent contractors or employees under the FLSA."  <u>Mack v.</u>

<u>Talasek</u>, 2012 WL 1067398, at *8 (S.D. Tex. Mar. 28, 2012) (citing <u>Mid–</u>

<u>Continent Cas. Co. v. Davis</u>, 2011 WL 13727, *4 (N.D. Tex. Jan. 3, 2011)

(recognizing that industry standard was to treat members of framing crew as

independent contractors, and "[p]ursuant to the industry standard . . . [alleged

employer did] not have control over whether the crew members work[ed] for other

25

framing crews or even r[a]n their own framing business."); Tr. of Mich. Reg. Council of Carpenters Emp. Benefits Fund v. Fox Bros. Co., 2005 WL 3579173, *6 (E.D. Mich. Dec. 27, 2005) (fact that method of payment was according to industry standard supported a finding that plaintiffs were independent contractors); but see Caballero v. Archer, 2007 WL 628755, *4 (W.D. Tex. Feb. 1, 2007) (expert's interpretation of industry standards was "not relevant to the legal standards for determining an employer/employee relationship"); Gate Guard Servs. L.P. v. Solis, 2013 WL 593418, at *12 (S.D. Tex. Feb. 13, 2013).  However, the Fifth Circuit has stated that "courts must make allowances for those operational characteristics that are unique or intrinsic to the particular business or industry, and to the workers they employ."  Mr. W Fireworks, 814 F.2d at 1054 (referring to seasonal nature of firework stands).

   While the Court recognizes that, due to the nature of oilfield work, it may be industry standard to employ some workers as independent contractors, the fact that here directional drillers were employed both as employees and as independent contractors cuts against Premier's argument.  Furthermore, deposition testimony from Premier's management indicates that there are no appreciable differences between the two.  (See Dkt. # 150-2 at 212, 253–54.)  Thus, the Court's consideration of industry standard does not support Premier's argument that Plaintiffs' were independent contractors.

### iii.   FLSA's Purpose

Premier also contends that the Court should consider that Plaintiffs are not the sort of low-wage employees the FLSA is designed to protect.  (Dkt. # 163 at 21.)  Indeed, the Fifth Circuit recognized in Usery v. Pilgrim Equipment Co., Inc., the purpose of the FLSA "is to 'eliminate low wages and long hours' and 'free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers.'"  527 F.2d 1308, 1311 (5th Cir. 1976) (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 727 (1947)).  Nevertheless, as Plaintiffs point out, the Supreme Court has held that "employees are not to be deprived of the benefits of the Act simply because they are well paid or because they are represented by strong bargaining agents.  This may in some instances require certain modifications and adjustments in existing customs and contracts in order to include all the hours actually worked in the statutory workweek or to compensate at the proper rate for all of such labor."  Jewell Ridge Coal Corp. v. Local No. 6167 United Mine Workers of Am., 325 U.S. 161, 167–68 (1945).  Accordingly, while it is true that Plaintiffs are not low-wage workers, given the Supreme Court's instruction on the application of the FLSA, the Court will find this factor neutral in the analysis.

27

D.    Conclusion

The Court's consideration of employee status is very fact dependent, and here, "as with most employee-status cases, there are facts pointing in both directions." Herman v. Express Sixty-Minutes Delivery Serv., Inc., 161 F.3d 299, 305 (5th Cir. 1998).  Upon review of the factors discussed above, the Court finds that Plaintiffs were employees of Premier, and not independent contractors.  Cf. Faulkner v. Patterson-UTI Drilling Co. LLC, 2014 WL 12567150, at *6 (E.D. Tex. Jan. 30, 2014).  While there are certainly facts supporting the classification of Plaintiffs as independent contractors, the fact that employee DDs and IC DDs were treated the same, and supervised in the same manner, with no appreciable differences other than how they were compensated, factors most heavily in the Court's analysis here.  Accordingly, the Court will **DENY** Premier's motion for summary judgment on this issue.

II.    Plaintiffs' Objections and Motions to Strike

Plaintiffs filed objections to, and motions to strike, (1) Premier's statement of undisputed facts, and (2) certain affidavit testimony.  (Dkts. ## 170, 172.)  The Court has considered both the evidence and facts proffered by Premier, and Plaintiffs' objections, and to the extent the Court has regarded portions of the evidence and facts as relevant, admissible, and necessary to the resolution of particular summary judgment issues, it hereby **OVERRULES** the evidentiary

objections and **DENIES** the motions to strike. To the extent the Court has not relied on other evidence or facts about which Plaintiffs' complain, the remaining objections and motions to strike are **DENIED AS MOOT**.

### III.   Plaintiffs' Motion for Summary Judgment

Plaintiffs filed their own motion for summary judgment on (1) their status as employees of Premier; (2) back wages owed to them under the FLSA; and (3) Premier's good faith defense.  (Dkt. # 150.)  Because the Court has already determined above that Plaintiffs were employees of Premier for FLSA purposes, the Court will **GRANT** Plaintiffs' motion as to this issue.  Thus, the Court will only address Plaintiffs' motion for summary judgment as to their alleged back wages and Premier's good faith defense.

### A.   Applicable Law

A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact," and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enters., L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. See Fed. R. Civ. P. 56(c); Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary

judgment." <u>United States v. Renda Marine, Inc.</u>, 667 F.3d 651, 655 (5th Cir. 2012)

(quoting <u>Brown v. City of Hous.</u>, 337 F.3d 539, 541 (5th Cir. 2003)).

      B.    <u>Fair Labor Standards Act</u>

      The Fair Labor Standards Act, 29 U.S.C. § 201, <u>et seq.</u> ("FLSA"),

mandates that "no employer may employ any non-exempt employee 'for a

workweek longer than forty hours unless such employee receives compensation for

his employment in excess of the hours above specified at a rate not less than one

and one-half times the regular rate at which he is employed.'" <u>Garcia v. U Pull It</u>

<u>Auto & Truck Salvage, Inc.</u>, No. 16-10257, 2016 WL 49326173, at *2 (5th Cir.

Sep. 15, 2016) (quoting 29 U.S.C. § 207(a)(1)).  In other words, the FLSA

"requires employers to provide overtime pay to any employee who works more

than forty hours per week unless an exemption from this protection applies."

<u>Halle v. Galliano Marine Serv., L.L.C.</u>, No. 16-30558, 2017 WL 1399697, at *2

(5th Cir. Apr. 19, 2017) (citing 29 U.S.C. §§ 207, 213).

      An employee who brings a FLSA action for unpaid overtime

compensation must demonstrate, by a preponderance of the evidence: "(1) that

there existed an employer-employee relationship during the unpaid overtime

periods claimed; (2) that the employee engaged in activities within the coverage of

the FLSA; (3) that the employer violated the FLSA's overtime wage requirements;

and (4) the amount of overtime compensation due."  Johnson v. Heckmann Water

Resources (CVR), Inc., 758 F.3d 627, 630 (5th Cir. 2014).

 Once the employee establishes his prima facie case, the burden shifts

to the employer to either (1) show evidence of the precise amount of work

performed or (2) negate the reasonableness of the inference to be made from the

employee's evidence.  Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 441

(5th Cir. 2005) (quoting Anderson v. Mount Clemens Pottery Co., 328 U.S. 680,

687-88 (1946)) (internal quotations omitted).

 C. Back Wages

 Plaintiffs move for summary judgment on (1) the number of hours

they worked in each workweek, (2) their rate of pay for each workweek; and

(3) the amount of back wages owed by Premier.  (Dkt. # 150 at 22.)  Plaintiffs

contend that, as misclassified employees, they are entitled to back wages in an

amount of $181,711.00.  (Dkt. # 150 at 20–22.)  In response, Premier apparently

does not dispute that Plaintiffs, if classified by the Court as employees pursuant to

the FLSA, are entitled to back wages.[4]  (See Dkt. # 174 at 21.)  Instead, Premier

takes issue with Plaintiffs' calculation of back wages, arguing that Plaintiffs'

---

[4] Premier's only argument is that "[b]ecause summary judgment should be denied
as to Plaintiffs' underlying claims, summary judgment as to damages should also
be denied."  (Dkt. # 174 at 21 n.89.)

calculation does not include any underlying data in support of how they arrived at their calculation of back wages owed.  (Id. at 21 n.89.)

The FLSA requires employers to provide non-salaried workers "extra half-time pay at the employees' regular rate for all hours worked in excess of 40" per workweek.  29 C.F.R. § 778.112.  Meaning, if an employee makes $10/hr as his regular rate, for every hour over forty that the employee shall make the normal $10, plus an additional half-time pay computed as follows:  Regular Rate/2 = half time pay, for a total of $15/hr for all hours over 40 hours per week.  However, 29 C.F.R. § 778.309 provides that if an "employee works a regular fixed number of hours in excess of the statutory maximum each work week, it is, of course, proper to pay him, in addition to his compensation for non-overtime hours, a fixed sum in any such week for his overtime work, determined by multiplying his overtime rate by the number of overtime hours regularly worked."

Notably, only hours that are spent on tasks that the employee is "employed to perform" are compensable.  Integrity Staffing Solutions, Inc. v. Busk, 135 S.Ct. 513, 519 (2014).  Compensable activities are those activities that are "integral and indispensable" to an employee's "principal activity or activities." Id. at 217.  Likewise, it excludes preliminary and postliminary activities that employees might engage in to get ready for or finish up their work.  Id.

For purposes of calculating the overtime payment, the "regular rate" must be known such that a proper half time payment can be calculated.  A regular rate shall "include all remuneration for employment paid to, or on behalf of the employee."  29 C.F.R. § 778.200.  The statute carves out an exception for "payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause; . . . and other similar payments to an employee which are not made as compensation for his hours of employment[.]"  29 C.F.R. § 778.200(2).

In support of their claim for back wages, Plaintiffs include as evidence a summary chart which purports to list the total amount of overtime wages owed to each of the five plaintiffs, for a grand total of $181,711.  (Dkt. # 194-44.)  In arriving at this calculation, Plaintiffs cite evidence of Premier's own records, which indicate the compensation rates paid to each Plaintiff and the number of days a Plaintiff worked in each pay period.  (Dkt. # 150 at 21.)  In regard to the number of hours each Plaintiff worked each day, Plaintiffs assert that Premier failed to keep hourly records of this time.  (Id. at 22.)  In such case, Plaintiffs urge the Court to consider the deposition testimony of Premier's employees, who state that DDs like Plaintiffs typically work "12 hours on, 12 hours off."  (Dkt. # 150-2 at 201–02.)  According to Plaintiffs, using Premier's 12-hour per day assumption, Plaintiffs calculated the total remuneration in each week and divided that by the

number of hours worked in the week to find the regular rate of pay.  (Dkt. # 150 at

22.)  Thus, Plaintiffs applied half time for overtime calculation described in FLSA

regulations to determine their claimed back wages total of $181,711.00.  (Id.)

   In addition to their summary chart, Plaintiffs have also provided as

evidence, Plaintiffs' pay stubs and invoices for their work with Premier.  (Dkts.

## 149-30–34.)  Additionally, Plaintiffs' attorney has declared that "[i]n order to

arrive at the damage calculations, the total weekly compensation was divided by

total hours worked each week, assuming each Plaintiff worked 12 hours per day.

This yielded the regular rate.  The regular hourly rate was then multiplied by .5 and

then by the number of overtime hours worked in each week to determine

backwages."  (Dkt. # 149-45 at 2–3.)

   The Fifth Circuit has instructed that when an employer has failed to

keep adequate records, "an employee has met h[is] requisite burden of proof 'if he

proves that he has in fact performed work for which he was improperly

compensated and if he produces sufficient evidence to show the amount and extent

of that work as a matter of just and reasonable inference."  Harvill v. Westward

Commc'ns, LLC, 433 F.3d 428, 441 (5th Cir. 2005) (quoting Sanderson v. Mount

Clemens Pottery Co., 328 U.S. 680, 687–88 (1946)).  "The burden shifts to the

employer to come forward with evidence of the precise amount of work performed

or with evidence to negative the reasonableness of the inference to be drawn from

the employee's evidence."  Id.  If the employer fails to produce such evidence, the

court may then award damages to the employee even though the result may only be

approximate.'"  Id.

On this record, without any competent controverting evidence on the

matter of whether Plaintiffs were adequately compensated for their time worked or

evidence negating Plaintiffs' calculation as a matter of just and reasonable

inference, the Court finds Plaintiffs' evidence sufficient, even if only approximate,

to grant summary judgment on this issue.  Plaintiffs are entitled to back wages in

the amount of $181,711.00.  (See Dkt. # 149-44.)

D.  Good Faith Defense

Plaintiffs also move for summary judgment on Premier's good faith

defense to the overtime violations.  (Dkt. # 150 at 23.)  Plaintiffs contend that

Premier cannot meet its burden of demonstrating that it had both subjective good

faith and an objectively reasonable basis for Plaintiffs' compensation rate.  (Id.)

Premier responds that liquidated damages should be eliminated in this case because

it acted in good faith and had reasonable grounds to believe it properly classified

Plaintiffs.  (Dkt. # 174 at 21.)

Under the FLSA, an employer who violates the overtime provisions is

liable not only for the unpaid overtime compensation, but also for "an additional

equal amount as liquidated damages."  29 U.S.C. § 216(b).  Liquidated damages in

this context are compensatory, not punitive; they "constitute[ ] compensation for the retention of a work[er]'s pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 (1945).

The Court can decline to award such damages, or reduce the amount awarded, if the Court concludes the employer acted in "good faith" and had "reasonable grounds" to believe its actions complied with the FLSA. 29 U.S.C. § 260. An employer, however, "faces a substantial burden of demonstrating good faith and a reasonable belief that its actions did not violate the FLSA." Singer v. City of Waco, 324 F.3d 813, 823 (5th Cir. 2003) (internal quotes omitted) (quoting Bernard v. IBP, Inc., 154 F.3d 259, 267 (5th Cir. 1998)). A finding the employer did not act willfully is not sufficient to establish it acted in good faith. Reich v. S. New England Telecomms. Corp., 121 F.3d 58, 71 (2d Cir. 1997) (citing Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 909 (3d Cir. 1991)). Additionally, even if Court determines the employer acted in good faith and with a reasonable belief its actions were legal, the court may nevertheless award liquidated damages. Bernard, 154 F.3d at 267 (citing Lee v. Coahoma Cnty., 937 F.2d 220, 226 (5th Cir. 1991)).

Good faith is a subjective component under which the employer must show that it "had an honest intention to ascertain what the Act requires and to act in accordance with it." Dybach v. State of Fla. Dept. of Corrections, 942 F.2d 1562, 1566 (11th Cir. 1991) (internal citations omitted). "[G]ood faith requires some duty to investigate potential liability under the FLSA." Barcellona v. Tiffany English Pub, Inc., 597 F.2d 464, 468–469 (5th Cir. 1979). Furthermore, good faith requires that an employer take "active steps" to ascertain and comply with the FLSA. Reich, 121 F.3d at 71. However, reasonableness is an objective component. Yourman v. Dinkins, 865 F. Supp. 154, 162 (S.D.N.Y. 1994), aff'd, 84 F.3d 655 (2d Cir. 1996). An employer may not rely on ignorance alone as reasonable grounds for believing that it did not violate the FLSA. Barcellona, 597 F.2d at 468–469. However, the ambiguity of the regulation and the closeness of the question may also be considered by courts in determining whether to impose liquidated damages. Brock v. Claridge Hotel and Casino, 846 F.2d 180 (3d Cir. 1988).

Premier contends that it considered Plaintiffs to be independent contractors based on (1) its analysis of Plaintiffs' relationship to the company, (2) Plaintiffs' representation that they were in business for themselves, (3) a survey of similar oilfield companies to establish industry standards, and (4) advice of legal counsel. (Dkt. # 174 at 21.) Premier contends that while it did not seek the advice

of legal counsel until after Plaintiffs' counsel first sued Premier in 2015, it thereafter relied on counsel's advice, and thus it is relevant to the Court's consideration of good faith.  (Id. at 21 n. 88.)

Despite Premier's assertion, the Court finds that it has not met its substantial burden of showing that it's "failure to obey the statute was in good faith." Nero v. Indus. Molding Corp., 167 F.3d 921, 928 (5th Cir. 1999).  The record in this case indicates that Premier's managerial employees did not know or seek to find out about the FLSA's overtime requirements when classifying its directional drillers (Dkt. # 150-2 at 124–25, 221–23, 228–35). See Barcellona, 597 F.2d at 468–469.  Additionally, they did not undergo any FLSA training.  (Dkt. # 150-2 at 87–88, 211–12.)  And, while Premier contends that it relied on the advice of counsel, this reliance did not occur—by Premier's own admission—until 2015, or sometime after the plaintiffs in this case worked for Premier, or after the daily rate for independent contractors was established.  (Id. at 21 n.88; Dkt. # 150-2 at 11.)

Furthermore, regarding Premier's reliance on industry standard to prove good faith, Plaintiffs have produced evidence that Premier's Chief Executive Officer previously worked for a company that was sued for misclassification of oilfield independent contractors, and who Plaintiffs contend were eventually reclassified as employees.  (Dkt. # 150-2 at 117–18, 128, 129–30.)  Accordingly,

because the Court finds that Premier has failed to produce sufficient evidence that it took active steps in investigating or complying with the FLSA's requirements, the Court will award Plaintiffs' request for liquidated damages in an amount of $181,711.00.  (See Dkt. # 149-44.)

E.     Conclusion

Based on the foregoing, the Court will **GRANT** Plaintiffs' motion for summary judgment, and will award to Plaintiffs an amount of $363,422.00 in damages ($181,711.00 in compensatory damages and $181,711.00 in liquidated damages) for Premier's violation of the FLSA.

IV.   Premier's Motion to Strike

Premier moves to strike the new evidence filed by Plaintiffs in their reply to their motion for summary judgment.  (Dkt. # 187.)  Premier argues that Plaintiffs inclusion of new evidence and a new argument raised for the first time in its reply is impermissible.  (Id.)  The new evidence consists of a resume of a DD Coordinator, as well as an email dated July 10, 2014.  (Dkt. # 179-1, Dkt. # 179-2.)

The Court will **DENY AS MOOT** Premier's motion to strike.  The Court did not rely on Plaintiffs' new evidence or new argument raised for the first time in their reply brief.  Plaintiffs rely on the new evidence, and make a new argument, in support of their contention that they were improperly classified as independent contractors.  (See Dkt. # 179 at 8–9.)  However, as stated above, the

Court already determined that Plaintiffs were employees of Premier for FLSA purposes in considering Premier's motion on this issue, and thus made the determination prior to ruling on Plaintiffs' motion for summary judgment. Accordingly, the Court did not need to consider any additional evidence or argument submitted by Plaintiffs in their reply.  Accordingly, the Court **DENIES AS MOOT** Premier's motion to strike.  (Dkt. # 187.)

<u>CONCLUSION</u>

Based on the foregoing, the Court (1) **DENIES** Premier's Motion for Summary Judgment as to all Plaintiffs (Dkt. # 163); (2) **GRANTS** Plaintiffs' Motion for Summary Judgment as to Employee Status, Liability/Backwages, and Premier's Good Faith Defense (Dkt. # 150); (3) **OVERRULES IN PART**, **DENIES IN PART**, and **DENIES AS MOOT IN PART** Parrish's Objections to, and Motion to Strike, Premier's Improper Affidavit Testimony (Dkt. # 170), and Parrish's Objections to, and Motion to Strike, Premier's Statement of Undisputed Facts (Dkt. # 172); and (5) **DENIES AS MOOT** Premier's Motion to Strike Plaintiff's New Evidence on Reply (Dkt. # 187).  Plaintiffs are awarded an amount of $363,422.00 in damages ($181,711.00 in compensatory damages and $181,711.00 in liquidated damages) for Premier's violation of the FLSA.

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, November 27, 2017.

_____
David Alan Ezra
Senior United States Distict Judge